**AK STEEL CORP. Plaintiff**

v.

**SOLLAC & UGINE Defendants**

No. C–1–98–690, C–1–98–804.

United States District Court,
S.D.Ohio,
Western Division.

July 30, 2002.

David E. Schmit, Ann G. Robinson, Frost, Brown, Todd, LLC, Cincinnati, OH,

John J. Kuzman, Jr., AK Steel Corporation, Middletown, OH, for AK Steel Corp.

Steven E. Lipman, J.P. Lavelleye, Steven P. Weihrouch, Stephen G. Baxter, Michael E. McCabe, Jr., Clayton W. Thompson, II, Oblon, Spivak, McClelland, Maier & Neustadt, P.C., Arlington, VA, Gregory A. Ruehlmann, David A. Pepper, Squire, Sanders & Dempsey, L.L.P., Cincinnati, OH, Edward A. Geltman, James V. Dick, James P. Wehner, Squire, Sanders & Dempsey, Washington, DC, for Ugine, Sollac.

Don W. Martens, Knobbe Martens Olson & Bear, Newport Beach, CA, pro se.

## ORDER

DLOTT, District Judge.

This matter comes before the Court on the Report and Recommendation of Special Master (doc. # 188) [1] (the "Hardy Recommendation") and the Report and Recommended Decisions of Special Master Regarding Defendants' and Plaintiff's Motions for Summary Judgment (doc. # 201) (the "Martens Recommendation").

## I. THE RECOMMENDATIONS

The Hardy Recommendation and the Martens Recommendation lay out in great detail the facts of these cases. The Court will rely on those factual summaries and present only those facts necessary to its analysis.

The Hardy Recommendation addresses Plaintiff AK Steel's Motion To Compel Discovery Regarding Testing By Defendants' Expert Witness Of Defendants' Furnace Atmosphere. (Doc. # 106.) Plaintiff moved to compel production of the results of gas composition tests conducted on Defendant Sollac's production

---

1. Each relevant document has been filed in both of the enumerated cases. For convenience, documents will be cited according to their docket number in case number C–1–98–690.

line in September, October, and November of 1999. Defendants argued that these results are work product entitled to protection under Federal Rule of Civil Procedure 26(b)(3). Special Master Hardy examined the relevant documents *in camera* and recommended that Plaintiff's motion be denied.

The Martens Recommendation addresses several summary judgment motions: Defendants' First Motion For Partial Summary Judgment Concerning The Legal Interpretation Of The "At Least About 95% Hydrogen" Patent Claim Terms (doc. # 68), Defendants' Second Motion For Partial Summary Judgment Of Non–Infringement Of The "At Least About 95% Hydrogen" Patent Claims (doc. # 69), Defendants' Third Motion For Partial Summary Judgment Of (i) Non–Infringement, And (ii) Invalidity, Of The Kilbane Patents (doc. # 70), Plaintiff AK Steel's First Motion For Partial Summary Judgment Of Claim Construction (doc. # 107), and Plaintiff AK Steel's Second Motion For Partial Summary Judgment Of Claim Construction (doc. # 108). Special Master Martens's recommendations on these motions would result in granting summary judgment in favor of Defendants on most issues.

The Court will not address every aspect of the recommendations or the parties' objections to those recommendations. Nevertheless, the Court's rulings are based on a *de novo* review of both the Hardy Recommendation and the Martens Recommendation.

## II. ANALYSIS

### A. The Hardy Recommendation

Plaintiff AK Steel Corporation ("AK Steel") argues that Special Master Hardy erred in recommending that the Court deny its motion to compel for three reasons: (1) the gas test results do not reveal the mental impressions, conclusions, opinions, or legal theories of an attorney; (2) AK Steel has a substantial need for the data in preparing its case and cannot obtain the information or its substantial equivalent without undue hardship; and (3) Defendants waived work product protection.

■ AK Steel's first argument misunderstands Rule 26(b)(3). That rule protects from discovery all "documents and tangible things ... prepared in anticipation of litigation or for trial" absent a showing of substantial need and undue hardship. Fed.R.Civ.P. 26(b)(3). It also provides additional protection against disclosure "of the mental impressions, conclusions, opinions, or legal theories of an attorney." *See Upjohn Co. v. United States*, 449 U.S. 383, 400, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981) ("Rule 26 accords special protection to work product revealing the attorney's mental processes."). The Special Master correctly found that the requested documents were "prepared in anticipation of litigation or for trial" and therefore entitled to at least qualified protection under Rule 26(b)(3). Therefore, whether or not the test data reveal mental impressions of Defendants' attorneys,[2] Plaintiff must nevertheless show at least substantial need and undue hardship in order to pierce work product protection.

■ AK Steel next contends that the Special Master erred because AK Steel has substantial need for the test data and

---

**2.** The Special Master noted that the data "could reflect opinions and mental impressions of counsel." (Doc. # 188 at 3.) If so, it would be entitled to even greater protection. However, the Special Master did not so conclude, and, given AK Steel's failure to show undue hardship, a finding on the question is unnecessary.

obtaining its substantial equivalent would require undue hardship. In his recommendation, the Special Master assumed that AK Steel had substantial need for the results, but found that AK Steel had not shown that obtaining its own data would require undue hardship. AK Steel asserts undue hardship on two bases: (a) Defendants prevented Plaintiff from performing its own tests during its first Rule 34 visit to Defendants' plant and continue to deny Plaintiff access to the plant for testing; and (b) even if Plaintiff had access to the line, its employees do not have sufficient expertise to conduct their own tests.

Both arguments fail because AK Steel has not shown that it has sufficiently exhausted its normal discovery remedies. While accusing Defendants of failing to cooperate during its first Rule 34 visit to Sollac's plant in December 1999, AK Steel has never noticed another Rule 34 examination of the plant, nor has it moved for an order compelling Defendants to comply with its initial Rule 34 notice. Consequently, Plaintiff has not shown that Defendants would not allow it access to the relevant production line, or that Sollac's personnel, who have the expertise to aid AK Steel in conducting the necessary tests, would be unwilling to do so. Furthermore, it would effectively nullify the work product privilege to force Defendants to turn over their work product when Plaintiff did not fully pursue its rights during discovery.

■ Finally, AK Steel argues that the Special Master erred when he found that Defendants did not waive work product protection of the documents. Plaintiff asserts that Defendants waived Rule 26(b)(3) protection in two ways: (a) by submitting an expert report based on the test data with its second motion for summary judgment; and (b) by eliciting expert opinion testimony in deposition about tests conducted prior to December 1999. AK Steel's first argument is legally accurate in that Defendants may not assert work product protection for the test data and then use that data as evidence. *Cf. United States v. Nobles*, 422 U.S. 225, 239–40, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975) (respondent's decision to call investigator to testify at trial waived work product protection with respect to matters covered in the testimony). But Plaintiff is wrong on the facts. The expert report at issue relied solely on the December 1999 tests, and the results of that test were already disclosed by Defendants. (*See* Doc. # 69 exh. 39.)[3]

■ Plaintiff's second argument-that Mr. Varroy's testimony waived any work product protection as to its subject matter-also lacks merit. Plaintiff incorrectly asserts that *United States v. Nobles*, 422 U.S. 225, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975), dictates that Defendants waived work product protection. In *Nobles*, the defendant waived work product protection by calling an investigator at trial whose reports would otherwise have been protected by the work product doctrine. Here, it is true that Defendants' counsel elicited opinion testimony at deposition from its expert, Mr. Varroy, regarding

---

**3.** Plaintiff insinuates that the expert report was implicitly based on the September, October, and November test results because those tests were used by Defendants to calibrate the production line in order to obtain beneficial results in the December test. Therefore, goes Plaintiff's argument, the September, October, and November test results must be disclosed because Defendant put them at issue by using the expert report. Furthermore, now that the line has been altered, the substantial equivalent of the earlier results cannot be obtained by other means without undue hardship. Plaintiff, however, points to no factual support for this theory, and unsubstantiated assertions of wrongdoing are insufficient to abrogate work product protections.

tests that he conducted before December 1999. Defendants, however, have not used this testimony in any way, nor have they designated Mr. Varroy as a testifying expert witness under Federal Rule of Civil Procedure 26(a)(2)(A). As such, Mr. Varroy is a non-testifying expert witness under Federal Rule of Civil Procedure 26(b)(4)(B). The facts known to him and his opinions may not be discovered absent a showing of "exceptional circumstances." Fed.R.Civ.P. 26(b)(4)(B). Just as Plaintiff has not shown undue hardship under Rule 23(b)(3), it also fails to show the "exceptional circumstances" required under Rule 26(b)(4)(B).[4]

## B. The Martens Recommendation

The Court will address three categories of AK Steel's objections to the Martens Recommendation: (1) objections to the finding of lack of enablement of claims 1, 3, 5, and 7 of the '549 patent; (2) objections to the findings of noninfringement of the patent claims involving the composition of the aluminum bath; and (3) objections to the findings of noninfringement of the patent claims involving the composition and location of the protective atmosphere.

### 1. Lack of Enablement

 Special Master Martens found that claims 1, 3, 5, and 7 of the '549 patent were invalid for lack of enablement. (Doc. # 201 at 84–87.) A patent specification is enabling if it discloses sufficient information to allow a person skilled in the art at the time the application was filed to make and use the claimed invention without undue experimentation. *Adang v. Fischhoff*, 286 F.3d 1346, 1355 (Fed.Cir.2002); *see* 35 U.S.C. § 112. "[E]nablement is a question of law ... which may involve subsidiary questions of fact." *In re Epstein*, 32 F.3d 1559, 1568 (Fed.Cir.1994). A patent is presumed to be valid, 35 U.S.C. § 282, and is therefore presumed to satisfy the enablement requirement. Given this presumption, the burden is on Defendants to show lack of enablement by clear and convincing evidence. *Nat'l Recovery Techs., Inc. v. Magnetic Separation Sys., Inc.*, 166 F.3d 1190, 1196 (Fed.Cir.1999).[5]

---

**4.** Plaintiff further argues, as it did before the Special Master, that Defendants waived work product protection by asserting the advice of counsel defense to the claim of willful infringement. Plaintiff's arguments on that point are not new and were properly addressed by the Special Master, but one nonetheless merits brief consideration. AK Steel asserts that the undisclosed test data may show that Sollac's process infringes on AK Steel's patents. If so, AK Steel argues, then Defendants' reliance on their attorney's opinion of noninfringement would have been unreasonable, and Defendants' advice of counsel defense would be untenable. The test data would therefore be relevant to the affirmative defense asserted by Sollac and should be disclosed.

The advice of counsel defense protects only those defendants whose reliance on the advice of their counsel was reasonable *at the time of the infringement. See Hoover Universal Inc. v. Graham Packaging Corp.*, 44 U.S.P.Q.2d 1596,

1598, 1996 WL 907737 (C.D.Cal.1996). Consequently, anything learned by a defendant subsequent to the time of the infringement is irrelevant to the defense. For this reason, courts have found that the advice of counsel defense waives protection only as to work product created *prior* to the beginning of litigation. *See Dunhall Pharms., Inc. v. Discus Dental, Inc.*, 994 F.Supp. 1202, 1205–06 (N.D.Cal.1998). In this case, Plaintiff filed suit in 1998, and the test data was not gathered until September, October, and November of 1999.

**5.** Contrary to Plaintiff's assertion, however, this burden of proof does not translate on summary judgment to a requirement that Defendants "show by clear and convincing evidence that there is no substantial question of material fact that the '549 claims 1, 3, 5, and 7 are invalid." (Doc. # 207 at 22.) Rather, Defendants must show that no reasonable jury would conclude, under a clear and convincing standard, that the claims are valid.

AK Steel first argues that claims 1, 3, 5, and 7 are enabled because the '549 patent discloses at least one claimed enablement-namely, it discloses a steel strip with an aluminum coating containing up to about 0.5% silicon by weight. Plaintiff relies on *Johns Hopkins University v. Cellpro Inc.*, 152 F.3d 1342 (Fed.Cir.1998), for the proposition that "the enablement requirement is met if the description enables any *mode* of making and using the invention." 152 F.3d at 1361 (emphasis added). This argument confuses the different methods of making a claimed product with the full range of products claimed in the patent. This distinction is borne out in *Johns Hopkins*, where the defendant asserted that the plaintiff's patents were not enabled (a) because they did not teach how to make the full range of claimed antibodies and (b) because they did not teach how to make the claimed antibodies using all disclosed alternative methods. The Federal Circuit rejected both arguments, but on different grounds. As to the first argument, the court acknowledged that " '[t]o be enabling, the specification of a patent must teach those skilled in the art how to make and use the full scope of the claimed invention without undue experimentation.' " *Id.* at 1359 (citing *Genentech, Inc. v. Novo Nordisk, A/S*, 108 F.3d 1361, 1365 (Fed.Cir.1997)). It then reviewed the record and found that summary judgment had been appropriately granted to the plaintiff because the patent specifications did teach how to make the full range of claimed antibodies. The Federal Circuit then found the second argument to be legally irrelevant, because a patent need not teach how to make the claimed invention using every alternate method disclosed in the patent.

Here, the '549 patent claims stainless steel strips hot-dipped in an aluminum bath containing up to about 10% silicon by weight. The aluminum coating, whether it contains 0.5% or 8.0% silicon by weight, is part of the claimed product. The range of aluminum coatings therefore does not describe alternative methods of creating the same product, but rather indicates the scope of products the patent is meant to claim. Therefore, the patent specification must teach a person of ordinary skill in the art how to coat a stainless steel strip with the full range of coatings.

AK Steel also argues that the Special Master's recommendation on enablement is wrong because claims 1, 3, 5, and 7 of the '549 patent were improperly construed. A patent should be interpreted to preserve its validity. *See Modine Mfg. Co. v. U.S. Int'l Trade Comm'n*, 75 F.3d 1545, 1557 (Fed.Cir.1996). Consequently, according to AK Steel, if the patent specification does not enable an aluminum coating with 10% by weight silicon, the Special Master should construe the language in claims 1, 3, 5, and 7 of the '549 patent to include aluminum coating metals containing up to, *but not including*, 10% silicon by weight.

As the Special Master noted, however, the axiom of preserving validity does not permit the Court to redraft the patent in a manner inconsistent with the intrinsic record. *See McCarty v. Lehigh Valley R. Co.*, 160 U.S. 110, 116, 16 S.Ct. 240, 40 L.Ed. 358 (1895). In rejecting the first application for the '549 patent, the PTO expressed a specific concern that the language used in the initial application-which had called for a "Type 1 aluminum" coating metal-was too vague. The Kilbane specification defined "Type 1 aluminum" as aluminum containing about 10% silicon by weight. In response to the PTO's concern, the patent applicant replaced the phrase "Type 1 aluminum" with language claiming an aluminum coating metal containing "up to about 10% silicon by weight." The Spe-

cial Master found that this substitution shows that the patent applicant intended the "up to about 10% silicon by weight" language to encompass "Type 1 aluminum." Furthermore, claims 3 and 7 are dependent on claims 1 and 5. Independent claims must be interpreted in a manner consistent with their dependant claims. *See Wright Med. Tech., Inc. v. Osteonics Corp.*, 122 F.3d 1440, 1445 (Fed.Cir.1997). Thus, the Special Master found that claims 1 and 5 must be at least as broad in scope as claims 3 and 7, *i.e.* they must also include aluminum coating metals containing up to and including 10% silicon by weight.

AK Steel posits that this analysis is erroneous [6] and asserts two alternate reasons why the change in the claim language does not imply that the '549 patent meant to include Type 1 aluminum coatings: (1) because such a coating arguably did not work at the time of the application; and (2) because if the patent applicant had meant to include Type 1 aluminum, he would have used "about 10% silicon by weight," not "up to about 10% silicon by weight." But Plaintiff's arguments beg certain questions to which AK Steel can provide no answer. If a Type 1 coating did not work, why was it included in the original application? What changed between the original application and the amendment that would justify excluding the only product that the original application was meant to include? These questions underline the conflict between Plaintiff's proposed construction and the prosecution history of the '549 patent. Consequently, even though the Special Master's construction results in the patent's invalidity, the Court adopts it because it is the only one logically consistent with the intrinsic record.

■ Plaintiff next claims that questions of fact remain on the issue of enablement for two reasons: (1) the Special Master wrongly considered documentary and other evidence created after the patent application; and (2) Plaintiff's expert reports create a question of fact. As to the first argument, an invention must be enabled by the patent specification at the time of the patent application, not at the time the patent is challenged. *In re Mott*, 539 F.2d 1291, 1296 (Cust. & Pat.App. 1976). In other words, the issue is what was known by an ordinary person skilled in the art as of the patent application filing date. This does not mean, however, that a court may never look to documentary evidence created at a later date in making its inquiry. It may, so long as that evidence is probative of what was commonly known at the time the patent application was filed.[7]

Plaintiff also argues that its expert evidence is sufficient to create a question of fact as to enablement. Specifically, the Joint Rebuttal Expert Report of Neil Birks and George St. Pierre states, "The

---

6. AK Steel's own analysis of the issue is fundamentally wrong. Specifically, Plaintiff conflates the clear and convincing standard used in determining whether a party has proven lack of enablement with the purely legal analysis involved in claim construction. (Doc. # 207 at 9 ("This analysis is erroneous—there is nothing in the prosecution history to clearly and convincingly show that the applicants intended the substituted language ... to be of the same scope as the original language.").) Claim construction is purely a question of law and does not involve evidentiary burdens. *Catalina Mktg. Int'l, Inc. v. Coolsavings.com. Inc.*, 289 F.3d 801, 807 (Fed.Cir.2002).

7. For instance, the Special Master appropriately noted that Armco records in 1988, well after the patent application filing in 1986, declared coating stainless steel with Type 1 aluminum to be a "discovery." (Doc. # 201 at 88.)

Kilbane patent specification contains information sufficient to enable a person of ordinary skill in the art to practice the inventions claimed, using either Type 1 or Type 2 aluminum, without undue experimentation." (Doc. #207 Exh. 14 at 21.) This statement is followed by a brief analysis of how one with ordinary skill in the art would "fine tun[e]" a process that successfully coats stainless steel with Type 2 aluminum to successfully coat stainless steel with Type 1 aluminum. (*Id.* at 21–24.) The report concludes, "[T]he adjustments that may be required to switch from Type 2 to Type 1 were known, and their effects predictable, based on the information published in the relative field and the Kilbane specification, as of May 20, 1986." (*Id.* at 24.)

■ The Special Master rejected the expert report, finding that the report provided only conclusions without any factual support. The Court agrees.[8] While the report details the chemical reactions involved in the coating process and how one might alter the process to permit coating with Type 1 aluminum, it fails to tell how these alterations would have been known by someone skilled in the art in 1986. Mere conclusions in an expert report are insufficient to support enablement. *See In*

*re Buchner,* 929 F.2d 660, 661 (Fed.Cir. 1991) ("An expert's opinion on the ultimate legal issue [of enablement] must be supported by more than a conclusory statement."). Furthermore, the expert reports contradict the express teachings of the patent specification, which states that Type 1 aluminum does not wet well to stainless steel. A person of ordinary skill in the art cannot be expected simply to ignore the patent specification when attempting to follow the patent. *See Genentech,* 108 F.3d at 1366–68 (holding that expert's opinion on level of ordinary skill in the art fifteen years earlier cannot overcome patent specification and extrinsic evidence showing lack of enablement). This is particularly true where, as here, the plaintiff itself has been unable to make the claimed invention. *See Enzo Biochem, Inc. v. Calgene, Inc.,* 188 F.3d 1362, 1375 (Fed.Cir.1999).

### 2. Noninfringement of Coating Bath Claims

Plaintiff asserts that the Special Master erred in finding that Defendants' product, which bears an aluminum coating containing 8.0—8.5% silicon by weight, does not infringe Plaintiff's patents, which claim aluminum coatings containing up to about

---

8. At the Court's request, Plaintiff filed additional material to provide factual support its expert reports. The additional material falls into three categories: (1) publications indicating that both Type 1 and Type 2 aluminum coatings provide corrosion resistance when coated on steel (doc. #220 exhs. A, B. C); (2) the '214 patent, which teaches that increasing the coating metal temperature may be helpful when the protective atmosphere is insufficiently reducing (*id.* exh. D); and (3) other patents in which both Type 1 and Type 2 aluminum coating metals may be used (*id.* exhs. E, F, G, H). None of this evidence is relevant.

First, the fact that both Type 2 and Type 1 aluminum coatings provide corrosion resistance does not show that one skilled in the art in 1986 would have known *how* to replace the former with the latter in the patented process. Second, the '214 patent does not address the failure of Type 1 aluminum to wet well to stainless steel; rather, it suggests a way to counteract the problem of a protective atmosphere which is insufficiently reducing. Furthermore, the solution proposed in the '214 patent-raising the coating metal temperature-is inconsistent with the admonition earlier in the patent that the coating metal temperature should not exceed 1310°F. Third, the fact that in some situations Type 1 and Type 2 aluminum coatings are interchangeable is no proof that they could be interchanged without undue experimentation in the specific context of the Kilbane patents.

0.5% silicon by weight. Plaintiff argues that Defendants' product infringes their patents both literally and through the doctrine of equivalents.[9]

### a. Literal Infringement

■■■■ Plaintiff argues that if the Special Master had correctly construed the claims in the '214 and '135 patents and claims 2, 4, 6, and 8 of the '549 patent, he would have then found literal infringement of the claims. The '214 and '135 patents call for a coating metal "consisting essentially of aluminum." The Special Master correctly noted that the phrase "consisting essentially of" is a term of art in patent drafting and is meant to "exclude any product or process that contains an ingredient or step which is not recited in the claim, and which would materially change the basic and novel characteristics of the claimed invention." (Doc. # 201 at 61 (citing PPG Indus. v. Guardian Indus. Corp., 156 F.3d 1351, 1354 (Fed.Cir.1998)).) Looking at the patent specification and prosecution history, the Special Master construed the claim to be limited to only those coating metals containing up to about 0.5% silicon.

■■■■ Plaintiff first argues that the Special Master should not have looked at the patent specification or prosecution history in construing the claims. This is incorrect. Claim language must be read consistently with the patent specification and prosecution history. See KCJ Corp. v. Kinetic Concepts, Inc., 223 F.3d 1351, 1357–58 (Fed.Cir.2000). Plaintiff also contends that even if the Special Master properly considered the patent specification and prosecution history, he incorrectly construed the claims in the '214 and '135 patents. This is also incorrect, and the

Court adopts the Special Master's analysis of this issue.

As to claims 2, 4, 6, and 8 of the '549 patent, Plaintiff argues that the Special Master improperly limited their scope given the open-ended language of the claims. These claims are limited to strips "wherein the coating metal includes less than about 0.5% silicon by weight" and "wherein the aluminum coating metal contains up to 0.5% by weight silicon." Plaintiff accepts the Special Master's conclusion that the terms "includes" and "contains" "do[ ] not limit the inclusion of unrecited ingredients and steps" (doc. # 201 at 71) and then argues that the additional 7.5—8.0% silicon found in Defendants' coating bath is merely an additional, unrecited ingredient. Claims 2, 4, 6, and 8 are explicit in their limitation of the amount of silicon in the coating bath, however. Consequently, considering additional silicon in the aluminum coatings to be an unrecited ingredient would contradict the express language of the claims and would render the limitations meaningless.

### b. Doctrine of Equivalents

Plaintiff contends that Defendants' aluminum coating, which contains between 8.0—8.5% silicon by weight, is equivalent to those claimed in Plaintiff's patents, containing up to about 0.5% silicon by weight. The essential inquiry in determining whether a patent is infringed under the doctrine of equivalents is, "Does the accused product or process contain elements identical or equivalent to each claimed element of the patented invention?" Warner–Jenkinson Co. v. Hilton Davis Chem., Co., 520 U.S. 17, 40, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997). The doctrine of

---

**9.** The Court refers to Defendants' "product" only loosely, as Plaintiff's patents variously claim a product (e.g., the '135 patent), a process (e.g., the '113 patent), or a product-by-process (e.g. the '723 patent).

equivalents is not a license to ignore claim limitations, however. *See Dolly, Inc. v. Spalding & Evenflo Cos.*, 16 F.3d 394, 398 (Fed.Cir.1994).

The limitation on quantity of silicon in the aluminum bath is clearly meaningful in the context of the patent, as the specification explicitly frowns on coating baths containing greater than 0.5% silicon by weight.[10] But finding that an aluminum bath containing 8.0—8.5% silicon is the equivalent of an aluminum bath containing merely 0.5% silicon would render that limitation meaningless. *See Conopco, Inc. v. May Dep't Stores Co.*, 46 F.3d 1556 (Fed. Cir.1994) (finding that a ratio of 162.9:1 in a process was not the equivalent of an "about 40:1" limitation). Plaintiff asserts, though, that finding that Defendants' product is not equivalent to the product claimed in the patent effectively converts the statements of preference in the Kilbane specification into a new claim limitation. This is not true. A steel strip may well exist which falls outside of the express claim limitations, but is nevertheless an equivalent of Plaintiff's claimed product. However, the Court agrees with the Special Master that an aluminum containing bath containing more than sixteen times the silicon claimed in the patent is not such an equivalent.

### 3. Noninfringement of Protective Atmosphere Claims

█ Plaintiff contends that the Special Master erred in three ways when he found that the protective atmosphere used in Sollac's process did not infringe on Plaintiff's patents: (1) the Special Master im-

properly combined his analyses of the Boston and Kilbane patents; (2) the Special Master incorrectly found no infringement under the doctrine of equivalents; and (3) the Special Master should have considered Plaintiff's evidence that Defendants copied Plaintiff's process.

With respect to the first asserted error, Plaintiff points to a conclusion in the report and recommendation:

> No reasonable jury could find, under the doctrine of equivalents, that the Sollac process contains an equivalent to the patents' "protective atmosphere" of "at least about 95% hydrogen." Therefore, it is recommended that summary judgment of noninfringement be entered for the Kilbane '214 and '723 patents and the Boston '113 and '645 patents.

(Doc. # 201 at 56.) Plaintiff argues that the phrasing of this conclusion implies that the Special Master improperly analyzed the issues of infringement of the Kilbane and Boston patents together. Of course, the Kilbane '214 and '723 patents and the Boston '113 and '645 patents are unrelated and must be analyzed separately. Yet, the Special Master did just that: for each relevant section of the analysis, the Special Master looked to both sets of patents before making broad conclusions. (*See, e.g., id.* at 44 ("The importance of a low dew point also is clearly taught *in each of the patents.*") (emphasis added).) The mere fact that he drew the same conclusions for each sets of patents does not indicate that he analyzed them together.

Plaintiff next argues that the Special Master erred in finding that the protective

---

**10.** Plaintiff asserts that the Special Master improperly relied upon statements in the patent specification to determine whether the two processes are equivalent. Such reliance, however, is entirely proper. *See SciMed Life Sys. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1345 (Fed.Cir.2001) (having spe-

cifically identified, criticized, and disclaimed a certain configuration in the patent specification, "the patentee cannot now invoke the doctrine of equivalents to embrace a structure that was specifically excluded from the claims").

atmosphere in Defendants' process did not infringe the Boston '113 and '645 patents under the doctrine of equivalents. The essential inquiry in determining whether a patent is infringed under the doctrine of equivalents is, "Does the accused product or process contain elements identical or equivalent to each claimed element of the patented invention?" *Warner–Jenkinson,* 520 U.S. at 40, 117 S.Ct. 1040. This inquiry has been framed in various ways by the Federal Circuit. Most notably, that court has applied the function-way-result test, which asks "whether the element in the accused device does substantially the same thing in substantially the same way to get substantially the same result as the claim limitation." *Toro Co. v. White Consol. Indus., Inc.,* 266 F.3d 1367, 1371 (Fed.Cir. 2001). Courts have also considered the known interchangeability of two elements in determining equivalence. *See Warner–Jenkinson,* 520 U.S. at 36, 117 S.Ct. 1040.

The Special Master found that the two atmospheres were not equivalent on three grounds. First, both patent specifications expressly state that even though various modifications can be made to the invention, the strip must pass through a protective atmosphere of at least about 95% by volume hydrogen. (Doc. # 201 at 46.) Second, despite Plaintiff's assertion that the atmospheres work in the same "way," AK Steel's process works by maximizing the concentration of hydrogen, a non-oxidizing

gas, while Defendants' process works by minimizing dew point, which also decreases oxidation.[11] Third, holding that a 0.06% hydrogen atmosphere would be equivalent to a limitation requiring an atmosphere of at least about 95% hydrogen would effectively vitiate that limitation.

AK Steel argues that the Special Master ignored the teaching of the Supreme Court in *Warner–Jenkinson* by limiting possible equivalents as a result of statements made in the patent specification. Specifically, Plaintiff relies on the Supreme Court's rejection of the argument that "equivalents must not only be known, but must also be actually disclosed in the patent in order for such equivalents to infringe upon the patent." *Warner–Jenkinson,* 520 U.S. at 37, 117 S.Ct. 1040. This holding is unhelpful to AK Steel. The Special Master did not suggest that AK Steel could claim protection only for those equivalents disclosed in the patent. Instead, he found that AK Steel could not claim protection for a possible equivalent expressly disclaimed in the patent specification.

Plaintiff also contends that *Corning Glass Works v. Sumitomo Electric U.S.A., Inc.,* 868 F.2d 1251 (Fed.Cir.1989), in which the Federal Circuit found two fiberoptic wires to be equivalent under the function-way-result test,[12] dictates a different result. *Corning Glass* is distinguish-

---

**11.** AK Steel's argument that both atmospheres work in the "way" by establishing thermodynamic and kinetic conditions that maintain a sufficiently low oxidation potential-illuminates a flaw inherent to the function-way-result test. Almost any two processes, if described at a sufficient level of generality, can be said to work in the same "way." Conversely, absent literal infringement, any two processes can be said to work in different "ways" if described at a sufficient level of specificity. Fortunately, the Court need not find the appropriate line to draw in this case, because the two processes

clearly are not equivalent for the reasons stated.

**12.** The court found that a fiberoptic wire with a core "doped" to achieve a *higher* refractive index (RI) than the surrounding sheath is equivalent to a fiberoptic wire with a sheath "doped" to achieve a *lower* RI than the core, even though the patent requires a doped core. Specifically, the two wires worked in the same "way"-they trapped light in the wire by maintaining a higher RI in the core than in the sheath.

able from this case, however, as the patent specification in *Corning Glass* did not specifically exclude the alleged equivalent; Plaintiff's patents do just that. *Corning Glass* teaches, "What constitutes equivalency must be determined against the context of the patent, the prior art, and the particular circumstances of the case." 868 F.2d at 1260. The particular circumstances in this case, as described by the Special Master, dictate that Plaintiff's protective atmosphere and Defendant's protective atmosphere are not equivalent.

██ Plaintiff also submitted a declaration by one of its experts, Dr. Birks, that states that the interchangeability of the two protective atmospheres was well known in the art. Plaintiff asserts that this declaration, coupled with the Joint Expert Report of Neil Birks and George St. Pierre (doc. # 207 Exh. 20), creates a question of fact as to equivalence. The Special Master dismissed the expert report, noting that "AK argues that the Kilbane patents are 'wrong' with respect to the requirement of a 95% by volume hydrogen atmosphere." (Doc. # 201 at 51.) As noted above, the doctrine of equivalents does not embrace equivalents that are specifically disclaimed or criticized in the patent specification. *SciMed*, 242 F.3d at 1345–47. An expert opinion does not overcome this limitation. *See Genentech*, 108 F.3d at 1366–68 (holding that expert's opinion on level of ordinary skill in the art fifteen years earlier cannot overcome patent specification and extrinsic evidence that shows lack of enablement).

██ Finally, Plaintiff argues that the Special Master erred in not considering evidence that Defendants intentionally and improperly copied AK Steel's process. The intent of the allegedly infringing party is irrelevant in applying the doctrine of equivalents. *Warner–Jenkinson*, 520 U.S. at 36, 117 S.Ct. 1040. Plaintiff puts forth its evidence of copying as proof that the differences in the processes are insubstantial. Evidence of copying is admissible for that purpose, and the Special Master erred in not considering it. The Court, however, has examined Plaintiff's evidence of copying and concludes that it does not show that the differences between the parties' processes are insubstantial and does not raise a question of fact whether Sollac's process is equivalent to that claimed in Plaintiff's patents.

### III. CONCLUSION

For the reasons set forth above, the Court adopts the Hardy Recommendation. (Doc. # 188.) Consequently, the Court **DENIES** Plaintiff AK Steel's Motion To Compel Discovery Regarding Testing By Defendants' Expert Witness Of Defendants' Furnace Atmosphere. (Doc. # 106). The Court also adopts the Martens Recommendation, except as it conflicts with the Court's opinion. Therefore, the various summary judgment motions of the parties are disposed of as indicated in the Martens Recommendation. (Doc. # 201 at 94–96.)

IT IS SO ORDERED.

### REPORT AND RECOMMENDATION OF SPECIAL MASTER

*REPORT OF SPECIAL MASTER REGARDING MOTION BY PLAINTIFFS TO COMPEL PRODUCTION OF TECHNICAL DATA ... WITHHELD UNDER A CLAIM OF WORK PRODUCT IMMUNITY (ITEM NO. 20.01)*

Plaintiff, AK Steel Corporation ("AK"), filed Case No. 1 98 00690 ("No. 690") on September 17, 1998 alleging patent infringement against two French Companies, Defendants Sollac and Uguine (collectively referred to as "Sollac"). Two United States Letters Patent are alleged

to have been infringed. Plaintiff, Armco Inc. ("Armco") filed Case No. 1 98 00804 ("No. 804") on October 23, 1998 alleging patent infringement against the same two defendants. Four different United States Letters Patent are alleged to have been infringed. All six patents are entitled "Hot Dip Aluminum Coated Chromium Alloy Steel". Subsequent to those filings, Armco was acquired by AK.

Sollac timely answered the complaints in both cases and counterclaimed for a declaratory judgment of non-infringement in both cases. In addition, in case No. 804, Sollac also counterclaimed for: (1) declaratory judgment of patent invalidity and (2) declaratory judgment of patent misuse and unenforceability. Both cases were consolidated for discovery purposes on March 19, 1999.

An important disputed issue of fact, said to be "central to this entire litigation", is the composition of gasses in the defendants' aluminized stainless steel processing line. Therefore, an important objective of discovery, particularly discovery by AK Steel Corporation ("AK"), has been the results of gas composition tests made during manufacturing runs. Pursuit of that objective has led to a number of discovery disputes including the specific dispute (Special Master Issue 20.01) which is presented here by Plaintiff AK Steel's Motion to Compel Production of Technical Data and Information Pertaining to Three Gas Composition Tests Conducted on Defendants' Line 2 Withheld Under a Claim of Work Product Immunity.

In the course of discovery, it has been disclosed that there have been three tests of the composition of gasses in the number two processing line at the Sollac and Ugine ("Sollac") facility which are claimed by Sollac to constitute attorney work product and to be immune from discovery. The three specific gas composition tests in-

volved in this particular dispute were conducted on September 24 and October 20, 1999 and on November 15, 2000.

The first of the three tests to be disclosed was the test conducted on October 20, 1999. The Special Master previously has ruled that certain redactions in a document related to that test are protected from disclosure by the attorney work product doctrine. That ruling was made on February 11, 2000 as supplemented on February 28, 2000 (Issue No. 1.09)(Decision Regarding Two Document Redactions, attached as Exhibit A).

The existence of the other two tests was disclosed by Sollac in response to an order of the Special Master which was issued in response to a motion to compel, originally filed by AK with the Court (Document 106 in Case 690 and 55 in Case 804) and subsequently referred to the Special Master (Document 135 in Case 690 and 84 in Case 804) and a "parallel" motion filed by AK with the Special Master (Issue No. 13.03). Substantially the same issue previously has been raised with Special Master Martens in conjunction with a Fed. R. Civ. Pro. 56(f) motion filed by AK.

AK also has filed a more or less "omnibus" Motion to Compel Production of Documents Withheld by Defendants Under Claims of Privilege or Work Product (sometimes referred to by the parties as "the July 21 Motion") (Issue 15.01). That motion, principally dealing with the attorney client privilege, is directed to documents listed on Sollac's privilege log. It is not clear whether or not documents involving the three tests described above are found on the privilege log. It can be argued, as AK does, that the Issue 15.01 motion imports into the testing data dispute (Issue 20.01) the argument of waiver of privilege (attorney client and/or attorney work product) based upon the assertion by Sollac of the "advice of counsel

rebuttal" (or defense). It is not necessary to address the Issue 15.01 dispute in this decision because the waiver argument will be addressed in the decision on this (Item 20.01) issue.

The Item 13.03 order, noted above and attached as Exhibit B, was issued because AK was entitled to sufficient information to permit it to ascertain whether or not information relating to gas composition tests, about which a Sollac witness refused to testify in a deposition, is or should remain privileged. Sollac's response to the Item 13.03 order, attached as Exhibit C, was considered to have provided sufficient information for AK to assess the claim of privilege, which it has done. Having done so, AK now has moved to compel the disclosure of documents related to all three of the disclosed tests (Item 20.01). AK's motion is grounded on two arguments. *The first argument* states that AK is entitled to the gas composition test documents because attorney work product immunity has been waived as to such documents. As noted above, the waiver is claimed to have arisen because of Sollac's advice of counsel rebuttal to AK's charge of willful infringement. *The second argument* is, essentially, a reiteration of arguments previously made in respect to Issue 1.09, namely that the documents are not work product immune under Fed. R. Civ. Pro. 26(b).

This Report does not go beyond documents and information involving the three tests described above. With that limit in mind, the decision only addresses the explicit relief which is sought at pages 5 and 6 of AK's supporting memorandum (which is reiterated almost verbatim at pages 16 and 17).

The following is a description of the items of relief requested by AK and an explanation of the disposition of each item.

**1. Plaintiffs seek the divulgence of any gas test information used by defendants' counsel as a basis for any opinion given to defendants that the Sollac process does or does not infringe.**

On August 28, 1998, prior to the initiation of this litigation, one Russell Orkin, a patent attorney (not associated with Sollac's trial counsel), provided Sollac with his opinion of non-infringement. That opinion is the only opinion (or evidence) which is to be offered by Sollac to support its advice of counsel rebuttal to AK's claim of willful infringement. Sollac claims, without contravention, that it has provided to AK all attorney work product relating to the advice given by Orkin. Because the three gas composition tests at issue all post-date Orkin's opinion and post date the filing of these law suits, the tests cannot be related to the advice of counsel rebuttal as of the date that the opinion was given or as of the date that this litigation was initiated.

Nonetheless, AK contends that it is entitled to production of all data and communications concerning the three gas composition tests at issue because the tests could have provided a basis for some form of an opinion of some other counsel, presumably Sollac's trial counsel, subsequent to the three tests and, therefore, subsequent to the Orkin opinion and subsequent to the initiation of this litigation. To be consistent, AK must argue, as it does, that all work product opinions of Sollac's counsel (including the bases for such opinions) regarding the subject of infringement at any time are waived and must be disclosed. (See AK's Reply Memorandum, pp. 29–30). The natural result of such an argument might ethically require, in most all similar infringement cases, the assertion by counsel of claims of willfulness in order to leverage relinquishment of attorney work product protection, particularly the protection from discovery of an attorney's "men-

tal impressions, conclusions, opinions or legal theories" which are solicitously guarded by the provisions of Fed. R. Civ. Pro. 26(b)(3). For this reason, if for none other, the better rule is that the waiver of the attorney-client privilege as to communications and documents relating to the advice of counsel rebuttal does not, in a case such as this one, waive the protection provided by the attorney work product doctrine. *Handgards, Inc. v. Johnson & Johnson*, 413 F.Supp. 926, 929 (N.D.Cal. 1976). And, if there is to be such a waiver of attorney work product protection, it should be limited to the subject matter of the rebuttal and it should be temporally limited to the period prior to the time of the filing of the lawsuit. See *Dunhall Pharmaceuticals v. Discus Dental*, 994 F.Supp. 1202, 1204–05 (D.C.Cal.1998).

For the reasons above, the attorney work product protection afforded the three gas composition tests at issue are not considered to have been waived by assertion of the advice of counsel rebuttal.

**2. Plaintiffs seek divulgence of any documents listed on defendants' Revised Privilege Log (Rev.2/16/2000) that pertain to the issue of infringement or non-infringement and which are not privileged or work product (or opinion work product).**

There is no apparent distinction between the bases upon which Sollac claims attorney work product protection for any one or more of the three gas composition tests at issue. Consequently, the reasons for upholding that protection in the case of Issue 1.09 are applicable to all three of the gas composition tests at issue. Therefore, it can be argued that it is unnecessary in this instance, to proceed beyond an analysis of the showing of substantial need, etc. required by Fed R. Civ. Pro. 26(b)(3). The concern over disclosure of counsel's mental impressions, conclusions, opinions and le-

gal theories (hereinafter "opinions") would not be reached. However, if that analysis was to be made, Sollac has posited credible reasons for concluding that opinions of counsel are involved as stated in Defendants Opposition ... [Memorandum] at pp. 17–19. This issue is addressed further in paragraph 3 below.

**3. Plaintiffs request an inspection *in camera* of all gas test information from the three tests described above to determine whether or not the information would result in the disclosure of an attorney's legal "opinions".**

While there is no apparent distinction between the three gas composition tests, as noted above, the decision made in the case of Issue 1.09 as to one of those tests was made *after* an *in camera* review of the document, portions of which are claimed to be protected by the attorney work product doctrine. That procedure has not been followed in the case of the documents disclosed in Sollac's response to the Issue 13.03 order (Exhibit C attached). Accordingly, AK's request is granted; and Sollac shall submit the documents, which are identified by Sollac in the response to the Issue 13.03 order, to the Special Master for *in camera* review within ten (10) days following the receipt by counsel of this Report.

**4. Plaintiffs request the provision of an affidavit of counsel that the gas test information for the three tests has not been and will not be provided or disclosed (a) to any ordinary non-party witness or (b) to any expert non-party witness who will or may testify at trial on behalf of defendants.**

It is believed that such a representation has been made by Sollac in past proceedings; and it is requested that Sollac prepare and submit to the Special Master a draft order covering this issue which order

can be included as an element in the final pre-trial order issued in this case.

**5. Provision of a "decision" (or statement) as to whether or not Mr. Varroy/Air Liquide and/or Mr. Houde/ AINF are or are not testifying experts which, if in the affirmative, calls into play the provisions of Fed. R. Civ. Pro. 26(f).**

It is the Special Master's understanding that Masseurs Varroy and Houde have *not* been designated as expert witnesses within the time required to do so. (See n. 7, page 6 of Defendants' Opposition . . . . [Memorandum] ). Accordingly, a negative representation is deemed unnecessary.

The time for appeal of this Order, if it is to be appealed, will not commence until after a final Report is filed with the Court. A final Report will follow the *in camera* review to be conducted in accordance with this Report.

Oct. 9, 2001.

## EXHIBIT A

*AK STEEL VS. SOLLAC AND UGINE, NOS. C–1–98–690 AND 804*

*DECISION REGARDING TWO DOCU- MENT REDACTIONS (ITEM 1.09)*

Redactions have been made in the case of two documents produced by Sollac to AK Steel. The redactions are made under claim of "Attorney Work Product", being a claim of privilege from disclosure of trial preparation materials. Both parties have briefed the issue.

The first redaction (Doc. SL 008804) involves certain types of data as can be seen by comparison with Doc. SL0008824 (unredacted). The second redaction does not include data. The second redaction relates to counsel's and/or the parties' conclusions or intentions. AK Steel's charac- terization of the redactions in paragraph 3 of its Memorandum is not entirely correct.

It cannot be disputed that the redactions involve trial preparation materials, specifi- cally documents, as "defined" in Rule 26(b)(3). It has been represented that the documents in question were prepared by Sollac or its representative at the request of and for the use of Sollac's counsel in preparation of the defense of the pending action.

AK Steel asserts that the redacted infor- mation is not protected by the work prod- uct privilege. The assertion is made based upon five separate, but somewhat over- lapping arguments. The five arguments are discussed below, but not in the same order as presented by AK Steel for rea- sons that may be apparent. (In order to expedite this decision, full citations to au- thorities referred to in AK Steel's Memo- randum are not made in this decision. It is believed that the citations easily can be found in AK Steel's Memorandum).

We begin with AK Steel's fifth (last) argument.

The statement is made in the second to last paragraph of AK Steel's Memorandum that ". . . a party may not use the work product privilege . . . as a shield against discovery of information gathered in antici- pation of litigation." Such a broad state- ment simply is not correct, otherwise the provisions of Rules 26(b)(3) and (4) have no meaning whatever. The *Raso* case does not support such a statement. That case concerned the deposition of an adjustment company investigator. *Raso* affirms that documents are subject to the privilege un- less substantial need is shown. *Abruzzo* and *Quadrini* both appear to involve testi- fying experts, as does *Loctite*.

The first argument made by AK Steel is akin to the last argument discussed above. The first argument (beginning with the

first full paragraph on page 2 of the Memorandum) posits that factual information is not protected by the work product doctrine. To paraphrase from the *Primetime* case, cited by AK Steel, "This analysis casts too wide a net." *Primetime* specifically recognizes the protection accorded to documents by Rule 26(b)(3) and, further, recognizes that "a party cannot evade the protection afforded by the rule through the expedient of asking at a deposition, either directly or indirectly, for the content of documents...[*e.g.* the facts contained within the documents]." The *Phillips Electronics* case specifically protects against the disclosure of documents relating to patent infringement investigations, tests or analyses performed by plaintiff's employees for its in house counsel. The same rationale should apply, more vigorously, to outside counsel as in this case. The *Lott* case is not precisely in point "since a document or tangible thing[s] is not at the heart of the problem." The phrase quoted from *Joyner* omits the words "by interrogatory and deposition" and is otherwise dicta.

A related argument is the second argument which begins with the third full paragraph on page 2 of AK Steel's Memorandum. It is argued that the Sixth Circuit does not recognize the privilege for documents generated by experts in connection with litigation. Neither *Toledo Edison* nor *UMC Corp.* appear to support such a broad proposition. *Toledo Edison*, by reversing the trial court's denial of a claim of protection, recognized the protections afforded by Rule 26(b)(3) and (4), specifically as to a non-testifying expert. *UMC Corp.*, a 1980 case, dealt with discoverability of documents constituting opinions held by an expert informally consulted in anticipation of litigation. That decision is not pertinent here. The quotation from *Samuels* is in-

complete; and the protection from disclosure was extended to a non-testifying expert in that case. AK Steel's argument is correct insofar as the materials referred to may not be subsumed under the protection afforded by Rule 26(b)(3). That is not the case. It is claimed, in this case, that the documents were prepared in anticipation of litigation by or for Sollac.

AK Steel's fourth argument begins with the last full paragraph on page 3 of its Memorandum. This argument invokes the "exceptional circumstances" relief from the privilege which is afforded in the case of non testifying experts. That relief is not in order here because there is no indication that an expert is involved, testifying or non-testifying. The appropriate test is "substantial need" under Rule 26(b)(3). That test requires a showing that AK Steel is unable to obtain the substantial equivalent of the "materials" by other means. That showing cannot be made as long as AK Steel has access to the process by which it can obtain full and adequate testing on its own terms. Documents which contain test data obtained by counsel (or at the request of counsel) from counsel's client for counsel's own use in preparation for trial is protected by the doctrine. The passage of time between two equivalent events, even on a "Planck scale", can be said to defeat test equivalency (or "observability" as that word has been used). That self evident observation is insufficient to show "substantial need".

At this point, the only issue presented is the discoverability of the two redactions under the provisions of Rule 26(b)(3). Consequently, AK Steel's third argument, which begins with the last paragraph on page 2, is moot. At least the argument is moot insofar as expert involvement in respect to the document as to which privilege has been claimed has not heretofore been called to the Special Master's attention.

The *possibility* of expert involvement is raised, for the first time, by AK Steel in the first full paragraph on page 3 of AK Steel's Memorandum. That case, if true, is not pending before the Special Master.

For the reasons above, Sollac need not produce the two unredacted documents. Feb. 28, 2000.

## EXHIBIT B

SPECIAL MASTER HARDY'S AMEND-ED DECISION [1] REGARDING DIS-COVERY BY AK STEEL OF GAS OR GAS COMPOSITION TESTS CONDUCTED ON THE SOLLAC FURNACE AT MOUZON

Special Master Hardy dictated the following decision to the parties in telephone conference calls:

"Okay, we start with this decision regarding discovery by AK Steel of gas or gas composition tests conducted on the Sollac furnace at Mouzon.

Paragraph 1—Mr. Varroy, Air Liquide and the defendants each will respond in writing to the questions addressed to Mr. Varroy by Ms. Bullock at line 9, page 37 and line 3 page 88, the deposition of Philippe Varroy on May 16, 2000.

Paragraph 2—If any other tests other than the test of December 3, 1999 are listed in response to the first paragraph above, then as to each such test, including the test performed on October 20, 1999 (which is the subject of Issue 1.09), the following information will be provided by defendants:

(a) the date or dates of each test;

(b) at whose request the test was performed;

(c) to whom all test results have been provided;

(d) a description of each report and/or analysis prepared in respect to each test;

(e) the author(s) of each report and/or analysis; and

(f) a description of each claim of privilege if any and all facts relevant to such claim.

Paragraph 3—Defendants will produce all written or tangible gas or gas composition test data on the Sollac furnace at Mouzon which has been provided to any ordinary non-party witness or any expert non-party witness who will or may testify on behalf of defendants. Except as provided under Rules 26(a)(2) and 26(b)(4) of the Federal Rules of Civil Procedure, nothing in this paragraph 3 or the foregoing paragraph 2 requires a description or production of any trial preparation material which would involve the disclosure of mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation.

Paragraph 4—The data and the information provided in response to paragraph 1 through 3 above will be served on the plaintiff, on Special Master Hardy, and Special Master Martens on May 1, 2001.

Paragraph 5—Clarification of any of the matters set forth in paragraphs 1 to 4 above if deemed necessary shall be served

---

1. Special Master Hardy read his decision during a telephone conference with counsel for the parties on April 16, 2001. At Special Master Hardy's request, counsel for defendants, who was asked to tape record part of the April 16 conference, transcribed Special Master Hardy's oral decision. The April 16 decision was subsequently amended by Special Master Hardy during a telephone conference with counsel for the parties on April 24, 2001. The following is defendants' counsel's transcription of Special Master Hardy's oral decision of April 16, as amended on April 24.

on Special Master Hardy by April 25, 2001."

. . . . .

"Paragraph 6—The data and information in response to paragraphs 1–3 above will cover the period January 1, 1997 to the present."

EXHIBIT C

## CONTAINS "HIGHLY CONFIDENTIAL" INFORMATION SUBJECT TO PROTECTIVE ORDER

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO

AK Steel Corporation, Plaintiff,

v.

Sollac and Ugine, Defendants.

Armco, Inc., Plaintiff

v.

Sollac and Ugine, Defendants.

Judge:　　　　　Susan Dlott

Magistrate:　　　Jack Sherman

Special Master: William Hardy

**DEFENDANTS' RESPONSE TO INFORMATION REQUESTED IN SPECIAL MASTER HARDY'S DECISION REGARDING DISCOVERY BY AK STEEL OF GAS OR GAS COMPOSITION TESTS CONDUCTED ON THE SOLLAC FURNACE AT MOUZON**

### Case Management Conference Item 13.03

Defendants Sollac and Ugine ("Sollac"), through counsel, submit this Response to the Information Requested in Special Master Hardy's April 16, 2001 Decision, as amended on April 24, 2001, Regarding Discovery by AK Steel of Gas or Gas Composition Tests Conducted on the Sollac Furnace at Mouzon (the "April Decision").[1,2]

## I. *Response to Two Deposition Questions*

In paragraph 1 of the April Decision, Special Master Hardy stated that "Mr. Varroy, Air Liquide and the defendants each will respond in writing to the questions addressed to Mr. Varroy by Ms. Bullock at line 9, page 37 and line 3 page 88, the deposition of Philippe Varroy on May 16, 2000." The specific questions at issue from Mr. Varroy's deposition are as follows:

Question 1: "Mr. Varroy, have you ever created any other reports related to gas analysis of the Sollac plant at any other time?" Varroy Depo. Tr. at 37, lines 9–11; and

Question 2: "Mr. Varroy, other than the tests of December 3rd 1999 have you done any other tests of gases from the Sollac furnace at Mouzon?" Varroy Depo. Tr. at 88, lines 3–5.

The responses of Mr. Varroy, Air Liquide, and defendants to these two questions are as follows:

Response to No. 1: Yes.

Response to No. 2: Yes.

---

1. In accordance with paragraph 4 of the April Decision, Sollac is providing this document under the terms of the Protective Order to (i) AK Steel's counsel, (ii) Special Master Hardy, and (iii) Special Master Martens.

2. Special Master Hardy ruled that the information requested in response to paragraphs 1–3 of his April Decision (Sections I–III, *infra*) is limited to the time period of January 1, 1997 to the present date.

## II. *Additional Information Regarding Response to Two Deposition Questions*

In paragraph 2 of the April Decision, Special Master Hardy stated that:

If any other tests other than the test of December 3, 1999 are listed in response to the first paragraph above, then as to each such test, including the test performed on October 20, 1999 (which is the subject of Issue 1.09), the following information will be provided by defendants: (a) the date or dates of each test; (b) at whose request the test was performed; (c) to whom all test results have been provided; (d) a description of each report and/or analysis prepared in respect to each test; (e) the author(s) of each report and/or analysis; and (f) a description of each claim of privilege if any and all facts relevant to such claim.

Since "other tests are listed in response to the first paragraph above ... including the test performed on October 20, 1999," defendants respond to parts (a) through (f) as follows:

(a) Test of September 24, 1999; Test of October 20, 1999; and Test of November 15, 2000;

(b) Trial counsel for Sollac;

(c) Trial counsel for Sollac, and Messrs. Vincent Eustache and Jean–Paul Hennechart (both of whom were employed by Sollac), for the tests of September 24, 1999 and October 20, 1999; and only trial counsel for Sollac for the test of November 15, 2000;

(d) Reports of gas analysis were prepared for the tests of September 24, 1999 and October 20, 1999, respectively. Those reports described the locations along Mouzon Line 2 where gas analyses were performed, logistics of the tests, and conclusions and opinions

reached for each of the tests. No report or analysis was prepared for the test of November 15, 2000;

(e) Mr. Jean–Michel Casquin (of AINF) and Philippe Varroy (of Air Liquide) conducted the September 24, 1999 and October 20, 1999 tests and co-authored the reports prepared of those tests, as requested by trial counsel for Sollac. *See also* subparagraph (f) below. As no report or analysis was prepared for the test of November 15th, there was no "author" for that test;

(f) The reports and/or results of the tests of September 24, 1999, October 20, 1999, and November 15, 2000 are immune from discovery by the attorney work product doctrine. Most of the patent claims at issue in the six suit patents include, as part of their claimed process, the process step of maintaining a cleaned steel strip in a protective atmosphere of at least about 95% by volume hydrogen. Consequently, after AK Steel and Armco filed the two underlying lawsuits, and at the specific request of defendants' trial counsel because of those filings, defendants' trial counsel directed that analyses be performed along Line 2 at Sollac's Mouzon facility in France, where Sollac performs the process that AK accused of infringing the six AK Steel/Armco patents-in-suit.

At defendants' trial counsel's instructions, two French gas testing companies ("AINF" and "Air Liquide") were retained to test and analyze the gases present along Mouzon Line 2. Such tests were conducted by Mr. Casquin, an employee of AINF, and Mr. Varroy, an employee of Air Liquide, on September 24th and October 20th, and the analyses were done on or shortly after the September 24th and

October 20th tests. The results of the analyses were reported upon to defendants' trial counsel in separate reports each co-authored by Messrs. Casquin and Varroy.

The reports of the September 24th and October 20th tests were prepared for, and were provided to, Sollac's trial counsel for trial preparation. The results of the September 24th and October 20th tests were disclosed only to Sollac's trial counsel and to Sollac's Mr. Eustache and Mr. Jean-Paul Hennechart. Neither the reports themselves, nor the data from and results of those test, have been provided or disclosed to anyone else, including "any person who may be used at trial to present evidence under Rules 702, 703, or 705 of the Federal Rules of Evidence."

Also pursuant to defendants' trial counsel's specific instructions, a different French gas testing company was retained in the Fall of 2000 to analyze gases along Mouzon Line 2. The testing by this other French gas testing company was conducted on or about November 15, 2000 by Mr. Gilles Puech, an employee of the French gas testing company. The results of that test were communicated orally to defendants' trial counsel. No report or analysis of the November 15th test was ever prepared. The data from and results of the November 15th test have not been provided or disclosed to anyone else, including "any person who may be used at trial to present evidence under Rules 702, 703, or 705 of the Federal Rules of Evidence." As set forth herein, the tests of September 24th, October 20th, and November 15th were conducted by individuals with expertise in gas testing

and analysis who will not be called to testify at trial. Moreover, none of defendants' testifying expert witnesses (each of whom has prepared a Rule 26(a)(2)(B) Expert Report) knows anything about any of these tests. The reports and results of these tests are attorney workproduct. Moreover, information concerning the testing, the accuracy of the tests, the testing conditions, the locations along Mouzon Line 2 at which the analyses were performed, the logistics of the tests, the results obtained, and the conclusions reached from the tests, was done for trial counsel's use only for use in trial preparation. This information reflects, inter alia, the legal theories, mental impressions, opinions, and conclusions of defendants' trial counsel and the respective non-testifying expert witnesses concerning this litigation. As such, this information is opinion work product.

If AK Steel wanted to, it could have conducted its own tests/analyses of Sollac's accused process beyond the testing and analyses defendants *voluntarily provided* to AK's counsel and experts from the December 3, 1999 run on Mouzon Line 2. Likewise, AK could have done such testing and analyses at any time during the nearly two years that fact discovery was pending in these two litigations. For example, AK Steel could have asked to conduct its own testing/analysis on December 3, 1999, when AK Steel's counsel and expert witness were present at Mouzon to observe Sollac's accused process. Additional tests, results, and/or analyses, or their "substantial equivalents" under Fed.R.Civ.P. 26(b)(3), could have been obtained by AK Steel and/or Armco without undue hardship, either directly off of Mouzon

Line 2 on December 3rd, or at another time during the extensive fact discovery period.

AK Steel and/or Armco also could have conducted their own tests and/or analyses of Sollac's accused process by "other means" under Fed.R.Civ.P. 26(b)(3). For example, AK could have tested and/or analyzed the gas samples that were taken and stored in gas bottles by Sollac on December 3, 1999—*specifically for use by AK Steel.* Although the gas samples of the December 3, 1999 test have been made available to AK Steel for well over a year, and despite repeated written reminders and requests by defendants' counsel to take possession of those gas bottles, AK Steel has refused to do so. AK Steel also could have retained its own gas experts to conduct testing/analyses of Mouzon Line 2, as it was entitled to do under Fed.R.Civ.P. 34 (which permits a party to enter "upon designated land or other property in the possession or control of the party upon whom the request is served for the purpose of ... measuring ... testing, or sampling .. ") Indeed, although it was not necessary for him to do so, Special Master Hardy himself advised AK Steel, during at least one Case Management Conference, that AK could conduct its own testing of Sollac's accused process under Rule 34. *See,*

*e.g.,* Transcript of the March 31, 2000 Case Management Conference, at 8.

Under these circumstances, AK Steel has not met, and can not meet, its burden of showing "exceptional circumstances under which it is impracticable for [AK] to obtain facts or opinions on the same subject by other means." Fed.R.Civ.P. 26(b)(4)(B). AK Steel also has not met, and can not meet, its burden of proving that it was "unable without undue hardship to obtain the substantial equivalent of the materials by other means." Fed. R.Civ.P. 26(b)(3).

### III. *Production of Written Gas Data*

In paragraph 3 of the April Decision, Special Master Hardy instructed defendants to "produce all written or tangible gas or gas composition test data on the Sollac furnace at Mouzon which has been provided to any ordinary non-party witness or any expert non-party witness who will or may testify on behalf of defendants." Other than the AINF/Air Liquide report of the December 3, 1999 test that defendants have already produced, no "written or tangible gas or gas composition test data, reports, or information" exists on the Sollac furnace at Mouzon that has been provided or disclosed (a) to any ordinary non-party witness, or (b) to any expert non-party witness who will or who may testify at trial on behalf of defendants.

Respectfully submitted,

OBLON, SPIVAK, McCLELLAND,
MAIER & NEUSTADT, P.C.

Dated: April 30, 2001

Jean-Paul Lavalleye
Steven E. Lipman
1755 Jefferson Davis Highway
Arlington, VA 22202
Tel: (703) 413-3000
Fax: (703) 413-2220

Of Counsel:

David P. Kamp (Oh Sup Ct #020665)
WHITE, GETGEY & MEYER CO., L.P.A.
1700 Fourth & Vine Tower
1 West Fourth Street
Cincinnati, OH 45202-3621
Tel: (513) 241-3685
Fax: (513) 241-2399

Edward A. Geltman
SQUIRE, SANDERS & DEMPSEY, L.L.P.
1201 Pennsylvania Avenue, N.W.
Washington, D.C. 20044-0407
Tel: (202) 626-6681
Fax: (202) 626-6780

*SUPPLEMENT TO REPORT OF SPECIAL MASTER REGARDING MOTION BY PLAINTIFFS TO COMPEL PRODUCTION OF TECHNICAL DATA ... WITHHELD UNDER A CLAIM OF WORK PRODUCT IMMUNITY (ITEM NO. 20.01)*

WILLIAM R. HARDY, Special Master.

Sollac has given to the Special Master for *in camera* review the documents ordered to be submitted by the initial Report on Item No. 20.01 of the Special Master, dated October 9, 2001. That "Report does not go beyond documents and information involving the three tests ... [conducted on September 24 and October 20, 1999 and on November 15, 2000]" (Report, p. 4); and the *in camera* review is to be made of the documents, if any, which were identified by Sollac in response to the Special Master Item ("Issue") 13.03 Order (Report, p. 6).

The gas composition test documents sought by AK are claimed by Sollac to be protected by the attorney work product doctrine. The applicable principles, in this case, are codified in Fed. R. Civ. Pro.

26(b)(3). That Rule provides *qualified* protection from discovery (1) of otherwise discoverable documents, (2) prepared in anticipation of litigation and (3) prepared by or for another party. All three conditions are met in this case. See *e.g.* Exhibit A to the initial Report. To circumvent the *qualified* protection from discovery, AK must show a "substantial need of the materials in the preparation of ... [its] ... case" *and* must show an inability "without undue hardship to obtain the substantial equivalent of the materials by other means." In addition, a higher level of protection exists and a higher level of need must be shown in the case of "the disclosure of the mental impressions, conclusions, opinions or legal theories of an attorney ..." That higher showing, for example, has been described as "extraordinary justification", *In re Sealed Case,* 676 F.2d 793, 810 (D.C.Cir.1982), and "extreme necessity". *Guideline No. 18, Special Masters' Guidelines for the Resolution of Privilege Claims, United States v. American Tel. & Tel. Co.,* Civ. No. 74–1698 (D.D.C. Feb. 28, 1979). The burden of making the showings described above falls upon AK because, as noted above, Sollac has made a *prima facie* showing that *qualified* protection is warranted in the first instance. *Cf. Upjohn Co. v. United States,* 449 U.S. 383, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981).

The documents reviewed *in camera* conform to the descriptions provided by Sollac in Exhibit C to the initial Report, para. II(d). As such, the subject matter of the documents does not depart substantially from the subject matter of the first document redaction which was decided under Special Master Issue 1.09. Although it might be reasonable to conclude that AK could have a substantial need for the redacted data in Issue 1.09, AK did not carry its burden of proof that it was unable without undue hardship to obtain the substantial equivalent of the material by other means. The same failure to carry its burden of proof obtains as to the documents submitted for *in camera* review in this Issue 20.01. AK has not shown that alternative sources of proof and testimony as to gas composition in the stainless steel aluminizing process are or have been unavailable.

AK argues, as to one alternative source, that arrangements it made with Sollac to conduct tests on the Mouzon line 2 furnace met with less than acceptable cooperation, or perhaps even obstruction. A failure to make properly requested discovery has measured consequences under the Federal Rules of Civil Procedure ... Rules 34(b) and 37(a) in this particular case. Those consequences do not include forfeiture of attorney work product protection, particularly in the absence of an order compelling testing in accordance with a Rule 34 request.

The documents reviewed *in camera* also contain information which could reflect opinions and mental impressions of counsel as described by Sollac in its response to the Decision on Special Master Issue 13.03 (Exhibit C to the initial Report). The selection, ordering and compilation for review of test data by defense counsel solely for counsel's own use in trial preparation could be found to reveal counsel's thought processes and theories regarding defense of the litigation. See *In re Allen,* 106 F.3d 582, 608 (4th Cir.1997)(selection and ordering of documents). None of the data in the documents has been made available to any ordinary non-party witness or any expert non-party witness who will or may testify on behalf of Sollac. None of the data in the documents is to be used at trial. AK has not carried its burden of proof that there is extraordinary justification for disclosure of the documents or

that exceptional circumstances exist for disclosure.

The principal purpose of the work product doctrine is to encourage careful and thorough preparation for litigation by counsel. That purpose is protected in this case by protecting from disclosure the gas composition test results which are the subject of Issue 20.01. Those gas composition test documents need not be produced.

Oct. 22, 2001.

## REPORT AND RECOMMENDED DECISIONS OF SPECIAL MASTER REGARDING DEFENDANTS' AND PLAINTIFF'S MOTIONS FOR SUMMARY JUDGMENTS

DON MARTENS, Special Master.

### I. *INTRODUCTION*

This is a patent infringement suit involving two related actions. AK Steel Corporation ("AK") filed C–1–98–690 against Defendants Sollac and Ugine ("Sollac") for infringement of two patents ("the Boston Patents"): U.S. Patent No. 5,023,113 to Boston et al. ("the '113 patent") entitled "Hot Dip Aluminum Coated Chromium Alloy Steel"; and U.S. Patent No. 5,116,645 to Boston et al. ("the '645 patent") entitled "Hot Dip Aluminum Coated Chromium Alloy Steel." Armco Inc. filed C–1–98–804 against Sollac for infringement of four patents ("the Kilbane patents"): U.S. Patent No. 4,675,214 to Kilbane et al. ("the '214 patent") entitled "Hot Dip Aluminum Coated Chromium Alloy Steel"; U.S. Patent No. 4,800,135 to Kilbane et al. ("the '135 patent") entitled "Hot Dip Aluminum Coated Chromium Alloy Steel"; U.S. Patent No. 4,883,723 to Kilbane et al. ("the '723 patent") entitled "Hot Dip Aluminum Coated Chromium Alloy Steel"; U.S. Patent No. 5,066,549 to Kilbane et al. ("the '549 patent") entitled "Hot Dip Aluminum Coated Chromium Alloy Steel".

Armco and AK later merged leading to the cases being related. Thus, AK charges Sollac with infringement of six patents.

The case was referred to me as Special Master for resolving several summary judgment motions involving issues of claim construction, infringement, noninfringement and invalidity. Orders of December 20, 2000 and February 1, 2001. I was instructed to provide the Court recommended decisions on these summary judgment motions. I reviewed all of the evidence and briefs and prepared a draft Recommended Decision which was sent to counsel for the parties on June 27, 2001 requesting comments. The parties submitted written comments and proposed revisions on July 16, 2001. In view of those comments, I then requested additional briefing on Sollac's Third Motion for Summary Judgment. Following that additional briefing, I conducted a full day oral hearing on all the motions on November 12, 2001, indicating that the parties should treat the draft Recommended Decision as a tentative decision. Having reviewed all the arguments and evidence, this report sets forth my recommended decisions.

### A. *First Summary Judgment Motions*

1. It is recommended that the limitations in Claims 1 and 10 of the Kilbane '214 patent, and Claim 1 of the Kilbane '723 patent that relate to the location and content of the protective atmosphere be construed as stated in the chart at p. 748 below.

2. It is recommended that the limitations in Claims 1 and 8 of the Boston '113 patent and Claims 1, 2 and 6 of the Boston '645 patent that relate to the location and content of the protective atmosphere be construed as stated in the chart at pp. 752-53 below.

## B. *Sollac's Second Summary Judgment Motion*

It is recommended that summary judgment of noninfringement of all claims of the Kilbane '214 and '723 patents, and all claims of the Boston '113 and '645 patents be granted.

## C. *The Third Summary Judgment Motions*

1. It is recommended that Sollac's Third Summary Judgment Motion be

a. granted as to noninfringement of the claims of the Kilbane '214, '135 and '723 patents;

b. granted as to noninfringement of Claims 2, 4, 6 and 8 of the Kilbane '549 patent;

c. granted as to invalidity for lack of enablement of Claims 1, 3, 5 and 7 of the Kilbane '549 patent;

d. denied as to noninfringement of Claims 1, 3, 5 and 7 of the '549 patent; and

e. denied as to invalidity of the Kilbane '723 and '549 patents for lack of written description. ·

2. It is recommended that AK's Second Summary Judgment Motion for infringement be

a. granted as to Sollac's steel strip meeting the "coating metal including aluminum or aluminum alloys" limitation of Claims 1 and 5 of the Kilbane '549 patent, and the "wherein the coating metal contains up to about 10% by weight silicon" limitation of dependent Claims 3 and 7 of the '549 if these Claims were not invalid;

b. denied as to Sollac's process and steel strip meeting the "coating metal consisting essentially of aluminum" limitation of the Kilbane '214 and '135 patents, respectively, and as to Sollac's steel strip meeting the "less than about"

or "up to" 0.5% silicon limitations of Claims 2, 4, 6 and 8 of the '549 patent; and

c. denied as to Sollac's process and steel strip meeting the "aluminum coating metal" and "including aluminum or aluminum alloy" limitations of the Kilbane '723 patent.

## II. *THE PATENT DISCLOSURES*

### A. *General Overview of the Technology*

Steel is the shorthand name for materials formed from iron ore and carbon. There are different types of "alloys" of steel based upon other materials, such as chromium, nickel and copper, which are added in making the steel. Steel can either be uncoated (i.e., "bare") or coated. The steel at issue in these patents is stainless steel, which is a chromium-steel alloy. '214 patent at 1:5–10. The stainless steel is coated with aluminum, i.e., it is aluminized. *Id.* The aluminum coating on stainless steel makes the steel more resistant to corrosion or rust. See *id.* at 3:3–7. The aluminum coating is applied to the steel by passing the stainless steel through a bath of molten aluminum. *Id.* at 2:54–60. The coating of the steel surface by aluminum is called "wetting." This is commonly called a hot dip process. *Id.* at 1:26–34.

One problem with aluminum coatings, however, is that hot dip aluminum coatings are poorly adherent to ferritic stainless steel base metal, resulting in uncoated or bare spots in the aluminum coating layer. *Id.* at 2:19–22. Poor adherence signifies flaking or crazing of the coating during bending of the strip. *Id.* at 2:23–4. Without good surface wetting by the aluminum, the aluminum coating layer will not be uniform or strongly·adherent to the steel base metal, which will consequently have uncoated areas. *Id.* at 2:39–41.

## B. *The Kilbane Patents*

The four Kilbane patents derive from a single parent patent application filed in May 1986 with the United States Patent and Trademark Office ("PTO"). In June 1987, the PTO issued the '214 patent based upon that parent application. The Kilbane parent patent application led to the other three Kilbane patents. These additional three Kilbane patents have the same specification as the original '214 patent and were filed as continuations or divisionals of the original Kilbane application to obtain additional patent claims. Unless otherwise noted, all references to the '214 patent specification apply to all other Kilbane patents.

According to the Kilbane patents, no one previously had proposed a solution for enhancing the "wetting" of ferritic stainless steel for hot-dip aluminum coatings to obtain a uniform coating layer, free of uncoated areas, and strongly adherent to the steel base metal. '214 patent at 2:36–41. The Kilbane patents claim to present a solution to this problem. This solution was the discovery that the wetting process

is dramatically improved if a cleaned ferritic chromium alloy steel is maintained in a protective hydrogen atmosphere substantially void of nitrogen prior to entry of the steel into an aluminum coating bath. *Id.* at 2:43–47.

The Kilbane patents disclose a process for continuous hot-dip aluminum coating of ferritic steel containing at least about six percent by weight chromium. *Id.* at 2:51–53. The surface of the steel is pretreated to remove oil, dirt, oxides and the like. *Id.* at 2:53–54. The steel is then heated to at least 1250°F in a reducing atmosphere, for example containing twenty percent hydrogen and eighty percent nitrogen. *Id.* at 4:12–16. The cleaned steel is then protected in an atmosphere containing substantially all hydrogen with the steel being maintained at a temperature near or slightly above the melting point of a coating metal consisting essentially of aluminum. *Id.* at 2:54–60. The hydrogen atmosphere enhances the wetting of the ferritic chromium steel to substantially eliminate uncoated or pin-hole defects in the aluminum coating layer. *Id.* at 2:60–63.

## FIG. 1

Figure 1 of the Kilbane patents, reproduced above, shows a schematic view of the process disclosed in the Kilbane patents. A strip of steel 11 is unwound from a coil 10. The steel passes around rollers 12, 13 and 14 before entering the top of a first furnace section 15. '214 at 3:21–24. Strip surface contaminants such as oil and

the like are almost instantaneously burned and removed. *Id.* at 27–30. A second furnace section 16 can further heat the strip 11 and provide a reducing atmosphere to minimize oxidation of chromium in the base metal. *Id.* at 3:31–40. The third section of the furnace 20 and the final section 22 are cooling zones. *Id.* at 3:41–45. The strip 11 passes from the final furnace portion 22 through a snout 26 into a coating pot 28 containing molten aluminum. *Id.* at 43–45. After passing through the coating pot 28, the strip 11 is vertically withdrawn and the coating layer solidifies. *Id.* at 45–50. The strip 11 is then coiled around coil 34. The processing discussed up until now is described as "well known in the art." *Id.* at 3:66–67. Figure 2 of the Kilbane patents, repro-

duced below, illustrates the snout 26 and coating pot 28 in further detail. With reference to Fig. 2, the improvement of Kilbane is explained in the specification as:

> passing the cleaned strip [11] through a protective atmosphere of substantially all hydrogen just before entering the coating bath [28]. When an in-line annealing such as described above is used to clean the strip, the protective atmosphere is maintained in an enclosure such as enclosed snout 26. Hydrogen gas can be introduced as necessary such as through inlets 27. The protective atmosphere *must* contain at least about 95%, more preferably at least 97%, and most preferably as close to 100% as possible, by volume hydrogen.

*Id.* at 4:7–24 (emphasis added).

FIG. 2

By use of the protective atmosphere, the coating quality and coverage was improved. See *id.* at 6:31–38.

The '214 patent claims are directed to a process or method for making aluminum coated stainless steel. The

claims of the '135 and '549 patents are directed to a product, i.e., the aluminum coated stainless steel itself. The '723 patent contains "product by process" claims; these claims are directed to a product made by a particular process.[1]

1. There are two conflicting Federal Circuit cases regarding whether process steps are limitations in product by process claims. In 1991, a three judge panel held that the "correct reading of such product-by-process claims is that they are not limited to product prepared by the process set forth in the claims." *Scripps Clinic & Research Found. Revlon Inc. v. Genentech, Inc.,* 927 F.2d 1565, 1583 (Fed.Cir.1991). One year later, a differ-

## C. *The Boston Patents*

The two Boston patents derive from a single parent patent application filed in August 1988. In June 1991, the PTO issued the '113 patent based upon that application. The '645 patent is a divisional of the '113 patent. As such, it contains the same specification as the '113 patent. Therefore, unless otherwise noted references to the '113 patent specification apply equally to the '645 patent. The Boston patents are directed to a process for making aluminized stainless steel.

Like the Kilbane patents, the Boston patents also relate to a process for hot-dip coating of stainless steel strip with aluminum. '113 patent at 1:6–10. According to the Boston patents, practice of the Kilbane process resulted in improved wetting as long as the steel was not cleaned by heating to an elevated temperature in a *direct fired furnace*. *Id.* at 2:37–40. However, the Boston patents note that heating the steel to an elevated temperature of greater than 1250°F in a direct fired furnace and subsequently passing the steel through a protective atmosphere of substantially pure hydrogen immediately prior to hot-dip coating with aluminum, still left large uncoated areas on the steel. *Id.* at 2:43–50.

With reference to the same figures above (which are identical in all patents), the Boston patents disclose a solution to this problem. Although sharing some aspects of the Kilbane process, several important modifications were made. First, in accordance with the Boston patents, the first furnace section 15 is a direct fired furnace heated by combustion with a ratio of fuel and air such that the gaseous products of combustion have no free oxygen. *Id.* at 3:65–68. Due in part to the lack of free oxygen, excessive oxidizing of chromium does not occur while removing surface contaminants such as rolling mill oil films, dirt, iron oxide, and the like. *Id.* at 3:65–4:8. Second, a protective atmosphere including at least about 95% by volume hydrogen preferably is maintained in furnace section 16 as well as possibly succeeding sections of the furnace, including cooling zones 20, 22 and snout 26. *Id.* at 4:12–21. This is done so that the "minimal oxidation of strip 11 in furnace portion 15 can be removed." *Id.* at 7:66–8:2.

## III. *ISSUES PRESENTED*

### A. *First Summary Judgment Motions*

Sollac's first summary judgment motion and AK's first cross summary judgment motion deal with the claim construction of

---

ent three judge panel held the opposite, that the process described is a limitation on the product claimed. *Atlantic Thermoplastics Co., Inc. v. Faytex Corp.*, 970 F.2d 834 (Fed. Cir.1992) *reh'g en banc denied*, 974 F.2d 1299 (concurring opinion), 974 F.2d 1279 (dissenting opinion) (Fed.Cir.1992). When confronted with two panel opinions in direct conflict, the earlier decision is generally considered controlling. *See Texas Instruments v. Cypress Semiconductor Corp.*, 90 F.3d 1558 (Fed.Cir. 1996); *Newell Cos., Inc. v. Kenney Mfg. Co.*, 864 F.2d 757, 765 (Fed.Cir.1988). However, the court in *Atlantic Thermoplastics* based its refusal to follow *Scripps Clinic* on the ground that the *Scripps Clinic* panel had not considered controlling Supreme Court precedent, stating: "A decision that fails to consider Supreme Court precedent does not control if the court determines that the prior panel would have reached a different conclusion if it had considered controlling precedent." *Atlantic*, 970 F.2d at 838 (citing *Tucker v. Phyfer*, 819 F.2d 1030, 1035 n. 7 (11th Cir.1987)). I agree with the *Atlantic* panel's reasoning that Supreme Court precedent does dictate a different conclusion than that reached by the *Scripps Clinic* panel. Therefore, the *Atlantic* decision that process is a limitation on product by process claims will be followed, since *Scripps Clinic* did not consider Supreme Court precedent. AK offers a similar explanation of what product-by-process claims cover. AK 1st Reply at 1.

the limitations "protective atmosphere" and "at least about 95% by volume hydrogen" in the claims of the Kilbane '214 and '723 patents and both Boston patents.

### B. Second Summary Judgment Motion

Sollac's second motion seeks summary judgment of noninfringement of the Kilbane '214 and '723 patents and both Boston patents in suit for failure to satisfy the limitations construed in the first summary judgment motions.

### C. Third Summary Judgment Motions

Sollac's third summary judgment motion and AK's second cross summary judgment motion (which for convenience are collectively referred to as the "third summary judgment motions") deal with claim construction, noninfringement and invalidity of the limitations involving "aluminum" and "aluminum alloy" as they appear in the claims of all the Kilbane patents in suit.

### IV. LAW APPLICABLE TO SUMMARY JUDGMENT

Summary judgment is appropriate when the record shows no genuine issue of material fact, and an entitlement to judgment as a matter of law for the moving party. See Fed.R.Civ.P. 56(c). The Supreme Court has stressed that the "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" Celotex Corp. v. Catrett, 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (citation omitted). Under Federal Rule of Civil Procedure 56, the Court should grant summary judgment where "there is no genuine issue of material fact." Fed.R.Civ.P. 56(c). A material fact is one that is relevant and necessary to the proceedings. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A genuine issue exists if sufficient evidence is presented so that a reasonable fact finder could decide the issue in the nonmoving party's favor. Id. An asserted issue of material fact is not "genuine" in the sense of Fed.R.Civ.P. 56 if a reasonable jury could only resolve the question for the moving party. See id. at 248, 106 S.Ct. 2505. The evidence proffered by the nonmoving party "is to be believed, and all justifiable inferences are to be drawn in [the nonmovant's] favor." Id. at 255, 106 S.Ct. 2505.

When ruling on a motion for summary judgment, the court must keep in mind the proof necessary to support liability under the applicable substantive law. Id. at 254, 106 S.Ct. 2505. The court must determine whether the showing the nonmovant claims it will make at trial would be sufficient to carry its burden of proof. Id. at 249, 106 S.Ct. 2505.

The Federal Circuit has emphasized repeatedly that "summary judgment is as appropriate in a patent case as any other case." See, e.g., Avia Group Int'l, Inc. v. L.A. Gear Cal., Inc., 853 F.2d 1557, 1561 (Fed.Cir.1988); Mark I Mktg. Corp. v. R.R. Donnelley & Sons Co., 66 F.3d 285, 289 (Fed.Cir.1995); Fed.R.Civ.P. 56(c). The Federal Circuit has stated that noninfringement is an issue on which it has "repeatedly upheld a grant of summary judgment." Chemical Eng.'g Corp. v. Essef Indus., Inc., 795 F.2d 1565, 1571 (Fed. Cir.1986). Finally, when both parties move for summary judgment, the court must evaluate each motion on its own merits, resolving all reasonable inferences against the party whose motion is under consideration. McKay v. United States, 199 F.3d 1376, 1380 (Fed.Cir.1999).

## V. FIRST SUMMARY JUDGMENT MOTIONS

These cross motions for summary judgment request interpretation of certain language appearing in all claims of the Kilbane '214 and '723 patents and both Boston patents. At issue are the claim elements that include the phrase "at least about 95% by volume hydrogen." Sollac Mot. at 1–5. Sollac contends that the phrase "at least about 95% by volume hydrogen" needs to be interpreted. *Id.* AK contends that the entire limitation in which this phrase appears needs to be interpreted. AK Opp'n at 14. Because it is helpful in order to understand the context of the "at least about 95% by volume hydrogen," I will interpret the entire limitation to the extent that a term is disputed.[2] *Elkay Mfg. Co. v. Ebco Mfg. Co.;* 192 F.3d 973, 977 (Fed.Cir.1999) ("[C]laim limitations must be construed in context...")

### A. The Applicable Law Relating To Claim Construction

The determination of infringement is a two-step process. First, the scope and meaning of the patent claims at issue are determined as a matter of law. *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 976, 979 (Fed.Cir.1995) *(en banc),* *aff'd,* 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996); *Cybor Corp. v. FAS Techs., Inc.,* 138 F.3d 1448, 1454 (Fed.Cir.

1998) *(in banc).* This step is commonly referred to as "claim interpretation" or "claim construction."

Claim construction begins with the words of the claims. *See Bell Communications Research, Inc. v. Vitalink Communications Corp.,* 55 F.3d 615, 620 (Fed.Cir. 1995). Words in a patent claim are given their ordinary and customary meaning, unless the patent uses or clearly defines those words differently from their ordinary meaning, or the terms are limited by the prosecution history. *See Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582 (Fed.Cir.1996). The "ordinary and customary meaning" of a word in a patent claim is "the meaning that it would be given by persons experienced in the field of the invention." *Id.* (quoting *Hoechst Celanese Corp. v. BP Chems. Ltd,* 78 F.3d 1575, 1578 (Fed.Cir.1996)).[3] Absent an express intent to impart a novel meaning, "terms in a claim are to be given their ordinary and accustomed meaning." *Renishaw PLC v. Marposs Societa' per Azioni,* 158 F.3d 1243, 1249 (Fed.Cir.1998); *Carroll Touch, Inc. v. Electro Mech. Sys., Inc.,* 15 F.3d 1573, 1577 (Fed.Cir.1993).

However, the Court does not view a claim term in isolation, but rather in the context of the patent documents—the specification and the prosecution history. *Toro Co. v. White Consol. Indus., Inc.,* 199 F.3d 1295, 1299 (Fed.Cir.1999). The speci-

---

**2.** AK's references to an "All Elements" rule for claim interpretation is misplaced. Under the "all elements" rule, there can be no infringement, either literally or under the doctrine of equivalents, unless every element of a claim or its equivalent is present in the accused device. *See, e.g., Pennwalt Corp. v. Durand–Wayland, Inc.,* 833 F.2d 931, 937 (Fed. Cir.1987) *(en banc ).* It is not a rule of literal claim interpretation.

**3.** A person experienced in the field is often referred to as "one of ordinary skill in the art." For the purposes of these summary

judgment motions, I have accepted AK's assertion that "a person of ordinary skill in the art would probably have a bachelor of science degree in materials science, metallurgical engineering or a related field, with several years actual experience in the metallic coating industry, or a combination of education and/or work experience equivalent thereto." See AK Supp. Resp. at tab 19 at 6, n. 1. However, if I were instead to accept Sollac's assertion as to the level of skill in art, it would not alter any of the decisions recommended herein.

fication is often "the single best guide to the meaning of a disputed [claim] term." *Vitronics,* 90 F.3d at 1582. Likewise, the prosecution history is "of primary significance in understanding the claims." *Markman,* 52 F.3d at 980. The "prosecution history" is the written record of the proceedings in the Patent and Trademark Office ("PTO") that considered the application(s) resulting in the patent in suit. It is error not to consider the prosecution history in interpreting the claims. *Alpex Computer Corp. v. Nintendo Co.,* 102 F.3d 1214, 1220 (Fed.Cir.1996) ("Prosecution history is relevant not only for purposes of prosecution history estoppel but also for construing the meaning and scope of the claims."); *Lemelson v. United States,* 752 F.2d 1538, 1550 (Fed.Cir.1985). The prosecution history limits the interpretation of claims so as to exclude any interpretation that may have been disclaimed or disavowed during prosecution. See *Vitronics,* 90 F.3d at 1582–83 (citing *Southwall Tech., Inc. v. Cardinal IG Co.,* 54 F.3d 1570, 1576 (Fed.Cir.1995)); *Specialty Composites v. Cabot Corp.,* 845 F.2d 981, 988 (Fed.Cir. 1988) (citation omitted); *Standard Oil Co. v. American Cyanamid Co.,* 774 F.2d 448, 452 (Fed.Cir.1985) (stating that the prosecution history, which includes "all express representations made by or on behalf of the applicant to the examiner to induce a patent grant," limits the interpretation of the claims "so as to exclude any interpretation that may have been disclaimed or disavowed during prosecution in order to obtain claim allowance").

The Court should, where possible, determine the meaning of the claims based upon the intrinsic evidence alone that is, the claim itself, the patent's specification, including the drawings and the written description, and the prosecution history. *See Vitronics,* 90 F.3d at 1582. "Such intrinsic evidence is the most significant source of the legally operative meaning of disputed claim language." *Id.* If the meaning of a claim term is clear after resort to the intrinsic evidence, it is never appropriate to refer to extrinsic evidence to vary the meaning established by the intrinsic evidence. *Key Pharms. v. Hercon Lab. Corp.,* 161 F.3d 709, 716 (Fed.Cir.1998) *(citing Vitronics,* 90 F.3d at 1584). "Thus, if the meaning of a disputed claim term is clear from the intrinsic evidence—the written record—that meaning, and no other, must prevail; it cannot be altered or superseded" by extrinsic evidence "simply because one of the parties wishes it were otherwise." *Id.*

If a claim term cannot be satisfactorily defined and interpreted after analyzing the intrinsic evidence, then extrinsic evidence may be considered to assist in determining the scope and meaning of the claim. *See Vitronics,* 90 F.3d at 1583. Extrinsic evidence includes prior art not cited in the prosecution history of the patent, technical treatises, and expert opinion testimony about the meaning of a claim term. *See id.* at 1584. The extrinsic evidence cannot contradict the express language of the patent claim or statements made during the prosecution of the patent. *See id.* However, dictionaries, although a form of extrinsic evidence, hold a special place and may sometimes be consulted along with the intrinsic evidence, as long as they do not contradict any definition found in the patent documents. *Cybor,* 138 F.3d at 1459; *Vitronics,* 90 F.3d at 1584 n. 6; *Interactive Gift Express, Inc. v. Compuserve, Inc.,* 231 F.3d 859, 866 n. 1 (Fed.Cir.2000).

Determining the meaning of a claim term may require the weighing of evidence and judgments of the credibility of conflicting experts. However, such evaluations are within the legal question of the meaning of the claim terms. *Markman,* 116 S.Ct. at 1395. They are not subsidiary or underlying questions of fact for the jury.

The totality of claim construction is a legal question to be decided by the judge. *Cybor,* 138 F.3d at 1455.

It is improper to use the patent specification to add a limitation to a claim that does not otherwise appear there. *See Mantech Envtl. Corp. v. Hudson Envtl. Servs., Inc.,* 152 F.3d 1368, 1374 (Fed.Cir. 1998). Thus, the claim language of a patent is not limited by the preferred embodiment of the patent. *See Enercon GmbH v. ITC,* 151 F.3d 1376, 1384 (Fed.Cir.1998), *cert. denied,* 526 U.S. 1130, 119 S.Ct. 1803, 143 L.Ed.2d 1007 (1999). However, "[c]laims must be read in view of the specification, of which they are a part." *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 979 (Fed.Cir.1995), *aff'd,* 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996); *see also United States v. Adams,* 383 U.S. 39, 49, 86 S.Ct. 708, 15 L.Ed.2d 572 (1966) ("[C]laims are to be construed in the light of the specifications and both are to be read with a view to ascertaining the invention."); *Slimfold Mfg. Co. v. Kinkead Indus., Inc.,* 810 F.2d 1113, 1116 (Fed.Cir.1987) ("Claims are not interpreted in a vacuum, but are part of and are read in light of the specification."). As the Federal Circuit has explained, "[o]ne purpose for examining the specification is to determine if the patentee has limited the scope of the claims." *Watts v. XL Sys., Inc.,* 232 F.3d 877, 882 (Fed.Cir.2000).

> While it is true, of course, that "the claims define the scope of the right to exclude" and that "the claim construction inquiry, therefore, begins and ends in all cases with the actual words of the claim," the written description can provide guidance as to the meaning of the claims, thereby dictating the manner in which the claims are to be construed, even if the guidance is not provided in explicit definitional format.

*SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.,* 242 F.3d 1337, 1344 (Fed.Cir.2001) (quoting *Renishaw PLC v. Marposs Societa´ per Azioni,* 158 F.3d 1243, 1248 (Fed.Cir.1998) (citations omitted)).

In some instances, a narrow description of the invention, or the exclusion of subject matter from the invention in the original disclosure of an application, can limit the permissible scope of the claims. *SciMed,* 242 F.3d at 1344; *Gentry Gallery, Inc. v. Berkline Corp.,* 134 F.3d 1473, 1478–1479 (Fed.Cir.1998). Furthermore, a statement within a specification that an embodiment is excluded from an invention can limit the permissible breadth of later-drafted claims. *Id.* However, a construction that flies in the face of the express language of the claim is not preferred. *Interactive Gift,* 231 F.3d at 865. Unless something in the written description suggests that the patentee intended the unambiguous claim language to be construed in a manner inconsistent with its ordinary meaning, the claim construction is bound by that claim language. *Id.*

Finally, where there are related patents (continuations, divisionals and continuation-in-parts), the prosecution history of one can be helpful in determining the meaning of the claims of another. *See Abtox, Inc. v. Exitron Corp.,* 122 F.3d 1019, 1027 (Fed.Cir.1997), *modified on reh'g,* 131 F.3d 1009 (Fed.Cir.1997); *Jonsson v. Stanley Works,* 903 F.2d 812, 818 (Fed.Cir.1990).

### B. *The Claim Language at Issue*

The patents in this case that involve the "at least about 95% by volume hydrogen" phrase are the '214 patent, '723 patent, '113 patent, and '645 patent. The entire limitations as they appear in the independent claims at issue are reproduced below.

| Patent Claim | | Claim Language |
|---|---|---|
| Kilbane '214 | | |
| | claim 1 | maintaining the cleaned steel in a protective atmosphere of *at least about 95% by volume hydrogen* |
| | claim 10 | maintaining said cleaned strip in a protective atmosphere of *at least about 95% by volume hydrogen* |
| Kilbane '723 | | |
| | claim 1 | maintaining said cleaned strip in a protective atmosphere of *at least about 95% by volume hydrogen* |
| Boston '113 | | |
| | claim 1 | passing said strip through a protective atmosphere having *at least about 95% by volume hydrogen* |
| | claim 8 | further heating said strip to a temperature at least about 830" C. in a second furnace portion containing a protective atmosphere of *at least about 95% by volume hydrogen* |
| | | passing said strip through an enclosed snout containing said atmosphere and into a molten bath of said coating metal to deposit a coating layer on said strip |
| | | said atmosphere in said snout having *at least about 97% by volume hydrogen* |
| Boston '645 | | |
| | claim 1 | maintaining said strip during said further heating step and during said cooling step in a protective atmosphere containing *at least about 95% by volume hydrogen* |
| | claim 2 | cooling said strip in a protective atmosphere containing *at least about 95% by volume hydrogen* |
| | claim 6 | maintaining said strip during said annealing step and during said cooling step in a protective atmosphere containing *at least about 95% by volume hydrogen* |

There is no real dispute between the parties regarding most of the terms above, including the term "protective atmosphere" itself. AK argues that the term "protective atmosphere" should be interpreted to mean a covering medium around a body. AK 1st Opp'n at 28–29. Sollac does not oppose that definition. Given the claim language and specification, and the vantage point of one skilled in the art, it is recommended that the claimed "protective atmosphere" in the claims of the Kilbane '214 and '723 patents and the Boston patents be interpreted to mean a gaseous medium covering and protecting the steel.

The real dispute is: (1) where must the "protective atmosphere" be, and (2) of what must the "protective atmosphere" be composed. Thus, the parties dispute the meaning of "at least about 95% by volume hydrogen" and the various leading phases ("maintaining," "passing," and "cooling") to the extent they identify where the "protective atmosphere" exists. AK has briefed

the interpretations of the other phrases in the limitations at issue without opposition by Sollac. Since those definitions are not contested and do not provide any further aid in interpreting the claim, no special definitions are necessary for those phrases. *See U.S. Surgical Corp. v. Ethicon. Inc.*, 103 F.3d 1554, 1568 (Fed.Cir.1997) (stating that claim construction is used "to clarify and *when necessary* to explain what the patentee covered by the claims") (emphasis added).

## C. *Claim Construction in the Kilhane '214 and '723 Patents*

### 1. *Where Must The "Protective Atmosphere" Be?*

Claims 1 and 10 of the '214 patent and Claim 1 of the '723 patent, claim "maintaining" the steel strip in a "protective atmosphere." The first issue is where does the cleaned steel or strip have to be *maintained* in a "protective atmosphere." In other words, where is the "protective atmosphere?" Sollac argues that the "protective atmosphere" must exist "throughout the snout of the coating line" for the claims of the Kilbane patents. Sollac 1st Mot. at 33–38. AK, on the other hand, argues that there need not be a specific location of the "protective atmosphere." AK 1st Opp'n at 16–17, AK 1st Reply at 13–17.

### a. *The Claim Language*

Sollac argues that since the "maintaining" step in the claims immediately precedes the "dipping" process step, the "protective atmosphere" must be present immediately preceding the dipping/coating of the steel. Sollac 1st Mot. at 33–34. Further, Sollac argues that what precedes the dipping must refer to the snout, where

the protective atmosphere exists in the Kilbane patents. *Id.*

AK correctly points out that none of the claims of the Kilbane patents use the word "snout" in conjunction with the "protective atmosphere" limitation. AK 1st Opp'n at 6–7.[4]

### h. *The Specification*

The Kilbane specification describes the "protective atmosphere" as existing just prior to the entry of the steel into the coating bath. For example, Kilbane states that the process "pass[es] the cleaned strip through a protective atmosphere of substantially all hydrogen just before entering the coating bath." '214 patent at 4:15–17. See *also id.* at 2:43–47, 6:27–31. The specification makes it clear that it is preferred that the "protective atmosphere" be maintained in a snout. As an example, Kilbane states: "[w]hen an in-line annealing such as described above is used to clean the strip, the protective atmosphere is maintained in an enclosure such as enclosed snout 26." *Id.* at 4:18–20. While not expressly stated in the specification, it is clear that the purpose of the protective atmosphere is to protect the steel strip after it has been cleaned and heated and until it reaches the coating bath. *Id.* at 2:50–60, 4:13–20. Thus, the specification supports an interpretation that the protective atmosphere must be maintained around the strip at least after it has been cleaned and just before it enters the coating bath.

The Boston patent also interprets the Kilbane disclosure to include, "cleaning a ferritic chromium alloy steel and passing the cleaned steel through a protective hydrogen atmosphere substantially void of nitrogen *prior to entry of the steel into an*

---

**4.** Claim 10 of the '214 patent uses the phrase "enclosed snout" in conjunction with the

"cooling" step, but not with the "maintaining.. in a protective atmosphere" step.

*aluminum coating bath."* '113 patent at 2:33–37 (emphasis added).

### c. *The Prosecution Histories*

The prosecution history of the Kilbane patents gives little further insight into the issue of where the "protective atmosphere" must exist.

### d. *Conclusion As To Where The "Protective Atmosphere" Must Be*

■ Given the context of the claim limitations, it is clear that the "protective atmosphere" must be maintained during the last portion of the travel of the strip before it is dipped in all the patents. This is dictated because, although the claims themselves do not dictate an order, the specification does. *Loral Fairchild Corp. v. Sony Corp.*, 181 F.3d 1313, 1322 (Fed. Cir.1999) ("Although not every process claim is limited to the performance of its steps in the order written, the language of the claim, the specification and the prosecution history support a limiting construction in this case."); *Interactive Gift Express, Inc. v. Compuserve Inc.*, 231 F.3d 859, 875–76 (Fed.Cir.2000).

In the Kilbane patents, the specification makes it clear that the maintaining of the protective atmosphere, must be done just prior to the dipping step. See, e.g., '214 patent at 2:43–47, 4:15–17, 6:27–31. This is not to say that the maintaining must be done with a snout; any device can be used to maintain the protective atmosphere as long as it is done just prior to the dipping step.

AK argues that the doctrine of claim differentiation dictates that the word "snout" is an improper claim limitation for Claim 1 of the '214 patent since dependent Claim 9 of the same patent includes the limitation: "wherein said atmosphere is maintained in a sealed enclosure." AK 1st Opp'n at 18–19, 34. The doctrine of claim differentiation creates a presumption that there is a difference in scope among the claims of a patent. *Tandon Corp. v. United States Int'l. Trade Com'n*, 831 F.2d 1017, 1023 (Fed.Cir.1987). Thus, independent claims should not be interpreted in a way that is inconsistent with a claim which depends from it, for instance rendering the dependent claim superfluous. *Wright Medical Tech., Inc. v. Osteonics Corp.*, 122 F.3d 1440, 1445 (Fed.Cir.1997). The presumption that separate claims have a different scope, however, "is a guide, not a rigid rule." *ATD Corp. v. Lydall, Inc.*, 159 F.3d 534, 541 (Fed.Cir.1998) (citing *Autogiro Co. of Am. v. United States*, 384 F.2d 391, 404 (Ct.Cl.1967)). Also, the doctrine "cannot [sic] broaden claims beyond their correct scope, determined in light of the specification and the prosecution history." *Multiform Desiccants, Inc. v. Medzam Ltd.*, 133 F.3d 1473, 1480 (Fed.Cir.1998).

Claim 9 further defines the "atmosphere" to be maintained in a sealed enclosure. According to the specification, a specific type of enclosure, a snout, can be used for maintaining the protective atmosphere. '214 at 4:18–20. This statement supports the argument that the protective atmosphere of Claim 1 is broader than the sealed enclosure in Claim 9 which is broader than a snout.

Therefore, it is recommended that the independent claims of the Kilbane '214 and '723 be interpreted to require that the protective atmosphere be maintained at least just prior to the dipping step.

### 2. *Claim Construction Of "At Least About 95% By Volume Hydrogen"*

The next issue to resolve is the meaning of the hedge phrase "at least about" that appears in all of the claims of the Kilbane and Boston patents. Sollac argues that in each patent, the phrase must be interpret-

ed to mean "approaching exactly 95% or greater than 95% and no less than 94%." Sollac 1st Mot. at 36–38. AK argues that the phrase means "an imprecise amount of hydrogen, loosely defined as approximately or near 95% (with a contemplated variation) by volume hydrogen." AK 1st Opp'n at 30–31.

### a. *"About" in Claims*

The term "about" appears often in patent claims and the courts have routinely had to interpret it. "About" has been interpreted by the Federal Circuit, generally, as "with some approach to exactness in quantity, number, or time." *Conopco, Inc. v. May Dep't Stores Co.*, 46 F.3d 1556, 1561 n.2 (Fed.Cir.1994) (citing Webster's Third New International Dictionary). This appears to add nothing to the ordinary meaning of "about." Even though the word "about" avoids a strict numerical boundary, its range must be interpreted in light of the specification, prosecution history and technology embodied in the invention. *Pall Corp. v. Micron Separations, Inc.* 66 F.3d 1211, 1217 (Fed.Cir.1995), *cert. denied,* 520 U.S. 1115, 117 S.Ct. 1243, 137 L.Ed.2d 326 (1997); *Modine Mfg. Co. v. United States Int'l Trade Comm'n,* 75 F.3d 1545, 1554 (Fed.Cir.1996), *cert. denied, sub. nom Showa Aluminum Corp. v. Modine Mfg. Co.,* 518 U.S. 1005, 116 S.Ct. 2523, 135 L.Ed.2d 1048 (1996). In this respect, it is appropriate to consider the effects of varying that parameter in order to discern the inventor's intended meaning. *Pall,* 66 F.3d at 1217.

### b. *The Patent Specification*

In the Kilbane patents, several references are made to the percentage of hydrogen by volume in the protective atmosphere. Kilbane teaches that: "[t]he protective atmosphere *must* contain at least about 95%, more preferably at least 97%, and most preferably as close to 100% as possible, by volume hydrogen." (Emphasis added). '214 at 4:21–24. Furthermore, in the section providing examples of the claimed process, Kilbane states:

> When the atmosphere was about 92% by volume hydrogen and the balance nitrogen, the coating quality was unacceptable. Increasing the hydrogen to about 94% by volume produced what was considered to be marginally acceptable coating quality. When the hydrogen was increased to 97% by volume, the coating quality observed was considered to be excellent and the coating layer had substantially no uncoated areas.

*Id.* at 6:31–38.

### c. *Conclusions as to "At Least About 95% By Volume Hydrogen" in the Kilbane Patents*

Although the Kilbane prosecution histories do not elucidate the meaning of "about" any further, the specification makes it clear that the term "about 95%" cannot mean 92% by volume hydrogen, since that percentage produced a coating quality that was unacceptable. *See, e.g., Maxwell v. J. Baker, Inc.,* 86 F.3d 1098, 1105 (Fed.Cir.1996) (stating that claim language must be interpreted in a manner that would not result in the inoperativeness of the claimed invention). With 94% to 100% by volume hydrogen, the coating quality ranges from "marginally acceptable" to excellent. Thus, it is recommended that the claim term "at least about 95% by volume hydrogen" be given its ordinary meaning, except that its lower limit is to be interpreted in light of the specification statements that 94% is marginally acceptable and 92% is unacceptable.

### 3. Conclusions As To Kilbane Patents

| Patent Claim | Claim Language | Recommended Claim Construction |
|---|---|---|
| **Kilbane '214** | | |
| claim 1 | maintaining the cleaned steel in a protective atmosphere of *at least about* 95% *by volume hydrogen* | maintaining the cleaned steel, at least just prior to the dipping step, in a protective atmosphere of at least about 95% (and not as low as 92%) by volume hydrogen |
| claim 10 | maintaining said cleaned strip in a protective atmosphere of *at least about* 95% *by volume hydrogen* | maintaining the cleaned strip, at least just prior to the dipping step, in a protective atmosphere of at least about 95% (and not as low as 92%) by volume hydrogen |
| **Kilbane '723** | | |
| claim 1 | maintaining said cleaned strip in a protective atmosphere of *at least about* 95% *by volume hydrogen* | maintaining the cleaned strip, at least just prior to the dipping step, in a protective atmosphere of at least about 95% (and not as low as 92%) by volume hydrogen |

### D. The Boston Patents

#### 1. Where Must The Protective Atmosphere Be?

#### a. Usage In The Claims

Claim 1 of the Boston '113 patent recites only that the strip be passed through a protective atmosphere, without expressly reciting where that protective atmosphere exists. However, as with the Kilbane patents, the "passing" step of Claim 1 of the '113 patent immediately precedes the "dipping" process step. Claim 8 of the '113 patent recites that the protective atmosphere be present in a second furnace portion and in the snout. Claims 1 and 2 of the Boston '645 patent recite that the protective atmosphere be maintained in the cooling step. Claim 6 of the '645 patent recites that the protective atmosphere be maintained both during the annealing step and during the cooling step.

#### b. The Specifications

Several passages in the Boston specification detail where the protective atmosphere exists. For example, the Boston specification states that: "a protective atmosphere including at least about 95% by volume hydrogen preferably is maintained in furnace section 16 as well as succeeding sections of the furnace..." '113 patent at 4: 17–21. Furthermore, the '113 patent states: "[b]y maintaining a protective atmosphere containing at least about 95% volume hydrogen in furnace portion 16, cooling zones 20, 22 and snout 26, minimal oxidation of strip 11 can be removed." *Id.* at 7:66—8:2. However, the '113 patent states that "various modifications" can be made to the invention "without departing from the spirit and scope" of the patent as long as, among other things, the strip is "passed·through a protective atmosphere containing at least about 95% by volume hydrogen prior to entry into the coating metal bath." *Id.* at 8:66—9:4. Thus, the

specification of the Boston patents clearly indicates that the protective atmosphere must be maintained at least prior to dipping and preferably is maintained also in the second furnace and in the cooling zones.

### c. *The Prosecution Histories*

The prosecution histories of the Boston patents address the issue of where the "protective atmosphere" must exist. During the prosecution of both of the Boston patents, the PTO Examiner rejected the pending claims of the Boston patents as either anticipated by or obvious over the Kilbane patents. In response to those rejections, the Boston patents applicants made amendments and statements that address the construction of some of the claims at issue.

Claim 8 of the '113 patent, which corresponds to claim 19 in the '113 patent application, was rejected under 35 U.S.C. § 103, as obvious over the Kilbane patents. Sollac Ex. 11 ('113 File History) at 233–234. In response to that rejection, the applicants argued that application claim 19 is "limited to the strip being continuously maintained in an atmosphere of at least 95% by volume hydrogen beginning with the heating in the second furnace portion and continuing through and including until the strip is finally dipped into the coating metal bath." *Id.* at 278. This statement is a clear declaration regarding what Claim 8 covers, and is consistent with the express claim recitations that the protective atmosphere is maintained in the second furnace portion, in the cooling step and in the snout.

Claim 1 of the '645 patent was application claim 2 and Claim 6 was application Claim 16. Both were rejected under 35 U.S.C. § 103, as obvious over the Kilbane patents. Sollac Ex. 12 ('645 File History) at 68–69. Application claim 2 was then amended to add "maintaining said strip during said further heating step and during said cooling step in" a protective atmosphere. *Id.* at 70–71. The applicants argued that this amendment was made to "point out that the strip is maintained in the hydrogen protective atmosphere throughout the coating line after being heated in the atmosphere formed by gaseous products of the combustion of fuel and air and prior to being coated with the aluminum coating metal." *Id.* at 70–72.

Similarly, application claim 16 was amended to add "maintaining said strip during said annealing step and during said cooling step in" a protective atmosphere. *Id.* at 71–72. The applicants argued that this amendment was made to include "that the strip is maintained in the hydrogen protective atmosphere throughout the coating line after being heated in the direct fired furnace portion and prior to being coated with the aluminum coating metal." *Id.* at 72–73. The applicants go on to state that application claims 2 and 16 are directed to a process where "after being heated in the fuel and air atmosphere, the strip then is maintained in the protective hydrogen atmosphere until being coated with aluminum." *Id.* at 73. Thus, it is clear from the prosecution history that in Claims 1 and 6 of the '645 patent (application Claims 2 and 16), the limitations that the protective atmosphere be maintained "during said further heating step" (Claim 1) or "during said annealing step" (Claim 6), and "during said cooling step" requires that the protective atmosphere be maintained throughout the coating line at least after being heated and prior to being coated with aluminum. *Southwall,* 54 F.3d at 1576; *Specialty Composites v. Cabot Corp.,* 845 F.2d 981, 988 (Fed.Cir.1988); *Standard Oil Co. v. American Cyanamid Co.,* 774 F.2d 448, 452 (Fed.Cir.1985).

No similar statements were made regarding the protective atmosphere with respect to application claims 11 or 12, which were combined to become Claim 2 of the '645 patent. However, the arguments made with respect to the meaning of "during said cooling step" in patent Claims 1 and 6 are relevant to the meaning to be attributed to "cooling said strip in a protective atmosphere" in Claim 2. *American Permahedge, Inc. v. Barcana, Inc.*, 105 F.3d 1441, 1446 (Fed.Cir.1997); *Phonometrics, Inc. v. Northern Telecom Inc.*, 133 F.3d 1459, 1465 (Fed.Cir.1998); *Southwall*, 54 F.3d at 1579. Although the language is slightly different, and there is no recitation in Claim 2 of maintaining the protective atmosphere during the heating step, the arguments regarding maintaining the strip in the protective atmosphere "during said cooling step" in Claims 1 and 6, show that the limitation "cooling said strip in a protective atmosphere" must mean that the protective atmosphere exists at least throughout the coating line from some point in the cooling stage until the strip is dipped into the coating bath.

The prosecution history gives no guidance with respect to Claim 1 of the '113 patent.

### d. *Conclusion As To Where The Protective Atmosphere Must Be In The Boston Patents*

Given the context of the claim limitations, it is clear that, in all claims of the Boston patents, the "protective atmosphere" must be maintained at least during the last portion of the travel of the strip before it is dipped. This is dictated by reading the claims in light of the specification. *Loral Fairchild Corp. v. Sony Corp.*, 181 F.3d 1313, 1322 (Fed.Cir.1999) ("Although not every process claim is limited to the performance of its steps in the order written, the language of the claim,

the specification and the prosecution history support a limiting construction in this case."). Here, the Boston patent specification clearly supports a limiting construction.

AK argues that as to Claim 1 of the '113 patent, the doctrine of claim differentiation dictates a different result. AK 1st Opp'n at 20–21. Specifically, Claim 3 and Claim 4 of the '113 patent add the further limitations to Claim 1 of the same patent by adding that the strip is "further heated" and "cooled" in the protective atmosphere, respectively. However, in accordance with the recommended interpretation given above, Claim 1 only includes a protective atmosphere *"at least during the lust portion of the travel of the strip before it is dipped."* Claims 3 and 4 add further limitations to the broader limitation of Claim 1 and therefore do not implicate the doctrine of claim differentiation.

Because of the express language of Claim 8 of the '113 patent, Claim 8 is limited to a process where the strip is continuously maintained in a protective atmosphere beginning with the heating in the second furnace portion and continuing through and including until the strip is finally dipped into the coating metal bath. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582–83 (Fed.Cir.1996); *Standard Oil*, 774 F.2d at 452; *Specialty*, 845 F.2d at 988.

Due to the prosecution history, claim 1 of the '645 patent is limited to a process where the strip is maintained in the protective atmosphere throughout the coating line from some point where it is heated in the furnace portion, until the strip is coated with the aluminum coating metal. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582–83 (Fed.Cir.1996); *Standard Oil*, 774 F.2d at 452; *Specialty*, 845 F.2d at 988. Similarly, Claim 6 is limited to a process where the strip is maintained in

the protective atmosphere during the annealing strip and throughout the coating line from some point in the annealing furnace, until the strip is coated with aluminum.

Claim 2 of the '645 patent should be interpreted in light of the specification, and of the prosecution history of the similar cooling step limitation in Claims 1 and 6. Therefore, Claim 2 should be interpreted as maintaining the protective atmosphere at least during some portion of the cooling step and from there throughout the coating line until the strip is dipped in the coating metal.

### 2. The "At Least About 95% By Volume Hydrogen" Limitation In The Boston Patents

The next issue to resolve is the meaning of the hedge phrase "at least about" that appears in the Boston patents. The phrase "at least about 95% by volume hydrogen" is not discussed as directly in the Boston patents or prosecution histories, as it is in the Kilbane patents. Specifically, the Boston patents do not include any statements similar to those found in the Kilbane patents that the coating quality achieved was unacceptable when a protec-

tive atmosphere of about 92% by volume hydrogen was used and was marginally acceptable when a protective atmosphere of about 94% by volume hydrogen was used. Sollac argues that in the Boston patents, the phrase must be interpreted to mean "approaching exactly 95%." Sollac 1st Mot. at 44–45. AK argues that the phrase must mean imprecisely 95% by volume hydrogen, with a contemplated variation in the amount of hydrogen. AK 1st Opp'n at 49–5 1.

Since there is no further clarification of the term in the specification or prosecution histories, the vantage point of one of ordinary skill in the art, from which the proper claim interpretation is ultimately determined, would have no reason to believe the term means anything other than its ordinary meaning. See, e.g., *Conopco*, 46 F.3d at 1561. With regard to the Boston patents, the term "about" should be given its ordinary meaning. *Id.* With regards to the "at least about 97% by volume hydrogen" of Claim 8 of the '113 patent, it should also be given its ordinary meaning. *Id.*

### 3. Conclusions As To Boston Patents

| Patent Claim | Claim Language | Recommended Claim Construction |
|---|---|---|
| **Boston '113** | | |
| claim 1 | passing said strip through a protective atmosphere having *at least about 95% by volume hydrogen* | passing said strip, at least during the last portion of the travel of the strip before the dipping step, through a protective atmosphere having at least about 95% by volume hydrogen |
| claim 8 | further heating said strip to a temperature at least about 830″ C. in a second furnace portion containing a protective atmosphere of *at least about 95% by volume hydrogen* | further heating said strip to a temperature at least about 830″ C. in a second furnace portion containing a protective atmosphere of at least about 95% by volume hydrogen |
| | passing said strip through an enclosed snout containing | passing said strip through an enclosed snout containing said atmosphere and |

| Patent Claim | Claim Language | Recommended Claim Construction |
|---|---|---|
| | said atmosphere and into a molten bath of said coating metal to deposit a coating layer on said strip | into a molten bath of said coating metal to deposit a coating layer on said strip |
| | said atmosphere in said snout having at least about 97% by volume hydrogen having a dew point no greater than –29″ C. | said atmosphere in said snout having at least about 97% by volume hydrogen having a dew point no greater than –29″ C. |
| | | said protective atmosphere being continuously maintained beginning with the heating in the second furnace portion and continuing through and including until the strip is dipped into the molten bath. |
| **Boston '645** | | |
| claim 1 | maintaining said strip during said further heating step and during said cooling step in a protective atmosphere containing *at least about 95% by volume hydrogen* | maintaining said strip in a protective atmosphere containing at least about 95% by volume hydrogen during said further heating step, and continuously thereafter through said cooling step and until the strip is dipped in the aluminum coating bath. |
| claim 2 | cooling said strip in a protective atmosphere containing *at least about 95% by volume hydrogen* | cooling said strip in a protective atmosphere containing at least about 95% by volume hydrogen and maintaining the strip in said protective atmosphere continuously thereafter until the strip is dipped in the aluminum coating bath. |
| claim 6 | maintaining said strip during said annealing step and during said cooling step in a protective atmosphere containing *at least about 95% by volume hydrogen* | maintaining said strip in a protective atmosphere containing at least about 95% by volume hydrogen during said annealing step, and continuously thereafter through said cooling step and until the strip is dipped in the aluminum coating bath. |

## VI. SECOND SUMMARY JUDGMENT MOTION

Sollac's Second Summary Judgment Motion is for noninfringement of all of the claims of the Kilbane '214 and '723 patents, as well as all of the claims of the Boston '113 and '645 patents. The limitations at issue in this motion are those relating to the location and composition of the protective atmosphere. Those limitations were construed in the recommended decision on the first Summary Judgment Motions, above.

As noted above, the determination of infringement is a two-step process. The first step is to determine the scope and meaning of the patent claims at issue as a matter of law. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976, 979 (Fed.Cir.1995) *(en banc )*, *aff'd*, 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996); *Cybor Corp. v. FAS Techs., Inc.*,

138 F.3d 1448, 1454 (Fed.Cir.1998) *(en banc )*. That has been done in Section V above. Then, the properly construed claims are compared to the accused product or process to determine whether all the limitations of the claims are present, either literally or by a substantial equivalent. *Cybor*, 138 F.3d at 1454 (citing *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 821 (Fed.Cir. 1992)); *Markman*, 52 F.3d at 976; *Renishaw PLC v. Marposs Societa´per Azioni*, 158 F.3d 1243, 1247–1248 (Fed.Cir.1998). The patent owner bears the burden of proving infringement by a preponderance of the evidence. *Conroy v. Reebok Int'l, Ltd.*, 14 F.3d 1570, 1573 (Fed.Cir.1994).

Where the parties do not dispute any relevant facts regarding the accused product, but disagree over possible claim interpretations, the question of infringement collapses into the question of claim construction, which is a matter of law suitable for summary judgment. *See Rhine v. Casio, Inc.*, 183 F.3d 1342, 1345 (Fed.Cir.1999); *Athletic Alternatives, Inc. v. Prince Mfg., Inc.*, 73 F.3d 1573, 1578 (Fed.Cir.1996).

## A. Undisputed Facts Regarding the Sollac Process

Pictorially, Sollac's process ("Line No. 2") can be represented as follows:

(reproduced and simplified from AK 2nd Opp'n at 32 (based upon Sollac's Ex. 38)).

As depicted in Fig. A above, the stainless steel strip travels from *right-to-left* through the key component parts of Line No. 2 into the coating "pot", as nitrogen and hydrogen gases are injected along the Line at five different points. To the left of the Gas Fire Pipe Radiant Zone are five points through which nitrogen and hydrogen gases are injected. These five injection points are as follows:

(i) nitrogen is injected in the snout portion (labeled "N2 lower part of the

bell" in Fig. A above) (Sollac's Hennechart Dep., Ex. 50, at 608:20—609:6; Sollac's Eustache Dep., Ex. 49, at 144:22—145:3, 146:3–7); [5]

(ii) nitrogen is injected in the upper part of the bell (labeled "$N_2$ upper part of the bell" in Fig. A above) (Sollac's Hennechart Dep., Ex. 50, at 603:12–14, 604:6–8, 604:18—605:1; Sollac's Eustache Dep., Ex. 49, at 133:6–10); [6]

(iii) hydrogen is injected at the lower part of the support (labeled "lower part of the support" in Fig. A above) (Sollac's Hennechart Dep., Ex. 50, at 553:2–7, 568: 1–11; Sollac's Eustache Dep., Ex. 49, at 108:4–8);

(iv) nitrogen is injected in area IV in the upper part of the vertical furnace (Sollac's Hennechart Dep., Ex. 50, at 560: 15—561:1); and

(v) hydrogen is injected in area V in the upper part of the vertical furnace (Sollac's Hennechart Dep., Ex. 50, at 561:12–16, 568:1–11; Sollac's Eustache Dep., Ex. 49, at 103:21—104:5).

Thus, the last location along the path of the strip at which hydrogen is injected is the lower part of the support. To the left of that hydrogen injector are two locations at which nitrogen is injected.

As a result of the foregoing gas flow injection rates, there is:

(i) 0.06% *hydrogen* in the snout portion (labeled "N2 lower part of the bell" in Fig. A above); and

(ii) 70.6% *hydrogen* in the Vertical Furnace.

These facts regarding the Sollac process are from the AINF report prepared by an independent company, hired by Sollac, and submitted by both parties. See Sollac Ex. 39; AK Ex. 50.

**B.** *Literal Infringement*

Literal infringement is found only where each limitation of an asserted patent claim is found literally in an accused process or product. *Palumbo v. Don–Joy Co.*, 762 F.2d 969, 974 (Fed.Cir.1985). Omission of a single claimed step/element from an accused process/product is sufficient to preclude a finding of literal infringement of that claim. *Wolverine World Wide, Inc. v. Nike, Inc.*, 38 F.3d 1192, 1199 (Fed.Cir. 1994) ("If an express claim limitation is absent from the accused product, there can be no literal infringement as a matter of law"). With respect to literal infringement, there is a generally applicable doctrine that "[o]ne who does not infringe an independent claim cannot infringe a claim dependent on (and thus containing all the limitations of) that claim." *Wahpeton Canvas Co. v. Frontier, Inc.*, 870 F.2d 1546, 1552 n. 9 (Fed.Cir.1989).

In this section, the properly construed claim limitations of "protective atmosphere" and "at least about 95% by volume hydrogen" are compared to the accused Sollac process to determine whether all these limitations of the claims are present in the accused Sollac process *Cybor*, 138 F.3d at 1454. To literally infringe the "protective atmosphere" of "at least about 95% hydrogen by volume" of the Kilbane '214 and '723 patents, as well as of the Boston '113 and '645 patents, the Sollac process must include a "protective atmosphere" at least just prior to the coating

---

5. There are no hydrogen injectors in the lower part of the snout. Sollac's Hennechart Dep., Ex. 50, at 609:4–6; Sollac's Eustache Dep., Ex. 49, at 144:21.

6. There are no hydrogen injectors in the upper part of the snout. Sollac's Hennechart Dep., Ex. 50, at 605:5–9.

pot, and that "protective atmosphere" must contain "at least about 95% hydrogen by volume." [7]

In the Sollac process, the area just prior to the coating pot is a snout. See Sollac 2nd Mot. at 28–31; Fig. A above. Sollac does not dispute that the snout in its process provides a "protective atmosphere." See Sollac 2nd Mot. at 28–3 1. Therefore, for all the claims at issue in this motion, a "protective atmosphere" exists at least just prior to the coating pot.

It is undisputed that the snout in the accused Sollac process contains only 0.06% by volume hydrogen. AK Ex. 50. As to the Kilbane patents, the claim construction above concluded that the .term "at least about 95% by volume hydrogen" cannot be as low as 92%. Thus, there is no literal infringement of this limitation of the Kilbane claims. As to the Boston patents, no reasonable jury could find that 0.06% is "about 95%" or "about 97%." Thus, there is no literal infringement of these limitations of the Boston claims either. Therefore, it is recommended that summary judgment of no literal infringement be granted as to all claims of the Kilbane '214 and '723 patents, as well as all claims of the Boston '113 and '645 patents. [8]

## C. *Infringement Under the Doctrine of Equivalents*

### 1. *Applicable Law*

Generally, a device or process that does not literally satisfy each limitation of the claim may still infringe the claim under the doctrine of equivalents. A finding of infringement under this doctrine requires

that the accused device or process which literally lacks a claimed element have an equivalent to the claimed element. *See Warner–Jenkinson Co., Inc. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 18, 29, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997). A device or process that lacks a single element or its equivalent does not infringe the claim. *See Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1535 (Fed.Cir.1991).

One important limitation on the doctrine of equivalents is known as the doctrine of "prosecution history estoppel." Under this doctrine, the patent owner is precluded from obtaining, through litigation, coverage of subject matter relinquished during prosecution of the patent application before the PTO. *See generally Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 234 F.3d 558 (Fed.Cir.2000) (en banc), *cert. granted*, 533 U.S. 915, 121 S.Ct. 2519, 150 L.Ed.2d 692, 69 U.S.L.W. 3779 (U.S.2001). Whether an amendment produces an estoppel depends on whether the amendment narrows the literal scope of the claim and whether the amendment was related to a statutory requirement for a patent. More specifically, "an amendment that narrows the scope of a claim for any reason related to the statutory requirements for a patent will give rise to prosecution history estoppel with respect to the amended claim element." *Id.* at 563, 566–68. Where a narrowing amendment related to a statutory requirement for a patent is made, it is irrelevant whether that amendment (a) was made in response to an Examiner's rejection or (b) was made "voluntarily" by the applicant; in either event, such an amendment will give rise to an estoppel.

7. As construed above, some of the Claims at issue in the Boston patents contain additional limitations as to other locations at which the "protective atmosphere" must also exist.

8. All claims in the Kilbane '214 and '723 patents and the Boston '113 and '645 patents

that were not construed in Section V above depend from one of the claims so construed. Thus, none of those claims can be infringed because the independent claim from which they depend are not infringed. *Wahpeton,* 870 F.2d at 1553.

*Id.* at 563–64, 568–69. The patentee has the burden of establishing that a narrowing amendment was unrelated to a statutory requirement for a patent. *Id.* at 569; see *also Warner–Jenkinson* at 34, 117 S.Ct. 1040. Where the patentee fails to establish that the amendment was unrelated to a statutory requirements for a patent, "the court should presume that the patent applicant had a substantial reason related to patentability for including the limiting element added by amendment." *Warner–Jenkinson* at 34, 117 S.Ct. 1040.

An estoppel arising from a narrowing amendment, related to a statutory requirement for a patent, will prevent the patentee from asserting *any* scope of equivalents with respect to the amended limitation. See *Festo,* 234 F.3d at 569 ("When a claim amendment creates prosecution history estoppel with regard to a claim element, there is no range of equivalents available for the amended claim element. Application of the doctrine of equivalents to the claim element is completely barred (a 'complete bar')."); *id.* at 575 ("By making prosecution history estoppel act as a complete bar, we enforce the disclaimer effect of a narrowing claim amendment.").

Moreover, arguments made to ensure issuance of a patent, even where no claim amendment is made, may create an estoppel. Such an estoppel, arising purely from argument made during prosecution of the patent, may limit the available scope of equivalents. *See e.g., KCJ Corp. v. Kinetic Concepts, Inc.,* 223 F.3d 1351, 1359–60 (Fed.Cir.2000) (concluding that the patentee's "statements [during prosecution] reflect a clear and unmistakable surrender" of subject matter that cannot be reclaimed through the doctrine of equivalents); *Ekchian v. Home Depot. Inc.,* 104 F.3d 1299, 1303–04 (Fed.Cir.1997) (in the context of arguments made by an applicant in an

Information Disclosure Statement, concluding that, "by distinguishing the claimed invention over the prior art, an applicant is indicating what the claims do not cover, he is by implication surrendering such protection."). Thus, "[a]rguments made voluntarily during prosecution may give rise to prosecution history estoppel if they evidence a surrender of subject matter." *Festo,* 234 F.3d at 568 (citations omitted).

If literal infringement is not found, and no estoppel applies, an analysis of infringement may continue under the doctrine of equivalents. Under the doctrine of equivalents a patentee may assert infringement by a product or process that does not literally satisfy each limitation of the claim provided that the accused product or process contains "elements identical or equivalent to each claimed element of the patented invention." *Warner–Jenkinson Co.,* 520 U.S. at 40, 117 S.Ct. 1040. An equivalent element is one which is insubstantially different from the claimed element. *Id.* at 29, 117 S.Ct. 1040. The doctrine of equivalents is applied to each individual element or limitation of a claim, rather than to the invention as a whole. See *id.* at 29, 117 S.Ct. 1040. The legal standard for determining equivalence is an objective one as of the time of the infringement. See *id.* at 36–37, 117 S.Ct. 1040.

Infringement under the doctrine of equivalents is a question of fact. See *SRI Int'l v. Matsushita Elec. Corp. of Am.,* 775 F.2d 1107, 1125 (Fed.Cir.1985) (en banc); *Critikon, Inc. v. Becton Dickinson Vascular Access, Inc.,* 120 F.3d 1253, 1255 (Fed. Cir.1997). "Although equivalence is a factual matter normally reserved for a fact finder, the trial court should grant summary judgment in any case where no reasonable fact finder could find equivalence." *Sage Prods., Inc. v. Devon Indus., Inc.,* 126 F.3d 1420, 1423 (Fed.Cir.1997). The

owner of the patent bears the burden of proving infringement by a preponderance of the evidence. *Conroy v. Reebok Int'l, Ltd.,* 14 F.3d 1570, 1573 (Fed.Cir.1994).

Although the "insubstantial difference" standard is the ultimate test of infringement under the doctrine of equivalents, whether an accused device is insubstantially different may be determined using a function-way-result test. *See Warner–Jenkinson,* 520 U.S. at 40, 117 S.Ct. 1040. By performing an "analysis of the role played by each element in the context of the specific patent claim," it can be determined "whether a substitute element matches the function, way, and result of the claimed element, or whether the substitute element plays a role substantially different from the claimed element." *Id.; see also Graver Tank & Mfg. Co. v. Linde Air Prods. Co.,* 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1950).

While the doctrine of equivalents expands the effective scope of a patent claim, the "application of the doctrine, even as to an individual element, is not allowed such broad play as to effectively eliminate that element in its entirety." *Warner–Jenkinson,* 520 U.S. at 29, 117 S.Ct. 1040. Where the claim of a patent contains structural or functional limitations, the doctrine of equivalents cannot be used to vitiate these limitations. *See Sage Prods., Inc. v. Devon Indus., Inc.,* 126 F.3d 1420, 1424–25 (Fed.Cir.1997); *see also Wiener v. NEC Elecs., Inc.,* 102 F.3d 534, 541 (Fed.Cir. 1996). The determination of whether application of the doctrine of equivalents would vitiate a claim limitation is decided on the facts of the particular case. *See Ethicon Endo–Surgery, Inc. v. United States Surgical Corp.,* 149 F.3d 1309, 1318 (Fed.Cir.1998).

Thus, a finding of infringement under the doctrine of equivalents requires that the accused Sollac process have substituted an equivalent for the missing "protective atmosphere" of "at least about 95% by volume hydrogen" recited in the claims. *See Warner–Jenkinson,* 520 U.S. at 40, 117 S.Ct. 1040. Here, there are two equivalency issues: (1) equivalency for the "at least about 95% by volume hydrogen" claim limitation and (2) equivalency for the location of the "protective atmosphere."

### 2. Equivalency For The "At Least About 95% By Volume Hydrogen" Claim Limitation

The first issue under the doctrine of equivalents is whether the accused Sollac process has a "protective atmosphere" which is equivalent to a "protective atmosphere" having "at least about 95% by volume hydrogen" as claimed. AK contends that the combination of a low dew point (i.e., decreased water concentration) with some hydrogen content and a sufficient temperature in Sollac's accused "protective atmosphere" is equivalent to and interchangeable with the claimed protective atmosphere of "at least about 95% by volume hydrogen" limitation. See AK 2nd Opp'n at 34–36, 38–40.

In the accused Sollac process, the dew point of the snout is approximately $(-)60°C—(-)50°C$.[9] Additionally, the ac-

---

9. Several cites in AK's brief to the evidence of record regarding the dew point in Sollac's process were mistaken. For instance, AK cited to the Eustache deposition in Ex. K at 184 to confirm that Sollac maintains a sufficiently low dew point. AK 2nd Opp'n at 34. That page, however, is devoid of any reference to dew point. Subsequently, AK corrected the deficiencies when it commented on the draft Recommended Decision. AK cites to Dr. Birks' declaration for support of the low dew point in Sollac's process. AK 2nd Opp'n at 35–36. Dr. Birks' declaration in turn cites to the AINF Report (AK Ex. 50), that I accept for the purpose of showing the Sollac process conditions.

cused Sollac process contains 0.06% by volume hydrogen in the snout. AK Ex. 50. Finally, the temperature of the snout in the accused Sollac process is about 680—690°C. *Id.* AK contends that ratio of hydrogen to dew point ($H_2/H_2O$) is an important factor in chromium oxide formation. AK Ex. 5 1, Birks Decl. ¶¶ 16–23; see *also* AK 2nd Opp'n at 35. Thus, AK contends that an equivalent to the claimed "protective atmosphere" limitation need not have much concentration of hydrogen, if the water concentration is sufficiently low, and the temperature is sufficient. AK 2nd Opp'n at 33–35.

One test of insubstantial differences between an accused element and a claim limitation is to determine whether both perform substantially the same function, in substantially the same way, to achieve substantially the same result. *Warner–Jenkinson,* 520 U.S. at 40, 117 S.Ct. 1040. Here, AK proposes that the function of the claimed "protective atmosphere" limitation in all the patents is to provide the potential to form only chromium oxide. AK 2nd Opp'n at 33–35. The Kilbane and Boston patents, however, do not support this assertion.

The specifications of both the Kilbane and Boston patents indicate that the function of the "protective atmosphere" is to minimize formation of oxide on the steel strip and to "reduce" that oxide which is formed. See '214 patent at 3:37–40; '113 patent at 2:55–59. This is consistent with the conclusion in AK's brief that "the purpose of the 'protective atmosphere' within the furnace is to protect the steel strip from excess oxidation." AK 2nd Opp'n at 12. For the purposes of this motion, I will assume that the Sollac process performs this function.

AK proposes that the result of the "protective atmosphere" in the patents is minimal oxidation allowing for the application of an adherent coating that is resistant to crazing and flaking and that is substantially free of uncoated areas. AK 2nd Opp'n at 33. This is supported in the patents. See '214 patent at 2:60–63; '113 patent at 2:55–59. There seems to be no dispute that this result is achieved in the Sollac process.

AK's expert, Dr. Birks, postulates that the "way" in which the patents and the Sollac process achieve the desired result is "by establishing thermodynamic conditions that allow formation of only chromium oxide." AK Ex. 5 1, Birks Decl. ¶ 25. However, he makes no attempt to rationalize this statement of the "way" with the more specific teachings of the patents that the "way" is through maximizing concentration of a reducing gas, specifically hydrogen.

Dr. Birks further asserts that Sollac minimizes oxidation by maintaining a sufficiently low dew point, i.e. a low concentration of water vapor. AK Ex. 51, Birks Decl. ¶ 21. He acknowledges that the patents teach increasing the hydrogen concentration for that purpose. AK Ex. 51, Birks Decl. ¶ 20; See *also* AK 2nd Opp'n at 34. Dr. Birks contends that one of skill in the art would have known that to minimize oxidation one could either increase the hydrogen concentration or decrease the water concentration. AK Ex. 5 1, Birks Decl. ¶¶ 19, 23; see *also* AK 2nd Opp'n at 35. Thus, AK ultimately contends that an equivalent to the claimed "protective atmosphere" limitation need not have much concentration of hydrogen, and in fact can be as low as 0.06% by volume hydrogen, if the water concentration is sufficiently low. AK 2nd Opp'n at 35. However, it appears from the patents that high hydrogen content and low water vapor content are different "ways" of achieving minimal oxide.

The Kilbane and Boston patents teach that the protective atmosphere should have *both* a high hydrogen content and low

water vapor content (low dew point). The importance of high hydrogen content is emphasized throughout the patents. For example, the '113 patent states: "[b]y maintaining a protective atmosphere containing at least about 95% volume hydrogen in furnace portion 16, cooling zones 20, 22 and snout 26, minimal oxidation of strip 11 can be removed." '113 at 7:66—8:2; see also Id. at 4:17–21, 8:66—9:4. Similarly, the Kilbane patent teaches that: "[t]he protective atmosphere *must* contain at least about 95%, more preferably at least 97%, and most preferably as close to 100% as possible, by volume hydrogen." '214 at 4:21–24 (emphasis added); see also id. at 6:31–38, 6:59–64.

The importance of a low dew point also is clearly taught in each of the patents. For instance, the Kilbane patent states that: "[i]t is also very important to control oxygen and dew point of the protective atmosphere. Accordingly, the protective hydrogen atmosphere must have a dew point no higher than about +40°F. (4°C.)." '214 patent at 4:25–37; see also Id. at 6:43 (table). Similarly, the Boston patent states that: "we have determined it to be especially beneficial to maintain extremely low dew points in the protective hydrogen atmosphere to compensate for water formation as iron and/or chromium oxide is reduced by hydrogen in the protective atmosphere." '113 patent at 8:2–7; see also Id. 6:51–54, 5:57–6:4.

Both the high hydrogen content and the low dew point are expressly claimed in the '214, '723, '113 and '645 patents. For instance, Claim 1 of the '214 patent recites: "maintaining the cleaned steel in a protective atmosphere of at least about 95% by volume hydrogen and has dew point of no more than about +40°F. (+4°C.)." Similarly, Claim 1 of the '723 patent recites: "maintaining said cleaned strip in a protective atmosphere of at least about 95% by volume hydrogen having a dew point of no more than +40°F. (+4°C.)." Also, Claim 8 of the '113 patent recites: "said atmosphere in said snout having at least about 97% by volume hydrogen having a dew point no greater than –29°C." Finally, Claim 7 of the '645 patent recites: "wherein said atmosphere has . . a dew point less than about –18°C."

It is clear from these statements that a low dew point or decreased water concentration is viewed in the patents as an additional and different factor contributing to the effectiveness of the protective atmosphere as opposed to a substitute for hydrogen. At the very least, in accordance with the patent, high hydrogen content and low dew point are disclosed as different "ways" of achieving minimal oxidation.

The doctrine of equivalents is not a license to ignore claim limitations. *Dolly, Inc. v. Spalding & Evenflo Cos.*, 16 F.3d 394, 398 (Fed.Cir.1994). As the Federal Circuit explained in *Sage:*

> "[F]or a patentee who has claimed an invention narrowly, there may not· be infringement under the doctrine of equivalents in many cases, even though the patentee might have been able to claim more broadly. If it were otherwise, then claims would be reduced to functional abstracts, devoid of meaningful structural limitations on which the public could rely."

*Sage Prods., Inc. v. Devon Indus., Inc.*, 126 F.3d 1420, 1424 (Fed.Cir.1997). Thus, the "doctrine of equivalents cannot be used to erase 'meaningful structural and functional limitations of the claim' on which the public is entitled to rely in avoiding infringement." *Id.* at 1429 (quoting *Conopco*, 46 F.3d at 1562). Here, AK's assertion that another claimed limitation (low dew point) is equivalent to the "at least about 95% by volume hydrogen" claim limitation results in impermissibly erasing or vitiat-

ing "at least about 95% by volume hydrogen" limitation from the patent claims.

Furthermore, each of the specifications contains explicit statements with regard to the intended scope of the patents and the importance of the "at least about 95% by volume hydrogen" claim limitation. For instance, the Kilbane patent states:

"Various modifications can be made to our invention without departing from the spirit and scope of it. For example, various modifications may be made to the protective atmosphere *so long as it includes at least about 95% by volume hydrogen.*"

'214 patent at 6:59–64 (emphasis added). Similarly, the Boston patent states:

"various modifications can be made to the invention without departing from the spirit and scope of it *so long us . . . the strip . . . is passed through a protective atmosphere containing at least about 95% by volume hydrogen . . . .*".

'113 patent at 8:66—9:4 (emphasis added).

Thus, the Kilbane and Boston patents clearly state that any modification that results in exclusion of "at least about 95% by volume hydrogen" from the protective atmosphere is outside the scope of the patent. *SciMed Life Systems, Inc. v. Advanced Cardiovascular Systems, Inc.*, 242 F.3d 1337, 1344 (Fed.Cir.2001). The specification of the Kilbane patents also teaches that a nitrogen atmosphere results in unacceptable coating quality. See, e.g., '214 patent at 6:43 (table). In fact, the Kilbane patents expressly state that the protective atmosphere should be "substantially void of nitrogen prior to entry of the steel into an aluminum coating bath." '214 patent at 2:43–48.

Additionally, equivalence is measured at the time infringement began. *Warner–Jenkinson*, 520 U.S. at 37, 117 S.Ct. 1040. Here, AK believed, at the time of filing suit, that stainless steel could not be successfully coated by aluminum in an atmosphere containing substantial amounts of nitrogen (regardless of the presence of a low dew point). For instance, in response to an interrogatory, AK stated that:

In addition, as of September 3, 1998, it was AK Steel's experience, that (1) while occasionally as much as a hundred of feet of ferritic stainless steel may be coated with some nitrogen in the furnace, AK Steel was aware of no case in which a whole coil was successfully coated using a mixture of nitrogen and hydrogen; nitrogen can interact with the clean steel surface and either be absorbed by the stainless steel or interact with the chromium in the steel to form a CrN surface layer that cannot be coated with aluminum; (3) if the nitrogen is absorbed by the steel, the mechanical properties and corrosion resistance can be degraded; and (4) if the CrN film is formed, uncoated spots will occur.

See Sollac Ex. 41 at 22 (AK Resp. to Interrog 16).

Dr. Kilbane himself testified:

Q: What was the gas mixture that did not work [in the AK process]?

A: Gas mixture containing nitrogen.

Sollac Kilbane Dep., Ex. 47 at 47:12–25; see *also Id.* at 71–73. The testimony of Mr. Beringer is similar:

Q: Now you have indicated that you read the Sollac ['744 patent] and one of the things you noticed was the description of nitrogen in the snout; is that correct?

A: That's correct.

Q: And you did not believe that description, because it was so much different from Armco's experience with nitrogen in the snout that you did not believe the Sollac process as described in the patent, in the Sol-

lac patent, would work; is that correct?

A: When we read that, it caused us to believe that the Sollac process probably did not work as described.

Sollac Beringer Depo., Ex. 43 at 44–45. Finally, Alan Gibson, a co-inventor of the Kilbane patents, stated in a memo:

Sollac has been doing its own development work and has a European patent for a coating process. We have reviewed that patent. There is no conflict with out patents, but in our opinion the process specified will not produce consistent good quality over long production runs and is not practical for commercial production.

Sollac Ex. 54. Such statements by those of skill in the art support the notion that an atmosphere being substantially devoid of hydrogen and containing substantial amounts of nitrogen cannot be equivalent or interchangeable with one that is essentially pure hydrogen. AK did not provide evidence rebutting these statements.

Clearly, AK's proposal that the accused Sollac protective atmosphere, composed of only 0.06% hydrogen, is equivalent to the claimed atmosphere of 95% hydrogen, would wholly vitiate the "at least about 95% by volume hydrogen" claim limitation. *Warner–Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 29–30, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997); *Athletic Alternatives Inc. v. Prince Mfg., Inc.*, 73 F.3d 1573, 1582 (Fed.Cir.1996). The Federal Circuit explained in *SciMed:*

Thus, if a patent states that the claimed device must be "nonmetallic," the patentee cannot assert the patent against a metallic device on the ground that a metallic device is equivalent to a nonmetallic device. The unavailability of the doctrine of equivalents could be explained either as the product of an impermissible vitiation of the "non-me-

tallic" claim limitation, or as the product of a clear and binding statement to the public that metallic structures are excluded from the protection of the patent. As the court made clear in *Sage*, the foreclosure of reliance on the doctrine of equivalents in such a case depends on whether the patent clearly excludes the asserted equivalent structure, either implicitly or explicitly.. As the court observed in *Sage*, the patentee had an opportunity to draft the patent in a way that would make clear that dual lumens as well as coaxial lumens were within the scope of the invention, but the patentee did just the opposite, leaving competitors and the public to draw the reasonable conclusion that the patentee was not seeking patent protection for catheters that used a dual lumen configuration. Under these circumstances, the district court was justified in concluding that a reasonable jury could not find [infringement] under the doctrine of equivalents.

*SciMed,* 242 F.3d at 1347.

Thus, AK cannot extend the claims to "embrace" a composition that was "specifically excluded from the scope of the claims." *Dolly, Inc. v. Spalding & Evenflo Cos.*, 16 F.3d 394, 400 (Fed.Cir.1994); *Moore U.S.A., Inc. v. Standard Register Co.*, 229 F.3d 1091, 1106 (Fed.Cir.2000) (holding that "it would defy logic to conclude that a minority...could be insubstantially different from a claim limitation requiring a majority, and no reasonable juror could find otherwise"). In *Conopco,* the Federal Circuit held that the "about 40:1" formulation claim limitation could not be infringed under the doctrine of equivalents by an accused product having a 162.9:1 formulation since that would eviscerate the plain meaning of that limitation." *Conopco,* 46 F.3d at 1562. The disparity in the formulation ratios in *Co-*

*nopco* is a factor of **four.** Here, the "at least about 95% by volume hydrogen" claim limitation is over 1500 times larger than the 0.06% by volume hydrogen of the accused Sollac process. Finding infringement under the doctrine of equivalents under such circumstances would clearly eviscerate the plain meaning of the "at least about 95% by volume hydrogen" claim limitation and embrace a composition (0.06% by volume hydrogen) specifically excluded from the claims.

*Eastman Kodak Co. v. Goodyear Tire & Rubber Co.,* 114 F.3d 1547 (Fed.Cir.1997), is particularly relevant. In that case, the claimed process included crystallizing a particular substance at high temperature "under an inert gas atmosphere." *Id.* at 1560–61. The Federal Circuit examined whether certain of the accused processes, which used "heated air" rather than "an inert gas atmosphere" could infringe under the doctrine of equivalents. *Id.* The Court held that because "the claim language specifically excludes reactive gases—such as 'heated air'—from the scope of the claims," the accused processes could not infringe under the doctrine of equivalents. *Id.; see also SciMed,* 242 F.3d at 1345–46 (commenting on *Eastman Kodak).*

These cases hold that by drafting a claim and specification in a way that clearly excluded certain subject matter, the patent implicitly disclaimed the subject matter that was excluded. This bars the patentee from asserting infringement under the doctrine of equivalents. *SciMed,* 242 F.3d at 1347.

Curiously, AK argues that the Kilbane patents are "wrong" with respect to the requirement of a 95% by volume hydrogen protective atmosphere. Summ. J. Hr'g Tr. at 82–84. Specifically, with respect to the Kilbane patents' requirement of a 95% by volume hydrogen protective atmosphere, AK argues that the patentee "didn't state

[their invention] right" and "shouldn't have said that. It's not right." *Id.* at 82:8–21, 94:13–21. Moreover, AK asserts that one of ordinary skill in the art would recognize that a protective atmosphere containing 95% by volume hydrogen was not a requirement of the patents and that Dr. Birks' equivalence theory was correct. *Id.* at 82:22–83:8. Yet, as AK admits, the Kilbane patents never discuss the ratio of hydrogen to dew point or the importance of that ratio. *Id.* at 91:20–23. AK arguments would result in judicial re-writing of the Kilbane patents.

Thus, Dr. Birks' conclusion that the Sollac protective atmosphere is equivalent to that claimed is founded on an analysis which does not match with the clear teachings and admissions of the patents. *See SciMed,* 242 F.3d at 1345–46; *Sage,* 126 F.3d at 1424–25. Therefore, no reasonable jury can rely on his conclusions.

### i. *Copying Under the Doctrine of Equivalents*

AK argues that two Sollac engineers visited AK's plant and reported their observations to Sollac. AK 2nd Opp'n at 40–42; AK Hennechart Depo., Ex. D, at 754, 784–85; AK Ex. 10 (Hennechart Report); AK Ex. 12 (Barzoukas Report). Allegedly those observations led to copying by Sollac. AK cites the Federal Circuit's *Hilton Davis* decision for the proposition that an attempt to copy raises an inference of insubstantial differences under the doctrine of equivalents. AK 2nd Opp'n at 40–42 (citing *Hilton Davis Chem. Co. v. Warner–Jenkinson,* 62 F.3d 1512 at 1522 (Fed.Cir. 1995)). That decision, however, was overturned by the Supreme Court. The Supreme Court held that "intent plays no role in the application of the doctrine of equivalents." *Warner–Jenkinson,* 520 U.S. at 35–36, 117 S.Ct. 1040.

This motion relates to patent infringement, not to allegations of trade secret misappropriation. Thus, the alleged copying is irrelevant.

For all the reasons discussed above, no reasonable jury could find that Sollac's nitrogen atmosphere is equivalent to the claimed "at least about 95% by volume hydrogen."

Sollac makes further arguments against application of the doctrine of equivalents which I will discuss below for completeness, even though they are moot if my recommendation of inapplicability of the doctrine of equivalents as stated above is accepted.

### ii. *Prosecution History Estoppel*

Both Boston patent applications were rejected by the PTO as not being patentably distinct from the process of the Kilbane '214 patent. Sollac contends that such rejections coupled with restrictively rewritten claims and accompanying arguments to distinguish the amended claims from the Kilbane process, give rise to estoppel. Sollac 2nd Mot. at 40–42.

Although they cannot be ignored, the arguments and amendments cited by Sollac emphasized the location of the "protective atmosphere" as opposed to its content of "at least about 95% by volume hydrogen." The arguments distinguished the Boston patent claims on grounds not related to the "at least about 95% by volume hydrogen" claim limitation. The "at least about 95% by volume hydrogen" limitation was present in the originally filed claims of all the patents in suit and its language was not altered during the prosecution of any of the patents in suit.

Thus, these statements and others in all the prosecution histories of the patents in suit with regard to the "at least about 95% by volume hydrogen" limitation are not sufficient to evidence a clear and unmistakable surrender of subject matter estopping the application of the doctrine of equivalents. *Festo*, 234 F.3d at 568.

### iii. *Estoppel From Subject Matter Disclosed But Not Claimed*

Sollac further contends that AK has surrendered coverage of other than a 95% hydrogen atmosphere because the Kilbane patent specifications shows that the inventors attempted a 100% nitrogen protective atmosphere in the snout ('214 patent at Example No. 4), but did not claim it. Sollac 2nd at 39 (citing, K–2 *Corp. v. Salomon S.A.*, 191 F.3d 1356, 1368 (Fed.Cir.1999) *(citing Maxwell v. J. Baker, Inc.*, 86 F.3d 1098, 1106–1107 (Fed.Cir.1996) ("[W]e have also stated that particular subject matter disclosed in the patent specification but not claimed is deemed to have been surrendered")); *United Carbon Co. v. Binney & Smith Co.*, 317 U.S. 228, 232, 63 S.Ct. 165, 87 L.Ed. 232 (1942) ("The inventor must inform the public of the limits of the monopoly asserted, so that it may be known which features may be safely used or manufactured without a license")).

*Maxwell v. Baker* applies in situations where the patent specification discloses "alternatives" to the claimed invention, such as other embodiments, but does not claim them. *Maxwell*, 86 F.3d at 1108. The Kilbane patents discuss an example using a 100% nitrogen protective atmosphere, as one which did not work. '214 patent at Example No. 4. It is clear that this example's inclusion was to point out the superiority of the hydrogen protective atmosphere not to identify nitrogen as an alternative embodiment of the invention. Therefore, *Maxwell v. Baker* does not apply.

### 3. *Equivalency For The Location Of The "Protective Atmosphere"*

In all of the claims at issue in the Second Summary Judgment motion, the "pro-

tective atmosphere" has been construed to exist at least just prior to the coating pot. See, *supra*, at 747-48 and 752-53. Some claims of the Boston patents add additional locations at which the "protective atmosphere" must exist. See, *supra*, at 752-53. AK contends that an equivalent "protective atmosphere" can exist anywhere, not just prior to the coating pot. AK 2nd Opp'n at 36–38. Furthermore, AK contends that the accused Sollac process has an equivalent "protective atmosphere" at each furnace zone except for at the preheater. AK 2nd Opp'n at 33. Sollac does not contest that its process has a "protective atmosphere" just prior to the coating pot, but that its "protective atmosphere" lacks an equivalent to the "at least about 95% by volume hydrogen" limitation.

It was determined above that a 0.06% hydrogen atmosphere with a low dew point is not equivalent to an atmosphere of "at least about 95% by volume hydrogen." In the accused Sollac process, there is no substantial area in which the hydrogen content of the protective atmosphere is over 71%. AK Ex. 50; Sollac's Hennechart Dep., Ex. 50, at 553:2–7, 606:12–17, 720: 1–22; Sollac Ex. 39 at SL0008820; See *also* Sollac 2nd Mot. at 20; AK 2nd Opp'n at 10.[10] There is no equivalent to the "at least about 95% by volume hydrogen" at any location in the accused process. Therefore, the issue of whether other locations for the "protective atmosphere" are equivalent need not be determined.

In any event, it is clear from the patent specification that the location of the "protective atmosphere" is crucial to its success. The Kilbane patents state that: "[t]he wetting is dramatically improved if a

cleaned ferritic chromium alloy steel is maintained in a protective hydrogen atmosphere substantially void of nitrogen prior to the entry of the steel into an aluminum coating bath." '214 patent at 2:43–47; see also id. at 2:50–60, 4:13–20. The prosecution history indicates the same. '214 File History at 49.

Similarly, it is clear from the Boston patent specification and prosecution history, that the "protective atmosphere" must exist at least in the area just prior to the coating pot. Here, statements in the Boston patent specification definitively state that the protective atmosphere was intended for use "prior to entry into the coating bath." '113 patent at 2:40–59, 3:4–8; 3:29–38; 3:39–47; 4:18–21; 8:66–9:8.

Therefore, AK's contention that a protective atmosphere anywhere in the process is equivalent to one prior to entry into the coating bath is inconsistent with the teachings of the patents.

Also, the doctrine of prosecution history estoppel precludes the broad equivalence asserted by AK for the location of the protective atmosphere of Claim 8 of the '113 patent. As discussed above, in order to define over the prior art, the applicants specifically argued that Claim 8 is limited to a protective atmosphere beginning with the heating in the second furnace portion and continuing through and including until the strip is finally dipped into the coating metal bath. '113 File History at 271–78.

The limitation regarding the location of the protective atmosphere in Claims 1 and 6 of the '645 patent was added by amendment to overcome a prior art rejection. '645 File History at 68–73. Thus, no

10. AK contends that the $H_2$ jet outlets provide an area where there is 100% by volume hydrogen. AK 2nd Opp'n at 25. This area, however, is immediately and only next to the jets located in Area V (see Fig. A) and therefore is not a "atmosphere" that "protects" the strip.

range of equivalents is permitted. *Festo,* 234 F.3d at 569. With respect to the location of the protective atmosphere, Claims 1 and 6 are limited by prosecution history estoppel to their literal meaning.

### 4. *Conclusion*

No reasonable jury could find, under the doctrine of equivalents, that the Sollac process contains an equivalent to the patents' "protective atmosphere" of "at least about 95% hydrogen." Therefore, it is recommended that summary judgment of noninfringement be entered for the Kilbane '214 and '723 patents and the Boston '113 and '645 patents.

### VII. *THIRD SUMMARY JUDGMENT MOTIONS*

Sollac's third Summary Judgment Motion is for noninfringement of all four Kilbane patents and invalidity of the '723 and '549 patents. AK cross moved for summary judgment that the accused Sollac process and coated steel strip meet the claim limitations using "aluminum" in all the Kilbane patents. The infringement issues raised by these cross Summary Judgment Motions involve the interpretation of all four Kilbane patents insofar as their various uses of the term "aluminum" as set forth in the following claim chart.

### A. *Claim Language at Issue*

| Patent Claim | Claim Language |
|---|---|
| Kilbane '214 | |
| claim 1 | dipping said cleaned strip into a molten bath of said coating metal *consisting essentially of aluminum* to deposit a coating layer on at least one side of said strip |
| claim 10 | dipping said cleaned strip into a molten bath of said coating metal *consisting essentially of aluminum* to deposit a coating layer on at least one side of said cleaned strip |
| Kilbane '135 | |
| claim 1 | the coating metal *consisting essentially of aluminum* |
| Kilbane '723 | |
| claim 1 | dipping said cleaned strip into a molten bath of said coating metal, which is *selectedfrom the group consisting of aluminum and aluminum alloy* |
| Kilbane '549 | |
| claim 1 | the coating metal *including aluminum or aluminum alloys* |
| claim 3 | The strip of claim 1 wherein the aluminum coating metal *contains up to about 10% by weight silicon* |
| claim 5 | A ferritic steel strip continuously hot dip coated with *an aluminum coating metal,* comprising: |
| claim 7 | The strip of claim 5 wherein the aluminum coating metal *contains up to about 10% by weight silicon* |

The summary judgment motions present two infringement issues to be resolved: (1) whether any of the claims in the Kilbane patents cover the use of an aluminum coating metal which contains more than about 0.5% by weight silicon, and (2) whether Sollac's use of an aluminum coating metal infringes any claims of the Kilbane patents either literally or under the doctrine of equivalents. The law concerning claim construction and infringement discussed in Sections VI(B) and VI(C) above is also applicable here. Again, AK bears the burden to prove infringement by a preponderance of the evidence.

The claims in issue contain transitional phrases, such as, "comprising," "consisting essentially of" and "consisting of." As will be discussed below, these transitional phrases define the scope of a claim with respect to what unrecited additional components or steps, if any, are excluded from the scope of the claim. "Comprising" is an open phrase (no exclusion as to additional unrecited components or steps); "consisting essentially of" is a partially open phrase (partial exclusion as to additional unrecited components or steps); and "consisting of" is closed (complete exclusion as to additional unrecited components or steps).

Sollac argues that statements in the specification regarding the purity of the aluminum, coupled with the claim transitional phrases used in the claims dictate that the aluminum defined in the patent claim must be limited to containing no more than about 0.5% by weight of silicon. Sollac 3rd Mot. at 3–5.

AK argues that the Kilbane specification distinguishes between the phrases "aluminum coating" and "pure aluminum coating." AK 3rd Opp'n at 20. According to AK, the specification uses the broad term "aluminum coating" generally, and the phrase "pure aluminum" only in connection with the preferred embodiment. *Id.* Thus, AK argues that the term "aluminum" in reference to the coating should be interpreted in all the claims to mean "commercially pure aluminum and aluminum alloys containing up to about 10% by weight silicon." *Id.* at 19.

## B. *The Kilbane Specification*

There are two types of aluminum commonly used to coat steel, including stainless steel, as acknowledged within the Kilbane patents themselves; these are called "Type 1" and "Type 2" aluminum. Type 1 aluminum contains "about 10% by weight of silicon," while Type 2 aluminum is "commercially pure aluminum." '214 patent at 5:21–41. The Kilbane patents, however, do not state the range of silicon that "commercially pure" or Type 2 aluminum contains. According to extrinsic evidence, Type 2 or "commercially pure" aluminum contains about 0.05 to 0.15% silicon. See AK Opp'n Supp. at 19 (citations omitted).

As conceded in the Kilbane patents, "[m]ost hot dip aluminum coatings contain about 10% by weight silicon," i.e., Type 1 aluminum. '214 patent at 5:21–23. In the Background of the Invention section, however, the Kilbane specification states:

> "This invention relates to a continuously hot dipped metallic coated ferritic chromium alloy ferrous base strip and a process to enhance the wetting of the strip surface with *commercially pure molten aluminum.*"

'214 patent at 1:7–10 (emphasis added). In describing the aluminum used for coating carbon steel, Kilbane states:

> "*Substantially pure aluminum* coating metals are normally maintained at about 1250° F (677° C) to 1270° F (688° C) for coating carbon steel."

*Id.* at 4:38–40 (emphasis added). Kilbane goes on to say:

"A ferritic stainless steel containing at least about 10% by [weight] chromium having a hot dip coating of *substantially pure aluminum* will have excellent corrosion resistance It has been determined [that] a Type 409 stainless steel may be hot dip coated with *pure aluminum.*"

*Id.* at 4:55–66 (emphasis added).

In discussing the types of aluminum contemplated by Kilbane for use in the process, Kilbane states the following:

"Most hot dip aluminum coatings contain about 10% by weight silicon. This coating metal is generally defined in the industry as Type 1. We have discovered this type aluminum coating metal does not wet well with ferritic chromium alloy steel even when using the hydrogen practice [protective] atmosphere. While not being bound by theory, it is believed silicon exceeding 0.5% by weight decreases the reactivity of the aluminum coating metal needed to react with a ferritic chromium alloy steel substrate. Accordingly, silicon contents in the coating metal should not exceed about 0.5% by weight."

*Id.* at 5:21–31. Furthermore, the Kilbane specification states that "[w]ithout good surface wetting, the aluminum coating layer will not be uniform, free of uncoated areas and strongly adherent to the steel base metal." *Id.* at 2:38–41. In fact, a "principal object" of the Kilbane patents is to make an aluminized stainless steel product "having enhanced wetting by the coating metal." *Id.* at 64–66.

Kilbane goes on to say:

"Commercially pure hot dip aluminum coatings, otherwise known as Type 2 in the industry, are preferred for our invention. By "pure" aluminum is meant those aluminum coating metals where addition of substantial amounts of alloy-

ing elements, such as silicon, are precluded."

*Id.* at 5:32–41.

Thus, the Kilbane specification makes it clear that "commercially pure" or Type 2 aluminum is the preferred embodiment: that aluminum which contains no more than about 0.5% by weight silicon, is acceptable; and that Type 1 aluminum results in unsatisfactory wetting.

## C. Claim Construction for The '214 and '135 Kilhane Patents

### 1. The Term "Consisting Essentially Of Aluminum" In The '214 And '135 Patents

The claims of the '214 and '135 patents include the limitation "consisting essentially of aluminum." "Consisting essentially of" is a special term of art in patent claim drafting and is subject to special rules of interpretation. *See, e.g., PPG Indus. v. Guardian Indus. Corp.*, 156 F.3d 1351, 1354 (Fed.Cir.1998); *Water Tech. Corp. v. Calco, Ltd.*, 850 F.2d 660, 666 (Fed.Cir. 1988). The use of that phrase restricts the scope of a claim to exclude any product or process that contains an ingredient or step which is not recited in the claim, and which would materially change the basic and novel characteristics of the claimed invention. *PPG Indus.*, 156 F.3d at 1354. In other words, "consisting essentially of" closes a claim to unrecited ingredients or steps that materially change the basic character of the claimed invention.

All of the Claims of the '214 and '135 patents also require that the coating layer be "substantially free of uncoated areas" and have "good adherence" or be "tightly adherent" to the strip. Therefore, the language of the Claims requires that any ingredient in the aluminum coating bath that results in a coating layer that is not substantially free of uncoated areas or

does not have good or tight adherence to the strip would materially change the claimed invention and thus be excluded from the "consisting essentially of aluminum" limitation.

## 2. *The Specification Of The '214 and '135 Patents*

As discussed above, the Kilbane specification makes clear that Type 1 aluminum, which has about 10% silicon does not work well and that aluminum with silicon content not exceeding about 0.5% by weight should be used. This supports a conclusion that, according to the teachings of the Kilbane specification, aluminum containing more than about 0.5% silicon (including Type 1 aluminum) is an ingredient which materially changes the basic character of the claimed invention, and that the phrase "consisting essentially of aluminum" is limited to aluminum having no more than about 0.5% by weight silicon.

## 3. *The Prosecution Histories Of The '214 And '135 Patents*

The claims of the first Kilbane application, both as filed and as issued, require a coating metal "consisting essentially of aluminum." '214 File History at 27–31. In an Information Disclosure Statement filed with the PTO in this prosecution history, the applicants stated:

> "None of the above-mentioned references, either alone or in combination, teach or suggest a ferritic steel strip that is continuously hot dip coated with substantially pure aluminum." '214 File History at 48.

The application for the '135 patent subsequently was filed as a divisional of the first filed application which then issued as the '214 patent. Although the statement quoted above seems to be made in reference to the claims that eventually issued in the '135 patent, the claims of the '214

patent include the same "consisting essentially of aluminum" limitation and thus the interpretation of that limitation applies to both patents. *Southwall Tech., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1576 (Fed. Cir.1995); *Specialty Composites v. Cabot Corp.*, 845 F.2d 981, 988 (Fed.Cir.1988) (citation omitted); *Standard Oil Co. v. American Cyanamid Co.*, 774 F.2d 448, 452 (Fed.Cir.1985).

Again in the '135 patent prosecution history, the applicant repeated:

> "None of the above-mentioned references, either alone or in combination, teach or suggest a ferritic steel strip that is continuously hot dip coated with substantially pure aluminum."

Sollac Ex. 8 ('135 File History) at 685.

Thus, both the '214 prosecution history and the '135 prosecution history support the conclusion that the limitation "consisting essentially of aluminum" encompasses only commercially pure aluminum and aluminum containing no more than about 0.5% silicon.

## 4. *The European Kilhane Patent Amlication*

Sollac argues that the European patent counterpart application (Sollac Ex. 31) to the first U.S. Kilbane patent application is instructive in construing the claims and construing the claims concerning aluminum. Sollac 3rd Mot. at 26–27. On March 20, 1987, applicants filed in Europe a counterpart to the first U.S. patent application. Sollac Ex. 31. Like the first and second U.S. Kilbane patent applications, the claims of the European Kilbane patent application required a coating metal "consisting essentially of aluminum." During prosecution of the European Kilbane patent, however, the European Patent Examiner asked Applicants to explain the scope and meaning of the term "consisting essen-

tially of aluminum." Applicants responded that the term "permitted the presence of certain elements or impurities in the coating metal of the aluminum bath such as up to 2% iron, but, on the other hand, silicon contents in the coating metal should not exceed about .5% by weight," as described in the European specification. Ex. 30 at AKS202167. Thus, Sollac argues that the interpretation of the term "consisting essentially of" aluminum in Europe requires that silicon be present in an amount no more than about 0.5% by weight.

Representations to foreign Patent Offices should be considered when they comprise relevant evidence and are relevant to claim construction of U.S. patents. *Tanabe Seiyaku Co., Ltd. v. United States Int'l Trade Comm'n*, 109 F.3d 726, 733 (Fed.Cir.1997); *Caterpillar Tractor Co. v. Berco, S.p.A.*, 714 F.2d 1110, 1116 (Fed. Cir.1983). Since the phrase "consisting essentially of" already has a special meaning in U.S. patent claim drafting, the legal interpretation of that phrase under European patent practice is of little relevance. However, it appears that AK treated the phrase to have the same meaning under European patent practice as in U.S. patent practice. Thus, AK's representations to the European Patent Office are consistent with the interpretation that the limitation "consisting essentially of aluminum" in the Kilbane patents encompasses only aluminum with no more than about 0.5% silicon.

### 5. *Analysis And Conclusions As To The Meaning Of The Phrase "Consisting Essentially Of Aluminum" In The '214 And '135 Patents*

As mentioned above, all the Kilbane '214 and '135 patent claims require that the coating layer be "substantially free of uncoated areas" and have "good adherence" or be "tightly adherent" to the base steel. Furthermore, the patent specification teaches that "good wetting" of the steel by the coating metal is required to achieve these attributes. '214 patent at 2:38–41. Thus, any additional ingredient within the aluminum bath that materially affects the wettability of the coating to the strip must fall outside the scope of "said coating metal consisting essentially of aluminum." *PPG Indus.*, 156 F.3d at 1354; *Water Tech.*, 850 F.2d at 666. The Kilbane patents are clear in stating that aluminum containing more than 0.5% by weight silicon should not be used because it inhibits wetting of the steel. Certainly, any ingredient that the Kilbane patents teach inhibits the ability of the steel to be "wet well" by the coating metal is excluded by this claim term.

AK argues that *PPG Indus.* stands for the proposition that a "consisting essentially of" question is for the jury. AK 3rd Opp'n at 30 (citing *PPG Indus.*, 156 F.3d at 1352.). To the contrary, *PPG Indus.* states that the court has the role of defining the claim with whatever specificity and precision is warranted by the language of the claim and the evidence bearing on the proper construction, whereas the task of determining whether the construed claim reads on the accused product is for the finder of fact. *PPG Indus.*, 156 F.3d at 1352. Here, the language of the claim and the specification directly speak to the issue of the amount of silicon in the aluminum coating which would be deleterious. Therefore, the definition of the "consisting essentially of" limitation to exclude more than about 0.5% by weight silicon is warranted by the language of the claim and the specification. That definition is appropriately a question of law for the court, not a question of fact for the jury.

AK also points out that here the phrase "consisting essentially of" is used in the body of the claim rather than in a transition from the preamble to the body of the

claims. AK contends that the phrase is a special term of art only when used in the transition. AK 3d Opp'n at 32–34. However, none of the cases cited by AK to support its contention actually address this issue and, the claim at issue in *PPG Indus.* contained the phrase "consisting essentially of" in the body of the claim. *See PPG Indus.*, 156 F.3d at 1352.

Since the claims of the '214 and '135 patents use the special term "consisting essentially of," it is recommended that these claims be construed to require aluminum with no more than about 0.5% by weight silicon.

### D. *Claim Construction for The '723 Patent*

#### 1. *The Term "Selected From The Group Consisting Of Aluminum And Aluminum Alloy" In The '723 Patent*

The claims of the '723 patent include the limitation "selected from the group consisting of aluminum and aluminum alloy." The transitional phrase "consisting of" excludes any element, step, or ingredient not specified in the claim, thus closing the claim to the inclusion of materials other than those recited except for impurities ordinarily associated therewith. *In re Gray*, 53 F.2d 520 (Cust. & Pat.App.1931); *Ex parte Davis*, 80 U.S.P.Q. 448, 450, 1949 WL 3555 (Pat.& Tr. Office Bd.App.1949). However, since the limitation here expressly includes both aluminum and aluminum alloy, the limitation would mean: (1) consisting of aluminum but nothing else besides impurities ordinarily associated therewith, or (2) consisting of aluminum alloy but nothing else besides impurities ordinarily associated therewith.

#### 2. *The Prosecution History of the Kilhane '723 Patent*

The '723 patent application was filed on June 24, 1988. The '723 patent application, as filed, contained the same 23 application claims which were presented in the first Kilbane patent application. Concurrently filed with the '723 patent application, applicants filed a Preliminary Amendment canceling claims 2–23 and adding claims 24–27. Sollac Ex. 9 ('723 File History) at 146–49. The claims remaining after the Preliminary Amendment, like the cancelled claims, all claimed a coating metal "consisting essentially of aluminum." *Id.* at 128–32. Ten months after the application for the '723 patent was filed, the '723 applicants amended the language of application claims 24–27 (which became '723 patent claims 1–4) by replacing the coating metal limitation of "consisting essentially of aluminum" with the limitation that the coating metal "is selected from the group consisting of aluminum and aluminum alloys." Sollac Ex. 9 ('723 File History) at 162–164, 186–1 88. In the same Amendment, applicants stated:

> "Claim 24 [Claim 1] has been amended to clarify that the coating metal includes aluminum and aluminum alloys. The claim language 'consisting essentially of aluminum' might be misconstrued to mean that applicants meant to cover only pure aluminum coating." *Id.* at 163.

██ Later, in a Supplemental Information Disclosure Statement, the applicants misquoted Claim 24 when they stated that it included a "coating metal consisting essentially of aluminum." *Id.* at 165–166. Such an erroneous quote does not alter the clear claim language. *Intervet America, Inc. v. Kee–Vet Laboratories, Inc.*, 887 F.2d 1050, 1053–54 (Fed.Cir.1989). In *Intervet*, the Examiner had taken the position that the claims needed to be limited to a "single vaccination scheme" in order to distinguish them from the prior art. In response, the applicant amended some

claims, but not others, to include the single vaccination scheme. In the accompanying arguments, the applicant's attorney made the unqualified, but untrue remark that all the claims were restricted to the single vaccination scheme. The Federal Circuit held that the district court had erred by reading the single vaccination scheme limitation into all claims, based only on the attorney's erroneous remarks, because the language of some claims clearly did not contain it. The court stated:

> "When it comes to the question of which should control, an erroneous remark by an attorney in the course of prosecution of an application or the claims of the patent as finally worded and issued by the Patent and Trademark Office as an official grant, we think the law allows for no choice. The claims themselves control."

*Id.* at 1054. Similarly here, the claim language controls over a misquote by the attorney in the prosecution history.

Thus, the prosecution history of the '723 patent expressly makes clear that the applicants used the limitation "selected from the group consisting of aluminum and aluminum alloy" so as not to be limited to pure aluminum.

### 3. Extrinsic Evidence Supporting a Broad Interpretation of the '723 Patent Claims

About the time the '723 patent was filed, Armco first determined that it could coat stainless steel with Type 1 aluminum. In an Armco Development Record, Kilbane and Boston stated that they "discovered" a "new feature" on June 27, 1988: Type 1 aluminum coating of stainless steel. Sollac Ex. 24. Importantly, this occurred after the '723 patent application was filed, but *before* the '723 patent claims were broadened. This Armco Development Record appears to be the basis for the Boston

patent applications. Thus, through the '723 claims, Armco apparently attempted to obtain broader claims from the Kilbane patent specification even though the Kilbane specification was filed years before the Type 1 aluminum "discovery."

### 4. Analysis and Conclusions As To Claim Meaning In The '723 Patent

The applicants for the '723 patent clearly intended to obtain claim coverage broader than a "pure aluminum" coating metal. Specifically, the applicants believed that the '214 and '135 Kilbane patents might be construed to "cover only pure aluminum coating" (i.e., Type 2 aluminum containing less than about 0.15% silicon). '723 File History at 163. Thus, they wanted to insure that they obtained claims not so narrow. The applicants for the '723 patent, however, did not state in the prosecution history how broadly they wanted to claim. Specifically, the '723 applicants did not mention what the upper limit of the silicon content in the aluminum should be: about 0.5% silicon or up to about 10% silicon (Type 1 aluminum) or higher.

Sollac argues that the written description serves to limit the interpretation of the claims to exclude Type 1 aluminum. Sollac 3rd Mot. at 41–44 (citing *Gentry Gallery*, 134 F.3d at 1478–79; *Lockwood*, 107 F.3d at 1572; *In re Kaslow*, 707 F.2d at 1375). Sollac argues that claim language broader than a silicon content of 0.5% is not enabled by the specification, and that where there is a choice between a broader and narrower interpretation for a claim, the one that preserves validity or does not raise questions of enablement should be adopted. Sollac 3rd Mot. at 43 (*citing Digital Biometrics v. Identix, Inc.*, 149 F.3d 1335, 1344 (Fed.Cir.1998)).

The Federal Circuit has made it clear that when a claim is amenable to more

than one construction, it should be interpreted to preserve validity if reasonably possible. *Modine Mfg. Co. v. US. Intern. Trade Comm'n,* 75 F.3d 1545, 1557 (Fed. Cir.1996). That axiom does not permit the Court to re-write the claims in a manner inconsistent with the intrinsic record in order to preserve validity of the claims. *McCarty v. Lehigh Valley R. Co.,* 160 U.S. 110, 116, 16 S.Ct. 240, 40 L.Ed. 358 (1895); *Process Control Corp. v. HydReclaim Corp.,* 190 F.3d 1350, 1357 (Fed.Cir.1999) ("[W]e must construe the claims based on the patentee's version of the claim as he himself drafted it."); *Quantum Corp. v. Rodime, PLC,* 65 F.3d 1577, 1584 (Fed.Cir. 1995) ("Although we construe claims, if possible, so as to sustain their validity, it is well settled that no matter how great the temptations of fairness or policy making, courts do not redraft claims."); *Becton Dickinson & Co. v. C.R. Bard Inc.,* 922 F.2d 792, 799 n. 6 (Fed.Cir.1990) ("Nothing in any precedent permits judicial redrafting of claims. At most there are admonitions to construe words in claims narrowly, if possible, so as to sustain their validity."); *Stearns v. Russell,* 85 F. 218, 224 (6th Cir.1898). Thus, the claim construction must be consistent with the plain meaning of the claim and the intrinsic record, whether or not that preserves validity. *Rhine v. Casio, Inc.,* 183 F.3d 1342, 1345 (Fed.Cir.1999).

Even though the applicants made specific broadening amendments to the claim language, the extent of the desired broadening was not stated in the prosecution history. The Kilbane patents themselves, however, state that "We have discovered that (type 1) aluminum coating metal does not wet well with ferritic chromium alloy steel," and that the "silicon contents in the coating metal should not exceed about 0.5% by weight." '214 patent at 5:21–31. A construction of the '723 claims to include aluminum coating metal with silicon in amounts many times higher than 0.5%, e.g. Type 1 aluminum with about 10% silicon would appear to cause the claims to be invalid for failure of written description and enablement. See discussion of these issues in relation to the Kilbane specification below. Therefore, it is recommended that these claims be limited to containing less than about 0.5% silicon.

This construction is consistent with the prosecution history. The '723 patent applicants wanted to insure that they received claim coverage broader than substantially pure aluminum (which contains up to about 0.15% silicon). By construing the claims to be limited to aluminum containing less than about 0.5% by weight silicon, that broadening is achieved. The extrinsic evidence discussed above at Section D(3) would indicate that the applicants may have intended the claims to include Type 1 aluminum. However, the intrinsic record and the lack of written description or enablement of Type 1 aluminum or other aluminum with substantially over 0.5% by weight silicon, must govern over the extrinsic evidence. *See Vitronics,* 90 F.3d at 1582–84.

**E. Claim Construction Of The Term "Including Aluminum Or Aluminum Alloys" And "Aluminum Coating Metal" In The '549 Patent**

Claim 1 of the '549 patent includes the limitation "including aluminum or aluminum alloys." The transitional phrase "including" is an open-ended transitional phrase that does not exclude additional, unrecited elements or method steps. See *Moleculon Research Corp. v. CBS, Inc.,* 793 F.2d 1261, 1271 (Fed.Cir.1986); *KCJ Corp. v. Kinetic Concepts, Inc.,* 223 F.3d 1351, 1356 (Fed.Cir.2000).

Similarly, Claim 5 of the '549 patent includes the phrase "coated with an alumi-

num coating metal" in its preamble. This phrase in the preamble is structural and is necessary to give meaning to the two "coating layer" limitations which appear in the body of the Claim. Therefore, it is a limitation of Claim 5. See *Rowe v. Dror*, 112 F.3d 473, 478 (Fed.Cir.1997). Neither party has cited a case deciding the meaning of the term "with" in a claim, but it is analogous to the term "including" which is open and does not exclude other elements. *See Moleculon Research Corp.*, 793 F.2d at 1271; *KCJ Corp.*, 223 F.3d at 1356.

Therefore, unlike the '214 and '135 patents, which use the partially closed phrase "consisting essentially of," the claim language in the '549 patent does not limit the inclusion of unrecited ingredients or steps.

Moreover, dependent Claims 3 and 7 (which depend on Claims 1 and 5 of the '549 patent respectfully) both specify that the aluminum coating contains up to about 10% by weight silicon. Independent claims of a patent ordinarily must be at least as broad as their dependent claims. *See Wright Medical Technology, Inc. v. Osteonics Corp.*, 122 F.3d 1440, 1445 (Fed. Cir.1997). Therefore, Claims 1 and 5 of the '549 patent must be broad enough to include an aluminum coating that contains up to about 10% by weight silicon.

### 1. *The Kilhane '549 Patent Prosecution*

The '549 patent issued from a fourth Kilbane patent application filed on November 22, 1988. Concurrently with its filing, the applicants amended the fourth application to add independent application Claims 24 and 28 (Claims 1 and 5 of the '549 patent, respectfully) which defined the coating metal as "including aluminum or aluminum alloys" (Claim 24), or simply with "aluminum" (Claim 28). Sollac Ex. 10 ('549 File History) at 304–305. The applicants stated specifically in this regard that

"[t]he primary difference between claims 24 and 28 of the present ['549 patent] application and allowed claim 1 of the ['135 patent] application is that the hot dipped coating metal of claims 24 and 28 of this application is clearly for *any* aluminum base coating metal." *Id.* at 305 (emphasis added). Thus, the applicants sought to use broader claim language of "including" or "with" rather than the restrictive "consisting essentially of" and by including both aluminum and aluminum alloys, intended to cover any aluminum base coating metal.

Concurrently with filing the November 22, 1988 application, the applicants also added dependent application Claims 26 and 30 (Claims 3 and 7 of the '549 patent, respectfully) which specified that the coating metal was "Type 1 aluminum." '549 File History at 304–5. In response, the Patent Examiner concluded that the term "Type 1 aluminum" was indefinite under 35 U.S.C. § 112, ¶ 2, and required that the claims use the language in the specification. As a result, applicants replaced "Type 1 aluminum" with "aluminum coating metal containing up to about 10% by weight silicon." *Id.* at 384.

Thus, the prosecution history supports and interpretation of Claims 1 and 5 of the '549 patent to include any aluminum base coating metal.

### 2. *Extrinsic Evidence Supporting a Broad Interpretation of the '549 Patent Claims*

By the time the '549 patent was filed, Armco determined that it could coat stainless steel with Type 1 aluminum. In an Armco Development Record, Kilbane and Boston stated that they "discovered" a "new feature" on June 27, 1988: Type 1 aluminum coating of stainless steel. Sollac Ex. 24. This occurred *before* the '549 patent claims were filed. Also, this Armco

Development Record appears to be the basis for the Boston patent applications. Thus, through the '549 claims, Armco apparently attempted to obtain broader claims from the Kilbane patent specification even though the Kilbane specification was filed years before the Type 1 aluminum "discovery."

### 3. The Term "Up To About 10%" in Claims 3 and 7 of the '549 Patent

Recently, AK, for the first time, argued that the term "up to about 10%" in claims 3 and 7 of the '549 patent means "up to but not including about 10%." AK Opp'n Supp. at 35; Summ. J. Hr'g Tr. at 11:1–7. Under that claim construction, claims 3 and 7 would be limited to an aluminum coating containing up to, but not including, the silicon content found in Type 1 aluminum, i.e. about 10% silicon. Upon my request, Sollac presented several cases interpreting the phrase "up to."[11] None of these cases, however, were conclusive.

AK asserts that the Kilbane patents state that *only* Type 1 aluminum (which includes about 10% silicon) does not wet well, but that the Kilbane patents are silent with respect to a coating metal containing "up to" *but not including* about 10% silicon, i.e. up to but not including Type 1 aluminum. Summ. J. Hr'g Tr. at 12. The Kilbane patents only mention commercially pure aluminum (Type 2), which is said to be preferred; aluminum containing up to about 0.5% silicon, which is stated to be the highest the silicon content should be; and Type 1 aluminum (containing about 10% silicon), which is described as not wetting well and therefore unsatisfactory. There is no mention of an aluminum coating with a range from about 0.5% up to but not including about 10% silicon. Therefore, a construction that adopted the "up to" but not including language would appear to lack both written description support and to lack enablement as well.

Be that as it may, the prosecution history of claims 3 and 7 of the '549 patent claims makes clear that "up to" means "up to and including", not "up to but not including." In a Preliminary Amendment filed along with the '549 patent application, the applicants added dependent application Claims 26 and 30 (Claims 3 and 7 of the '549 patent, respectfully) which specified that the "coating metal *is* Type 1 aluminum." '549 File History at 304–5 (emphasis added). In response, the Patent Examiner concluded that the term "Type 1 aluminum" was indefinite under 35 U.S.C. § 112, ¶ 2, and required that the claims use the language in the specification. As a result, applicants replaced "coating metal is Type 1 aluminum" with "aluminum coating metal containing up to about 10% by weight silicon." *Id.* at 384. Although Claim 3 and 7 as amended cover a range rather than being limited to Type 1 aluminum only, nothing in the prosecution history indicates that the applicants did not mean the new limitation ("alumi-

---

11. *See Arness v. Franks,* 31 C.C.P.A. 737, 138 F.2d 213, 216 (Cust. & Pat.App.1943) (" 'up to 30% (which means anything from zero to 30%)' "); *In re Egbert,* 49 C.C.P.A. 888, 298 F.2d 947, 948 (Cust. & Pat.App.1962) ("the expression 'up to about 25 atmospheres' includes, of necessity, atmospheric as well as super atmospheric pressures up to the point specified"); *Ex parte Dobson,* 165 U.S.P.Q 29, 30 (Pat.& Tr. Office Bd.App.1970); *Goodwall Constr. Co. v. Beers Constr. Co.,* 991 F.2d 751, 26 U.S.P.Q.2d 1420, 1426 (Fed.Cir.1993) (affirming district court trebling of jury's lost profits award, emphasis added) ("under 35 U.S.C. § 284 (1988), a court 'may increase the damages *up to three times* the amount found or assessed.' "); and *FilmTec Corp. v. Hydraunautics,* 90–563 GT, 1991 U.S. Dist. LEXIS 13495, *13–14 (S.D.Cal. August 30, 1991) *rev'd on other grounds not relevant to claim construction,* 982 F.2d 1546 (Fed.Cir. 1992).

num coating metal containing up to about 10% by weight silicon") to encompass Type 1 aluminum of the original limitation. This conclusion is supported by the fact that before the '549 patent claims were filed, Armco discovered that Type 1 aluminum coating of stainless steel was possible. Sollac Ex. 24.

Therefore, it is recommended that the "aluminum coating metal containing up to about 10% by weight silicon" limitation of Claims 3 and 7 of the '549 patent be construed to mean an "aluminum coating metal containing up to and including about 10% by weight silicon, i.e. including Type 1 aluminum."

#### 4. *Analysis and Conclusions As To Claim Meaning In The '549 Patent*

The applicants for the '549 patent clearly intended to broaden the coverage of the claims being pursued in this patent application. Sollac argues, however, that the written description serves to limit the interpretation of the '549 patent claims to exclude Type 1 aluminum. Sollac 3rd Mot. at 41–44 *(citing Gentry Gallery,* 134 F.3d at 1478–79; *Lockwood,* 107 F.3d at 1572; *In re Kaslow,* 707 F.2d at 1375). Sollac argues that the broader claim language is not enabled by the specification, and that where there is a choice between a broader and narrower interpretation for a claim, the one that preserves validity or does not raise questions of enablement should be adopted. Sollac 3rd Mot. at 43 *(citing Digital Biometrics,* 149 F.3d at 1344).

As mentioned above, the Federal Circuit has made it clear that when a claim is amenable to more than one construction, it should be interpreted to preserve validity if reasonably possible. *Modine Mfg. Co. v. U.S. Intern. Trade Comm'n,* 75 F.3d 1545, 1557 (Fed.Cir.1996). That axiom, however, does not permit the Court to re-write the claims in a manner inconsistent with the intrinsic record in order to preserve validity of the claims. *McCarty v. Lehigh Valley Railroad Co.,* 160 U.S. 110, 116, 16 S.Ct. 240, 40 L.Ed. 358 (1895); *Process Control Corp. v. HydReclaim Corp.,* 190 F.3d 1350, 1357 (Fed.Cir.1999); *Quantum Corp. v. Rodime, PLC,* 65 F.3d 1577, 1584 (Fed.Cir.1995); *Becton Dickinson & Co. v. C.R. Bard Inc.,* 922 F.2d 792, 799 n.6 (Fed.Cir.1990); *Stearns v. Russell,* 85 F. 218, 224 (6th Cir.1898). Thus, the claim construction must be consistent with the plain meaning of the claim and the intrinsic record, whether or not that preserves validity. *Rhine v. Casio, Inc.,* 183 F.3d 1342, 1345 (Fed.Cir.1999).

With respect to the independent claims of the '549 patents, the applicants made clear statements regarding the broad coverage they wanted to claim. Thus, *Digital Biometrics* and *Modine* do not apply, since the claim terms at issue there were susceptible to two meanings without such a clarifying prosecution history. In this case, the intrinsic evidence only supports one construction of the limitations "aluminum coating metal" or "including aluminum or aluminum alloy," since the applicants expressly directed the examiner to a broad interpretation.

Given that the applicants made specific broadening amendments to the claim language, these terms cannot be limited as the claims of the '214, '135 and '723 patents were. Therefore, these claims cannot be limited to containing no more than about 0.5% silicon. Thus, it is recommended that the "aluminum coating metal" or "including aluminum or aluminum alloy" limitations be construed to include any aluminum base coating metal. This construction is appropriate even though the written description specifically prefers an aluminum containing less than about 0.5% by weight silicon and expresses dissatisfaction with Type 1 aluminum because it contains

about 10% by weight silicon. Whether the claims so interpreted are invalid for failure to satisfy § 112 is a separate issue which cannot be decided as a part of this claim construction as mentioned above.

### F. Sollac's Process

The Sollac equipment and process for aluminizing stainless steel is discussed extensively above with respect to the first and second summary judgment motions. Sollac asserts that its process uses *Type 1 aluminum exclusively,* as evidenced by, *inter alia,* the testimony of Mr. Jean–Paul Hennechart, Sollac's Fed.R.Civ.P. 30(b)(6) witness on the subject. Hennechart Dep. (Ex. 50), at 538: 10–539:8. At the Hearing, AK asserted, for the first time, that the accused Sollac aluminum coating contains about 8.0—8.5% silicon. Summ. J. Hr'g Tr. at 10:15–25. Although there is a factual dispute as to the actual amount of silicon in Sollac's aluminum, for the purposes of Sollac's summary judgment motion, I will accept AK's assertion that the accused Sollac aluminum coating contains about 8.0–8.5% silicon; and for purposes of AK's summary judgment motion, I will accept Sollac's assertion that the accused Sollac aluminum coating contains about 10% silicon. As will be seen below, it is not necessary to resolve the legal issue of whether "about 8.0—8.5%" is within the scope of "about 10%" or the fact issue of which correctly reflects the silicon content of the accused coating.

### G. Infringement Of The Kilhane Patents

#### 1. The '214 and '135 Patents

##### a. Literal Infringement

Sollac has moved for noninfringement of the '214 and '135 patent claim limitations requiring a "coating metal consisting essentially of aluminum," while AK has moved for a finding that those claim limitations are met by Sollac's process and steel strip. This claim term must exclude an aluminum bath which contains more than about 0.5% by weight silicon. There is no dispute that the accused Sollac aluminum coating contains at least 8% silicon. Therefore, the accused Sollac coating cannot meet the "coating metal consisting essentially of aluminum" limitation, and no reasonable jury could find that Sollac infringes any Claims of the '214 or '135 patents.

##### h. Infringement Under The Doctrine Of Eauivalents

The Kilbane patents teach explicitly that Type 1 aluminum does not "wet well" to the stainless steel in the Kilbane process, while Type 2 aluminum does. '214 patent at 5:21–31. Also, the Kilbane patents teach that the silicon content in the aluminum should not exceed 0.5% in order to achieve good wetting. *Id.* The patents also teach that good wetting is a prerequisite to achieving a product with the claimed features of being free of uncoated areas and having good adherence. *Id.* at 2:36–41. Thus, it is clear from the Kilbane patents themselves that Type 1 or aluminum with a silicon content exceeding 0.5% and Type 2 aluminum are not "equivalent" under the function-way-result test, in that they work in a different way and, according to the patents, achieve a different result. *Warner–Jenkinson,* 520 U.S. at 29, 117 S.Ct. 1040; *Hilton Davis,* 62 F.3d at 1521–22. Specifically, according to the Kilbane patents, Type 1 aluminum or aluminum with a silicon content exceeding 0.5% results in a product with uncoated areas and poor adherence, whereas Type 2 aluminum results in uniform coating. '214 patent at 5:21–31. If the Sollac process in fact does achieve uniform coating with aluminum containing at least 8% silicon, then it must do so in a different way. For the same

reason, in the context of the Kilbane patents, Type 1 aluminum or aluminum with a silicon content exceeding 0.5% is not "interchangeable" with Type 2 aluminum coating metals. *Hilton Davis*, 62 F.3d at 1518–20.

As with the "95% hydrogen" limitations discussed above, AK curiously argues that the Kilbane patents were "wrong" when they state that a silicon content more than 0.5% should not be used. Specifically, AK states that: "The patentees got it wrong. Any person of ordinary skill in the art would recognize that, they would know that that's wrong and therefore ignore it." Summ. J. Hr'g Tr. at 55:2–13. Following AK's assertion would result in judicial re-writing of patents and provides no notice to the public. Therefore, it should be given no weight.

AK's conclusion that the Sollac aluminum coating metal is equivalent to that claimed is founded on an analysis which does not match with the clear teachings and admissions of the patents. *See SciMed*, 242 F.3d at 1345–46; *Sage*, 126 F.3d at 1424–25. Therefore, the "consisting essentially of aluminum" claim limitation is not met by the Sollac process or steel strip under the doctrine of equivalents. Accordingly, no reasonable jury could find that Sollac infringes any Claims of the '214 or '135 patents under the doctrine of equivalents.

### 2. *Infringement of the '723 Patent*

Sollac has moved for noninfringement of the '723 patent claims, while AK has moved for a finding that the '723 patent limitations requiring a coating metal "selected from the group consisting of aluminum and aluminum alloy" are met by the accused Sollac steel strip.

I already have recommended above that the '723 be found not infringed because of the "protective atmosphere" limitation which appears in the '723 claims, but not in the '549 claims. I have also recommended that the coating metal "selected from the group consisting of aluminum and aluminum alloys" limitations of the '723 patent claims be interpreted as requiring a coating metal of aluminum containing no more than about 0.5% silicon. Therefore, the infringement analysis of this limitation is similar to the analysis done with respect to the '214 and '135 patent "aluminum" limitations. Thus, since the accused Sollac coated steel strip contains aluminum containing at least 8.0% silicon, no reasonable jury could find that it infringes the coating metal "selected from the group consisting of aluminum and aluminum alloys" limitations of the '723 patent claims, either literally or under the doctrine of equivalents. Thus, it is recommended that the '723 patent be found not infringed on this ground as well.

### 3. *Infringement of the '549 Patent*

Sollac has moved for noninfringement of the '549 patent claims, while AK has moved for a finding that the '549 patent limitations requiring a coating metal "including aluminum or aluminum alloys," or simply "an aluminum coating metal" are met by the accused Sollac steel strip. In contrast to the recommendation that the claims of the '214, '135 and '723 patents be limited to aluminum containing no more than about 0.5% silicon, I have recommended that the "including aluminum or aluminum alloys" limitation of Claim 1 and the "aluminum coating metal" limitation of Claim 5 not be limited to aluminum containing less than 0.5% silicon. Since the Sollac process uses aluminum, albeit aluminum containing at least 8.0% silicon, no reasonable jury could find that these limitations are not met by the Sollac steel strip. In fact, a reasonable jury should only find that these limitations are met by

Sollac's steel strip. Therefore, it is recommended that summary judgment be entered that the "coating metal including aluminum or aluminum alloys" limitation of Claims 1 and 5 of the '549 patent are met by the accused Sollac coated steel strip. Additionally, it is recommended that summary judgment be entered that the "wherein the coating metal contains up to about 10% by weight silicon" limitation of dependent Claims 3 and 7 of the '549 patent are met by the accused Sollac coated steel strip.

Claims 2, 4, 6 and 8 of the '549 patent expressly require that the coating metal containing "less than about" or "up to" 0.5% silicon, which the accused Sollac coated steel strip does not satisfy since it contains aluminum containing at least 8.0% silicon. Thus, with respect to Claims 2, 4, 6 and 8 of the '549 patent, it is recommended that summary judgment of noninfringement be entered.

## H. *Invalidity Of The '723 and '549 Patents*

Sollac moves for summary judgment that the '549 and '723 patents are invalid. Sollac 3rd Mot. at 44–45. Sollac argues that neither patent contains a written description of a process, or a product made by a process, using a coating bath containing more than about 0.5% by weight silicon, which is substantially free of uncoated areas and exhibits good adherence. *Id.* Sollac also contends that neither patent enables one of skill in the art to make Type 1 aluminum-coated stainless steel without undue experimentation. *Id.* at 44–45.

### 1. *Applicable Law Regarding Patent Invalidity*

Under the Patent Statute, 35 U.S.C. § 282, patents are presumed valid. *American Hoist & Derrick Co. v. Sowa & Sons,* *Inc.,* 725 F.2d 1350, 1360 (Fed.Cir.1984). Where a party challenges the validity of a patent, the party must prove invalidity by clear and convincing evidence. *Ryco, Inc. v. Ag–Bag Corp.,* 857 F.2d 1418, 1423 (Fed. Cir.1988).

The first paragraph of 35 U.S.C. § 112 provides:

> "The specification shall contain a *written description* of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to *enable* any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention." (emphasis added).

The written description requirement and the enablement requirement are two separate requirements, each of which must be satisfied for a patent to be valid. *Vas–Cath, Inc. v. Mahurkar,* 935 F.2d 1555, 1562–63 (Fed.Cir.1991).

### 2. *Written Description*

One purpose of the "written description" requirement is to ensure that the scope of the right to exclude, as set forth in the claims, does not overreach the scope of the inventor's contribution to the field of art as described in the patent specification. *See In re Gosteli,* 872 F.2d 1008, 1012 (Fed. Cir.1989) ("[T]he description must clearly allow persons of ordinary skill in the art to recognize that [the inventor] invented what is claimed."); *see also Vas–Cath,* 935 F.2d at 1561 ("Adequate description of the invention guards against the inventor's overreaching by insisting that he recount his invention in such detail that his future claims can be determined to be encompassed within his original creation." (quoting *Rengo Co. v. Molins Mach. Co.,* 657 F.2d 535, 551 (3d Cir.1981))).

■ To satisfy the "written description" requirement, the original disclosure of a patent application must describe the claimed subject matter "in sufficient detail that one skilled in the art can clearly conclude that the inventor invented [or possessed] the claimed invention as of the filing date sought." *Lockwood v. American Airlines, Inc.*, 107 F.3d 1565, 1572 (Fed.Cir.1997); *In re Kaslow*, 707 F.2d 1366, 1375 (Fed.Cir.1983). This requires that the original disclosure provide support for each claim limitation on a limitation-by-limitation basis. *Gentry Gallery, Inc. v. Berkline Corp.*, 134 F.3d 1473, 1479 (Fed.Cir.1998); *Lockwood*, 107 F.3d at 1572 ("[A]ll of the limitations must appear in the specification"). Compliance with the written description requirement is a question of fact. *See Tronzo v. Biomet, Inc.*, 156 F.3d 1154, 1158 (Fed.Cir.1998).

■ The Kilbane patent specification teaches one the use of Type 2 aluminum and aluminum containing no more than about 0.5% silicon instead of Type 1 aluminum in the coating bath. As discussed above in Section B, the specification clearly states that the inventors discovered that Type 1 aluminum was not satisfactory as it does not wet well as required for achieving the claimed coating layer that is "substantially free of uncoated areas" and "tightly adherent." The specification itself clearly does not teach that the inventors were in possession of a coating bath of Type 1 aluminum which achieved the claimed coating layer that is substantially free of uncoated areas and tightly adherent. It expressly teaches the contrary.

As construed above, the claims of the '723 patent are limited to a coating metal containing up to about 0.5% silicon. So limited, the claims of the '723 patent clearly have written description support in the specification.

Claims 1, 3, 5 and 7 of the '549 patent as construed above, on the other hand, encompass Type 1 aluminum. However, these claims were filed concurrently with the filing of the November 22, 1988 application that later issued as the '549 patent. '549 File History at 304–05. The claims are part of the written description. *In re Koller*, 613 F.2d 819, 823 (Cust. & Pat.App.1980). If the claims as issued were part of the application as filed, the written description requirement is thereby satisfied. *Id.* at 823–24.

Claims 3 and 7 as originally filed recited "Type 1 aluminum." *Id.* In order to overcome a rejection for indefiniteness, Claims 3 and 7 were amended to their current form, replacing "Type 1 aluminum" with "aluminum coating metal containing up to about 10% by weight silicon." *Id.* at 384. Thus, Claims 1, 3, 5 and 7 as originally filed on November 22, 1988 comprise a written description of the invention using Type 1 aluminum. The specification of the Kilbane patents makes it clear that Type 1 aluminum has about 10% by weight silicon. '214 patent at 5:21–23. Therefore, Sollac has not shown by clear and convincing evidence that the claims of the '549 patent as originally filed on November 22, 1988 do not satisfy the written description requirement for the claims as issued.

For the above reasons, it is recommended that summary judgment of invalidity of '723 and '549 Claims for failure to satisfy the written description requirement be denied.

■ In commenting on a draft of this Recommended Decision, Sollac asserted for the first time that if Claims 3 and 7 are not entitled to a priority date prior to November 22, 1988, they are invalid as anticipated by the Kilbane '214 patent. See *Lockwood*, 107 F.3d at 1571–72. It appears that none of Claims 1, 3, 5 or 7 of the '549 patent may be entitled to a filing

date earlier than November 22, 1988, as there was no written description of the use of Type 1 aluminum as part of the claimed invention prior to that date. *Id.* The Kilbane '214 patent was published on June 23, 1987, more than one year before November 22, 1988, and thus would be prior art if the '549 claims are not entitled to a filing date earlier than November 22, 1988. The '214 patent includes a disclosure of at least a portion of the claimed silicon range of Claims 1, 3, 5, and 7, i.e., the use of aluminum containing less than 0.5% silicon. A patent claim is anticipated if a prior art reference discloses a portion of a claimed range, even if it does not disclose the entire claimed range. *See Atlas Powder Co. v. Ireco, Inc.,* 190 F.3d 1342, 1346 (Fed.Cir.1999). Thus, it would appear that the Kilbane '214 patent may anticipate Claims 1, 3, 5 and 7. However, the issue of invalidity for anticipation was not raised by Sollac in its motion papers, and is not before me. Accordingly, I make no recommendation as to whether or not Claims 1, 3, 5, or 7 are invalid on this ground.

### 3. *Enablement*

The statutory "enablement" requirement mandates that a patent "specification" shall contain a written description of the invention, and of the process of making and using it, in such "full, clear, concise, and exact terms" as to enable persons of ordinary skill in the art to make and use the full scope of the claimed invention "without undue experimentation." 35 U.S.C. § 112, ¶ 1; *National Recovery Techs., Inc. v. Magnetic Separation Sys., Inc.,* 166 F.3d 1190, 1195 (Fed.Cir.1999); *Raytheon Co. v. Roper Corp.,* 724 F.2d 951, 955 (Fed.Cir.1983). The enablement requirement ensures that the public knowledge is enriched by the patent specification to a degree at least commensurate with the scope of the claims. *National Recovery,* 166 F.3d at 1196. The scope of enablement is that which is disclosed in the patent specification plus the scope of what would be known to one of ordinary skill in the art without undue experimentation. *Id.* at 1196; see also *In re Fisher,* 57 C.C.P.A. 1099, 427 F.2d 833, 839 (Cust. & Pat.App.1970) ("[T]he scope of the claims must bear a reasonable correlation to the scope of enablement provided by the specification to persons of ordinary skill in the art.").

In *In re Wands,* the Federal Circuit set forth a number of factors which a court may consider in determining whether a disclosure would require undue experimentation: (1) the quantity of experimentation necessary, (2) the amount of direction or guidance presented, (3) the presence or absence of working examples, (4) the nature of the invention, (5) the state of the prior art, (6) the relative skill of those in the art, (7) the predictability or unpredictability of the art, and (8) the breadth of the claims. 858 F.2d 731, 737 (Fed.Cir. 1988); *Enzo Biochem, Inc. v. Calgene, Inc.,* 188 F.3d 1362, 1374 (Fed.Cir.1999). Not all of these factors need be reviewed when determining whether a disclosure is enabling. *See Amgen, Inc. v. Chugai Pharm. Co.,* 927 F.2d 1200, 1213 (Fed.Cir. 1991) (noting that the *Wands* factors "are illustrative, not mandatory. What is relevant depends on the facts.").

Invalidity of a patent for lack of enablement is a conclusion of law based on underlying factual inquiries. *Process Control Corp. v. HydReclaim Corp.,* 190 F.3d 1350, 1359 (Fed.Cir.1999).

As construed above, the claims of the '723 patent are limited to a coating metal containing up to about 0.5% silicon. So limited, the claims of the '723 patent clearly are enabled by the specification.

Claims 1, 3, 5 and 7 of the '549 patent as construed above, on the other hand, en-

compass Type 1 aluminum. *See Enzo Biochem, Inc. v. Calgene, Inc.,* 188 F.3d at 1372 (analyzing the breath of the claims as a factor in determining enablement). Thus, those claims are invalid if Sollac proves by clear and convincing evidence that the specification does not enable the use of Type 1 aluminum coating. On summary judgment, Sollac also must show that there is no genuine issue of material fact as to nonenablement.

The Kilbane patent specification teaches one to use Type 2 aluminum instead of Type 1 in the coating bath. As discussed above in Section B, the specification clearly states that the inventors discovered that Type 1 aluminum was not satisfactory as it does not provide the uniform wetting required for achieving the claimed coating layer that is "substantially free of uncoated areas" and "tightly adherent." As mentioned above, the Kilbane specification itself acknowledges that Type 1 aluminum coating metal "does not wet well" even with a protective hydrogen atmosphere. '214 patent at 5:21–31. The specification goes on to propose a theory that silicon exceeding 0.5% by weight decreases reactivity, but states that the invention is not to be bound by the theory. *Id.* However, the specification then states: "[a]ccordingly, silicon contents in the coating metal should not exceed about 0.5% by weight." *Id.*

An inventor need not understand, or correctly state, the scientific theory on which his or her invention is based. *See Raytheon Co. v. Roper Corp.,* 724 F.2d 951, 959 (Fed.Cir.1983), *cert. denied,* 469 U.S. 835, 105 S.Ct. 127, 83 L.Ed.2d 69 (1984). Thus, AK is not bound by the theory that decreased reactivity is the cause of the poor wetting with Type 1. However, the statement in the specification that "We have discovered that (Type 1) aluminum coating metal does not wet well." is a statement of fact, not theory, and the patentee AK is bound by it.

Thus, the teachings set forth in the specifications not only provide no "plan," "invitation" or "guidance" for those of skill in the art to experiment practicing Type 1 aluminum in a coating layer, but rather explicitly provide a deterrent by stating that Type 1 aluminum should not be used. *See Enzo Biochem, Inc. v. Calgene, Inc.,* 188 F.3d 1362, 1374 (Fed.Cir.1999). The lack of a teaching to use Type 1 aluminum is an important factor in determining whether claims directed to such are enabled. See *id.* (holding that a specification that provided no guidance, direction, or working examples to practice the claimed invention was nonenabled). Here, we have not merely a lack of teaching to use Type 1 aluminum, but a teaching *not* to use Type 1 aluminum. Thus, the Kilbane patent specification itself reveals that it has not enabled the use of aluminum containing substantially more than 0.5% silicon.

### 4. *Extrinsic Evidence Is Inconclusive And Cannot Overcome The Intrinsic Evidence Of Non–Enablement*

Clearly, the intrinsic evidence reveals that an aluminum coating containing more the 0.5% silicon is not enabled by the specification. Considerable extrinsic evidence also supports the conclusion of nonenablement.

For example, the testimony of the named inventor, Kilbane supports that the quantity of experimentation necessary to practice the invention with Type 1 aluminum was high. Dr. Kilbane testified:

Q. At the time you filed the application for this ['214] patent, May 20, 1986, was Armco able to successfully coat type two aluminum on stainless?

A. Yes.

Q. And at the time the application for this ['214] patent was filed on May 20, 1986, was Armco able to successfully coat type one aluminum on stainless?

A. No.

Q. And the reason that Armco, or the problem with the type one at that time was uncoated areas; is that correct?

A. Yes.

Sollac Ex. 47 at 52. Thus, the inventor's own failed attempts to use Type 1 aluminum in the coating bath leads to the conclusion that the amount of experimentation required to adapt the practice of wetting steel from Type 2 aluminum to Type 1 Aluminum was quite high. See *Enzo Biochem*, 188 F.3d at 1372–74. AK distances itself from this testimony by filing a new declaration of Kilbane some three months after I submitted my draft Recommended Decision. In this new declaration, Kilbane states that he was not asked for an explanation of what he meant by "successfully" and that, if he had been asked, he would "have explained that what I meant was that Armco could not 'successfully' make a commercially acceptable product at that time using Type 1 aluminum coating." AK Supp. Resp. at tab 25. This "clarification," however, does not alter or contradict his testimony, which was given as a 30(b)(6) witness, that at the time of filing the Kilbane patent application Armco had problems with uncoated areas when using Type 1 aluminum. Kilbane's new testimony only states that Armco's problems with uncoated areas when using Type 1 aluminum were *at least* sufficient to prevent a commercially acceptable product from being made. Even in his new declaration, Kilbane did not testify that Armco, at the time of the application, was able to achieve a coating on stainless with Type 1 aluminum which was "substantially free of un-coated areas and exhibit good adherence" as required by the '549 claims. Thus, Kilbane's testimony evidences that the Kilbane patents are not enabled for Type 1 aluminum use, and the new declaration does not counter that.

Lack of enablement is further evidenced by the Armco Development Record dated June 27, 1988. This Development Record, dated more than two years after the filing of the first Kilbane patent application and signed by Kilbane, identified "Type 1 coating" of stainless steel as being one of the "new or unique" features of a "discovery." See Sollac Ex. 24. Clearly, the development and recognition of Type 1 coating of stainless steel as a new discovery by Plaintiffs themselves, is indicative of the undue experimentation beyond the Kilbane patent specification required to coat stainless steel with Type 1 aluminum. *See Enzo Biochem, Inc. v. Calgene, Inc.*, 188 F.3d at 1374 (analyzing the quantity of experimentation necessary to practice the claimed invention as a factor in determining enablement).

However, AK cites to several pieces of extrinsic evidence in order to show that the specification is enabling for an aluminum coating containing more the 0.5% silicon.

AK submitted evidence that Armco produced a Type 1 coated product in June 18, 1995. See AK Resp. Supp. At 56. As support, AK cites miscellaneous memorandums. See AK Exs. 34, 62; AK Supp. Ex. 26. Although these memorandums mention the use of Type 1 aluminum on stainless steel, none of them states that AK could successfully coat stainless steel with Type 1 aluminum. Furthermore, they fail to establish that a Type 1 aluminum coated product contained a coating layer that was "substantially free of uncoated areas" and "tightly adherent" to the strip as set forth in the claims. Thus, this extrinsic evi-

dence does not raise a genuine issue of fact and does not alter the consequence of the Kilbane specification's clear teaching that the specification cannot be followed to coat steel with Type 1 aluminum.

AK also cites to their expert report which stated that "[t]he Kilbane patent specification contains information sufficient to enable a person of ordinary skill in the art to practice the inventions claimed, using either Type 1 or Type 2 aluminum, without undue experimentation." See AK Supp. Resp. at tab 19 (Joint Rebuttal Expert Report of Neil Birks and George St. Pierre) at 21. The expert report further includes several suggested modifications to the disclosed process that allegedly would allow a person of ordinary skill in art to coat steel with Type 1 aluminum. *Id.* at 21–26.

The question is whether this expert report raises a genuine issue of material fact on the enablement issue. It is directly contrary to the specification which teaches that Type 1 aluminum will not work. Can an expert raise a genuine issue of fact on enablement by an opinion that one of ordinary skill in the art would have known that the process taught in the specification could have been modified to achieve results that the specification says cannot be achieved? In effect, the expert says the patent specification is wrong, and those skilled in the art would disregard it and use a different undisclosed process to enable the claimed invention.

However, it is the *specification* which must enable one of ordinary skill in the art to practice the claimed invention. 35 U.S.C. § 112, ¶ 1. *See also National Recovery,* 166 F.3d at 1195; *In re Buchner,* 929 F.2d 660, 661 (Fed.Cir.1991) ("§ 112 requires that, unless the information is well known in the art, the application itself must contain this information; it is not sufficient to provide it only through an expert's declaration"). The enablement requirement ensures that the public knowledge is enriched by the patent *specification* to a degree at least commensurate with the scope of the claims. *National Recovery,* 166 F.3d at 1196. Although the scope of that which is enabled by the disclosure in the specification can be supplemented by what would have been known to one of ordinary skill in the art without undue experimentation (*Id.*), it is patently inconsistent with the purpose of the enablement requirement to find a claim enabled by a specification which says the claimed invention will not work. How has the specification enriched the public knowledge, if it is to be disregarded? If the specification is to be disregarded because it says the claimed invention cannot be made by the disclosed process, how can it be deemed to have described the process of making the invention in "full, clear, concise and exact terms?" See 35 U.S.C. § 112, ¶ 1.

An expert's declaration must provide more than conclusions regarding enablement. See *Genentech, Inc. v. Novo Nordisk A/S,* 108 F.3d 1361, 1367 (Fed.Cir. 1997) (citing *In re Buchner,* 929 F.2d 660, 661 (Fed.Cir.1991) ("[A]n expert's opinion on the ultimate legal issue [of enablement] must be supported by something more than a conclusory statement.")). *Buchner* was a patent application appeal from the PTO involving an enablement question. The claimed invention related to a higher order digital transmission system including a divider and a phase comparator. *In re Buchner,* 929 F.2d at 660. After an enablement rejection based upon failure to describe how to make and use the divider and phase comparator without undue experimentation, the applicant offered an expert declaration stating that the divider and phase comparator "were well-known to those of ordinary skill in the art" as of

the effective filing date and providing details concerning the structure and function of these elements. *Id.* at 661. The Federal Circuit affirmed the PTO's rejection of the patent application for failure to comply with the enablement requirement. *Id.* at 662. As the basis for the decision, the Federal Circuit stated that the expert's declaration did not provide adequate support for his conclusion that the elements were well-known in the art as of the effective filing date. *Id.* at 661. The Federal Circuit went on to characterize the expert's explanation concerning the structure and function of the divider and phase comparator as really only describing "how *he* would construct the divider and phase comparator, but he did not demonstrate that such construction was well-known to those of ordinary skill in the art." *Id.* at 661 (emphasis in original). The Federal Circuit, agreeing with the PTO, arrived at this characterization by noting that if such dividers and phase comparators were so "well-known" as of the filing date, "the declarant should have [had] no trouble documenting the same." *Id.* Similarly, AK's experts' report really only describes how *they* would have modified the Kilbane process to coat with Type 1 aluminum. Completely missing from their analysis is any supporting documentation to show that those modifications would have been "well-known" in the art. Only undocumented conclusionary statements are offered.

*Buchner* involved a PTO rejection of a patent application, where the applicant had the burden to show enablement. However, *Buchner* was cited with favor by the Federal Circuit in *Genentech*, an infringement action where the accused infringer had the burden to show nonenablement by clear and convincing evidence.

*Genentech* was an appeal from a grant of a preliminary injunction. *Genentech*, 108 F.3d at 1362. The district court found that the patentee had demonstrated a likelihood of success in overcoming a lack of enablement defense. *Id.* at 1363. The patent at issue claimed a method of producing human growth hormone (hGH) by cleaving a conjugate protein. *Id.* The accused infringer argued that the specification contained insufficient detail concerning the cleaving of a conjugate protein, also referred to as cleavable fusion expression. *Id.* at 1364. In response, Genentech argued that those of skill in the art would have been able use cleavable fusion expression without undue experimentation by using the teachings of the specification along with methods and tools well known in the art. *Id.*

On appeal, the Federal Circuit not only reversed the grant of a preliminary injunction, but also instructed the district court to dismiss Genentech's infringement claim on the ground that the asserted patent was invalid. *Id.* at 1368. The Federal Circuit found that the portion of the specification relied upon by Genentech to support its patent's enablement did not describe in any detail how to make hGH using cleavable fusion expression. *Id.* at 1365. Specifically, the Federal Circuit found that the specification did not describe "a specific material to be cleaved or any reaction conditions under which cleavable fusion expression would work." *Id.* Genentech, however, had argued that "the knowledge of one skilled in the art was sufficient to provide all of the missing information. . [and] that the [specification's] disclosure of a DNA encoding hGH, when combined with prior art cleavable techniques applied to non-human proteins, would enable the practice of the claimed method." *Id.* As support, Genentech pointed to the testimony of an expert as to the knowledge of one skilled in the art, the prior art techniques, as well as the asserted patent's reference

to a British patent, which details a type of cleavable fusion expression. *Id.*

The Federal Circuit rejected Genentech's arguments, stating that "[p]atent protection is granted in return for an enabling disclosure of an invention, not for vague imitations of general ideas that may or may not be workable." *Id.* (citation omitted). "While every aspect of a generic claim certainly need not have been carried out by an inventor, or exemplified in the specification," the Federal Circuit held that "reasonable detail must be provided in order to enable members of the public to understand and carry out the invention." *Id.* Thus, "when there is no disclosure of any specific starting material or of any of the conditions under which a process can be carried out," undue experimentation is required and a failure to meet the enablement requirement occurs. *Id.* This failure, according to the Federal Circuit, "cannot be rectified by asserting that all the disclosure related to the process is within the skill of the art," since "[i]t is the specification, not the knowledge of one skilled in the art, that must supply the novel aspects of an invention in order to constitute adequate enablement." *Id.* Furthermore, the Federal Circuit reasoned that if using cleavable fusion expression "were so clearly within the skill of the art, it would have been expressly disclosed in the specification, in the usual detail." *Id.* at 1367.

As in *Genentech,* AK's assertion that one of skill in the art, using the Kilbane specification, would be able to make the claimed invention with Type 1 aluminum relies on expert testimony, containing insufficient documentation, regarding how one of skill in the art would supplement the Kilbane specification. The Kilbane specification does not provide reasonable detail enabling members of the public to understand and carry out the invention. See *Genentech,* 108 F.3d at 1366. Also, the Kilbane specification fails to disclosure the necessary conditions under which a process to coat with Type 1 aluminum can be carried out according to the '549 claims. See *id.* Thus, undue experimentation is required and, accordingly, the '549 patent fails to meet the enablement requirement. This conclusion is supported by, at least, *Wands* factors number 1 (the high quantity of experimentation necessary), 2 (the lack of direction or guidance presented), 3 (the absence of working examples with Type 1 aluminum) and 8 (the extensive breath of the '549 claims). See *In re Wands,* 858 F.2d at 737; *Enzo Biochem,* 188 F.3d at 1374.

If using Type 1 aluminum coating "were so clearly with the skill of the art, it would have been expressly disclosed in the specification." See *Genentech,* 108 F.3d at 1367. Instead, the use of Type 1 aluminum is expressly disclosed as not enabled. Therefore, it is recommended that summary judgment of invalidity for failure to satisfy the enablement requirement be granted as to Claims 1, 3, 5 and 7 the '549 patent and denied as to the '723 patent claims.

## VIII. CONCLUSIONS

### A. First Summary Judgment Motions

1. It is recommended that the limitations in Claims 1 and 10 of the Kilbane '214 patent, and Claim 1 of the Kilbane '723 patent that relate to the location and content of the protective atmosphere be construed as stated in the chart at pp. 747-48 above.

2. It is recommended that the limitations in Claims 1 and 8 of the Boston '113 patent and Claims 1, 2 and 6 of the Boston '645 patent that relate to the location and content of the protective atmosphere be construed as stated in the chart at pp. 752-53 above.

### B. *Sollac's Second Summary Judgment Motion*

It is recommended that summary judgment of noninfringement of all claims of the Kilbane '214 and '723 patents, and all claims of the Boston '113 and '645 patents be granted.

### C. *The Third Summary Judgment Motions*

1. It is recommended that Sollac's Third Summary Judgment Motion be

a. granted as to noninfringement of the claims of the Kilbane '214, '135 and '723 patents;

b. granted as to noninfringement of Claims 2, 4, 6 and 8 of the Kilbane '549 patent;

c. granted as to invalidity for lack of enablement of Claims 1, 3, 5 and 7 of the Kilbane '549 patent;

d. denied as to noninfringement of Claims 1, 3, 5 and 7 of the '549 patent; and

e. denied as to invalidity of the Kilbane '723 and '549 patents for lack of written description.

2. It is recommended that AK's Second Summary Judgment Motion for infringement be

a. granted as to Sollac's steel strip meeting the "coating metal including aluminum or aluminum alloys" limitation of Claims 1 and 5 of the Kilbane '549 patent, and the "wherein the coating metal contains up to about 10% by weight silicon" limitation of dependent Claims 3 and 7 of the '549 patent if these Claims were not invalid;

b. denied as to Sollac's process and steel strip meeting the "coating metal consisting essentially of aluminum" limitation of the Kilbane '214 and '135 patents, respectively, and as to Sollac's steel strip meeting the "less than about" or "up to" 0.5% silicon limitations of Claims 2, 4, 6 and 8 of the '549 patent; and

c. denied as to Sollac's process and steel strip meeting the "aluminum coating metal" and "including aluminum or aluminum alloy" limitations of the Kilbane '723 patent.